Ashish PATEL, Anverali Satani, Nazira Momin, Minaz Chamadia, and Vijay Lakshmi Yogi, Petitioners/Cross–Respondents,

v.

TEXAS DEPARTMENT OF LICENSING AND REGULATION, et al., Respondents/Cross-Petitioners

NO. 12–0657

Supreme Court of Texas.

Argued February 27, 2014

OPINION DELIVERED: June 26, 2015

Arif Panju, Matthew R. Miller, Wesley Hottot, Institute for Justice, Bellevue, WA, for Petitioners.

Jonathan F. Mitchell, Solicitor General, Greg W. Abbott, Attorney General, Daniel Tekstar Hodge, First Asst. Attorney General, Dustin Mark Howell, Amanda Joy Cochran- McCall, Nancy K. Juren, Office of the Attorney General, Austin, for Respondents.

James B. Harris, Richard Barrett Phillips Jr., Thompson & Knight LLP, Dallas, for Amicus Curiae Houston Belt & Terminal Railway Co., BNSF.

J. David Breemer, Sacramento, CA, for Amicus Curiae Pacific Legal Foundation.

C. W. 'Rocky' Rhodes, Houston, for Amicus Curiae South Texas College of Law.

Justice Johnson delivered the opinion of the Court, in which Justice Green, Justice Willett, Justice Lehrmann, and Justice Devine joined.

In this declaratory judgment action several individuals practicing commercial eyebrow threading and the salon owners employing them assert that, as applied to them, Texas's licensing statutes and regulations violate the Texas Constitution's due course of law provision. They claim that most of the 750 hours of training Texas requires for a license to practice commercial eyebrow threading are not related to health and safety or what threaders actually do. The State concedes that over 40% of the required hours are unrelated, but maintains that the licensing requirements are nevertheless constitutional.

The trial court and court of appeals agreed with the State. We do not. We reverse and remand to the trial court for further proceedings.

## I. Background

Eyebrow threading is a grooming practice mainly performed in South Asian and Middle Eastern communities. It involves the removal of eyebrow hair and shaping of eyebrows with cotton thread. "Threading," as it is most commonly known, is increasingly practiced in Texas on a commercial basis. Threaders tightly wind a single strand of cotton thread, form a loop in it with their fingers, tighten the loop, and then quickly brush the thread along the skin of the client, trapping unwanted hair in the loop and removing it. In 2011, commercial threading became regulated in Texas when the Legislature categorized it as a practice of "cosmetology." *See* TEX. OCC. CODE § 1602.002(a)(8) (" '[C]osmetology' means the practice of performing or offering to perform for compensation . . . . [the] remov[al] [of] superfluous hair from a person's body using depilatories, preparations, or tweezing techniques. . . ."). That categorization and its effects underlie this case.

In order to legally practice cosmetology in Texas a person must hold either a general operator's license or, in certain instances, a more limited but easier-to-obtain esthetician license. *Id.* § 1602.251(a). Licensing requirements for general operators include completing a minimum of 1,500 hours of instruction in a licensed beauty culture school and passing a state-mandated test. *Id.* § 1602.254; 16 TEX. ADMIN. CODE § 83.20(a). Requirements for an esthetician license include completing a minimum of 750 hours of instruction in an approved training program and passing a state-mandated test. TEX. OCC. CODE § 1602.257(b); 16 TEX. ADMIN. CODE § 83.20(b). Commercial eyebrow threaders must have at least an esthetician license. *See* TEX. OCC. CODE §§ 1602.002(a)(8), .257; *see also* 16 TEX. ADMIN. CODE § 83.10(36).

The Texas Department of Licensing and Regulation (TDLR or the Department), which is governed by the Texas Commission of Licensing and Regulation (the Commission), is charged with overseeing individuals and businesses that offer cosmetology services. TEX. OCC. CODE §§ 51.051, .201(a), 1602.001–.002, 1603.001–.456. The executive director of TDLR is authorized to impose administrative fines of as much as $5,000 per violation, per day. *See id.* §§ 51.302, 1602.251.

In late 2008 and early 2009, TDLR inspected Justringz—a threading business with kiosk locations in malls across Texas—and found Nazira Nasruddin Momin and Vijay Lakshmi Yogi performing eyebrow threading without licenses. TDLR issued Notices of Alleged Violations to them for the unlicensed practice of cosmetology. Minaz Chamadia was also performing threading at Justringz without a license, but she was not cited by TDLR. The administrative hearings and fines pending against Momin and Yogi have been stayed pursuant to a Rule 11 Agreement. *See* TEX. R. CIV. P. 11.

Ashish Patel and Anverali Satani own threading salons named Perfect Browz. The State has not taken any administrative action related to Perfect Browz. Satani is the sole owner of another threading business, Browz and Henna. TDLR inspected and investigated Browz and Henna on the basis of complaints filed against it. Although Satani received two warnings for Browz and Henna employing unlicensed threaders, the Department did not issue a Notice of Alleged Violation. Like the proceedings against Momin and Yogi, prosecution of Browz and Henna has been stayed by agreement of the parties.

In December 2009, Patel, Satani, Momin, Chamadia, and Yogi (collectively, the Threaders) brought suit against TDLR, its executive director, the Commission, and the Commission's members (collectively, the State) pursuant to the Uniform Declaratory Judgments Act (UDJA) seeking declaratory and injunctive relief. *See* TEX. CIV. PRAC. & REM. CODE §§ 37.001–.004, .006, .010. The Threaders alleged that the cosmetology statutes and administrative rules issued pursuant to those statutes (collectively, the cosmetology scheme) were unreasonable as applied to eyebrow threading and violated their constitutional right "to earn an honest living in the occupation of one's choice free from unreasonable governmental interference." They specifically sought declaratory judgment that, as applied to them, the cosmetology statutes and associated regulations violate the privileges and immunities and due course guarantees of Article I, § 19 of the Texas Constitution. They also sought a permanent injunction barring the State from enforcing the cosmetology scheme relating to the commercial practice of eyebrow threading against them.

The Threaders moved for summary judgment, contending that "application of the state's cosmetology laws and administrative rules to the commercial practice of eyebrow threading is unconstitutional because it places senseless burdens on eyebrow threaders and threading businesses without any actual benefit to public health and safety." The motion urged that the State could not constitutionally regulate the commercial practice of eyebrow threading as conventional cosmetology unless it could establish a real and substantial relationship between the statutes and regulations and the public's health and safety, and the State could not meet this standard. The State filed both a plea to the jurisdiction and a traditional motion for summary judgment. By its plea to the jurisdiction, the State challenged the Threaders' standing, contending that their claims were barred by sovereign immunity

and the redundant remedies doctrine. In its motion for summary judgment, the State asserted that the Threaders failed to show that Texas's regulation of the practice of eyebrow threading deprived the Threaders of any substantive due process right protected by Article I, § 19 or to plead a privileges and immunities claim different from their substantive due process claim.

The district court denied the State's plea to the jurisdiction, granted its motion for summary judgment, and denied the Threaders' motion for summary judgment. Both parties appealed.

The court of appeals affirmed. *Patel v. Tex. Dep't of Licensing & Regulation,* 464 S.W.3d 369 (Tex.App.–Austin 2012). As to the State's jurisdictional issues, the court held that the Threaders' suit was not barred by sovereign immunity or the redundant remedies doctrine, the Threaders had standing, and their claims were ripe. *Id.* at 378–79. As to the merits, the appeals court concluded that under either the real and substantial or rational basis test, the State established that the challenged cosmetology scheme, as applied to the Threaders, does not violate Article I, § 19. *Id.* at 380.

In this Court the Threaders argue that (1) the real and substantial test governs substantive due process challenges to statutes and regulations affecting economic interests when the challenges are brought under Article I, § 19 of the Texas Constitution; (2) the cosmetology statutes and rules are unconstitutional as applied to the Threaders because they have no real and substantial connection to a legitimate governmental objective; and (3) even if rational basis review is the correct constitutional

test, under the appropriate test, the statutes and regulations are unconstitutional as applied to the Threaders.

The State contends that (1) it is immune from declaratory judgment claims raising constitutional challenges to statutes; (2) the Threaders' claims lack both justiciability and ripeness; (3) the claims are barred by the redundant remedies doctrine; (4) the business owners lack standing; (5) there is no real difference between the "real and substantial" and "rational relationship" tests for due process concerns; and (6) threading raises public health concerns, implicating valid governmental concerns, thus the challenged licensing statutes and regulations that address these concerns comport with the substantive due process requirements regardless of which test is applied.[1]

We address the arguments in turn, necessarily beginning with the jurisdictional issues the State raises. *See Rusk State Hosp. v. Black,* 392 S.W.3d 88, 95 (Tex. 2012) (noting that if a court does not have jurisdiction, its opinion addressing any issues other than jurisdiction is advisory).

## II. Jurisdiction

### A. Sovereign Immunity

Sovereign immunity implicates a trial court's jurisdiction, and, when it applies, precludes suit against a governmental entity. *Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 224 (Tex. 2004); *Tex. Natural Res. Conservation Comm'n v. IT–Davy,* 74 S.W.3d 849, 853 (Tex.2002). The State acknowledges this Court's decisions to the effect that sovereign immunity is inapplicable when a suit challenges the constitutionality of a statute

1. *Amicus curiae* briefs have been submitted by the Pacific Legal Foundation (in support of the Threaders); Houston Belt & Terminal Railway Co., BNSF Railway Co., and Union Pacific Railway Co.; and South Texas College of Law 2014 State Constitutional Law Class (not submitted in support of either party).

and seeks only equitable relief. *See City of Elsa v. M.A.L.*, 226 S.W.3d 390, 392 (Tex.2007) (concluding "that the appeals court did not err by refusing to dismiss the plaintiffs' claims [against the city] for injunctive relief on alleged constitutional violations"); *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 149 (Tex.1995) (determining that a plaintiff whose constitutional rights have been violated may sue the State for equitable relief). But referencing *Texas Department of Insurance v. Reconveyance Services, Inc.*, 306 S.W.3d 256, 258–59 (Tex.2010), and *City of El Paso v. Heinrich*, 284 S.W.3d 366, 370–72 (Tex. 2009), the State argues that our more recent decisions indicate that we may be departing from that rule. We are not.

■ In *Heinrich* we decided that sovereign immunity does not prohibit suits brought to require state officials to comply with statutory or constitutional provisions. 284 S.W.3d at 372. But, to fall within this "ultra vires exception," a suit must allege that a state official acted without legal authority or failed to perform a purely ministerial act, rather than attack the officer's exercise of discretion. *Id.* The governmental entities themselves remain immune from suit, though, because unlawful acts of officials are not acts of the State. *Id.* at 372–73. Thus, we concluded that suits complaining of ultra vires actions may not be brought against a governmental unit, but must be brought against the allegedly responsible government actor in his official capacity. *Id.* at 373.

We reconfirmed the point in *Reconveyance*, where we held that the trial court lacked jurisdiction to hear a suit against the Texas Department of Insurance. 306 S.W.3d at 258–59. We concluded that the claims were substantively ultra vires claims because the pleadings alleged the Department of Insurance had acted beyond its statutory authority. *Id.* That be-

ing so, the claims should have been brought against the appropriate state officials in their official capacities. *Id.*

■ In this case, the Threaders did not plead that the Department and Commission officials exceeded the authority granted to them; rather, they challenged the constitutionality of the cosmetology statutes and regulations on which the officials based their actions. The State proposes that an official can act ultra vires either by acting inconsistently with a constitutional statute or by acting consistently with an unconstitutional one. It urges that the Threaders' claims fall within the "acting consistently with an unconstitutional statute" category. But the premise underlying the ultra vires exception is that the State is not responsible for unlawful acts of officials. *Heinrich*, 284 S.W.3d at 372. The State's proposal would effectively immunize it from suits claiming a statute is unconstitutional—an illogical extension of that underlying premise.

Contrary to the State's position, *Heinrich* and *Reconveyance* do not represent a departure from the rule that sovereign immunity is inapplicable in a suit against a governmental entity that challenges the constitutionality of a statute and seeks only equitable relief. *See id.* at 373 n.6. To the contrary, in *Heinrich* we clarified that "[f]or claims challenging the validity of . . . statutes . . . the Declaratory Judgment Act requires that the relevant governmental entities be made parties, and thereby waives immunity." *Id.* (citing *Tex. Educ. Agency v. Leeper*, 893 S.W.2d 432, 446 (Tex.1994)). And we have reiterated the principle more recently. *See Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 621–22 & n.3 (Tex.2011) (restating that state entities can be—and in some instances such as when the constitutionality of a statute is at issue, must be—parties to challenges under the UDJA); *Tex. Lottery Comm'n v.*

*First State Bank of DeQueen,* 325 S.W.3d 628, 634 (Tex.2010) (holding that allegations against the lottery commissioner were not ultra vires allegations because the claim challenged a statute and was not one involving a government officer's action or inaction). Accordingly, because the Threaders challenge the validity of the cosmetology statutes and regulations, rather than complaining that officials illegally acted or failed to act, the ultra vires exception does not apply. The Department and the Commission are not immune from the Threaders' suit.

## B. Viability

 Next, the State contends that the officials are immune from suit because the Threaders had to prove their claims in order to survive a plea to the jurisdiction. *See Heinrich,* 284 S.W.3d at 372 ("To fall within this *ultra vires* exception, a suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act."). The State argues that because the trial court granted summary judgment to the State on the merits, the Threaders did not prove a valid claim, rendering their pleadings insufficient to give the trial court jurisdiction. The State relies on *Andrade v. NAACP of Austin,* in which we held that the Secretary of State was immune from suit because the constitutional claims against her were non-viable. 345 S.W.3d 1, 6, 11–12, 18 (Tex. 2011). But, our conclusion there simply followed a line of decisions in which we held that claims were not viable due to basic pleading defects. *Id.* at 13–14. *Andrade* stands for the unremarkable principle that claims against state officials—like all claims—must be properly pleaded in order to be maintained, not that such claims must be viable on their merits to negate immunity. *Id.*

Because the Threaders' pleadings presented a viable claim, they were sufficient.

## C. Justiciability

Next, the State employs the doctrines of standing, ripeness, and redundant remedies to argue that the courts below, and this Court, lack jurisdiction because the claims of the Threaders are not justiciable. We consider each doctrine in turn.

### 1. Standing

 The standing doctrine identifies suits appropriate for judicial resolution. *Brown v. Todd,* 53 S.W.3d 297, 305 (Tex. 2001). Standing assures there is a real controversy between the parties that will be determined by the judicial declaration sought. *Id.* (quoting *Tex. Workers' Comp. Comm'n v. Garcia,* 893 S.W.2d 504, 517–18 (Tex.1995)). "[T]o challenge a statute, a plaintiff must [both] suffer some actual or threatened restriction under the statute" and "contend that the statute unconstitutionally restricts the plaintiff's rights." *Garcia,* 893 S.W.2d at 518. The State argues that Patel and Satani—whose claims are based solely on their status as threading salon owners—lack standing because they fail both prongs of the standing test.

 Generally, courts must analyze the standing of each individual plaintiff to bring each individual claim he or she alleges. *Heckman v. Williamson Cnty.,* 369 S.W.3d 137, 152 (Tex.2012). However, "where there are multiple plaintiffs in a case, who seek injunctive or declaratory relief (or both), who sue individually, and who all seek the same relief[,] ... the court need not analyze the standing of more than one plaintiff—so long as that plaintiff has standing to pursue as much or more relief than any of the other plaintiffs." *Id.* at 152 n.64. The reasoning is

fairly simple: if one plaintiff prevails on the merits, the same prospective relief will issue regardless of the standing of the other plaintiffs. *Id.*; *see also Andrade,* 345 S.W.3d at 6 ("Because the voters seek only declaratory and injunctive relief, and because each voter seeks the same relief, only one plaintiff with standing is required.").

Here, Momin and Yogi, the threaders who received Notices of Alleged Violation, have standing, and the State does not contend otherwise. First, they have suffered some actual restriction under the challenged statute because TDLR initiated regulatory proceedings against each of them pursuant to their alleged violations of the Texas cosmetology statutes and regulations. And second, they are contending that the statute unconstitutionally restricts their rights to practice eyebrow threading. Accordingly, because Momin and Yogi have standing, we need not analyze the standing of Patel and Satani.

 The State also argues that because the Threaders seek attorneys' fees, the relief ultimately awarded will not necessarily be identical. But standing is determined at the beginning of a case, and whether the relief ultimately granted is the same for all parties is not determinative of the question. Here, Momin and Yogi have standing to seek relief and that is all we need to determine. *See Andrade,* 345 S.W.3d at 6–11; *Barshop v. Medina Cnty. Underground Water Conservation Dist.,* 925 S.W.2d 618, 626–27 (Tex.1996); *Garcia,* 893 S.W.2d at 518–19.

### 2. Ripeness

 The State next argues that the claims brought by Patel, Satani, and Chamadia are not ripe because Patel, Satani, and Chamadia have not faced administrative enforcement. We disagree.

 Under the ripeness doctrine, courts must "consider whether, *at the time a lawsuit is filed,* the facts are sufficiently developed 'so that an injury has occurred or is likely to occur, rather than being contingent or remote.'" *Waco Indep. Sch. Dist. v. Gibson,* 22 S.W.3d 849, 851–52 (Tex.2000) (emphasis in original) (citations omitted). Thus, the ripeness analysis focuses on whether a case involves uncertain or contingent future events that may not occur as anticipated or may not occur at all. *Id.* at 852.

Here, although Patel, Satani, and Chamadia have not yet faced administrative enforcement, the threat of harm is more than conjectural, hypothetical, or remote. Satani's business, Browz and Henna, has received two warnings for employing unlicensed threaders, and he has been referred to TDLR's legal department for enforcement. Patel and Satani risk $5,000 in penalties daily for employing unlicensed threaders. Tex. Occ. Code §§ 51.302(a), 1602.403(c)(1). And Chamadia works at the same threading salon where Momin and Yogi were cited. Because at the time the lawsuit was filed Chamadia was performing threading services without a cosmetology license and Patel and Satani were employing threaders who did not have cosmetology licenses, these individuals were subject to a real threat of likely civil and criminal proceedings, as well as administrative proceedings that could result in penalties and sanctions. *See Mitz v. Tex. State Bd. of Veterinary Med. Exam'rs,* 278 S.W.3d 17, 26 (Tex.App.–Austin 2008, pet. dism'd by agr.) (holding that a constitutional challenge to a state-licensing law is ripe when enforcement of the law is "sufficiently likely" to occur). Therefore, their claims are ripe.

### 3. Redundant Remedies

 The State also seeks to dismiss the claims of the Threaders who have re-

ceived citations based on the redundant remedies doctrine. Under the redundant remedies doctrine, courts will not entertain an action brought under the UDJA when the same claim could be pursued through different channels. *See, e.g., Tex. Mun. Power Agency v. Pub. Util. Comm'n,* 253 S.W.3d 184, 200 (Tex.2007). The focus of the doctrine is on the initiation of the case, that is, whether the Legislature created a statutory waiver of sovereign immunity that permits the parties to raise their claims through some avenue other than the UDJA. *See, e.g., Aaron Rents, Inc. v. Travis Cent. Appraisal Dist.,* 212 S.W.3d 665, 669 (Tex.App.–Austin 2006, no pet.) (en banc) ("When a statute provides an avenue for attacking an agency order, a declaratory judgment action will not lie to provide redundant remedies."); *see also Alamo Express, Inc. v. Union City Transfer,* 158 Tex. 234, 309 S.W.2d 815, 827 (1958) (holding "an action for declaratory judgment does not lie" in a suit that asserts a "direct attack upon the [agency's] order by appeal").

The State maintains that the Legislature has provided Momin and Yogi two alternative avenues under the Administrative Procedures Act (APA): (1) a suit for judicial review alleging that the administrative decision was "in violation of a constitutional or statutory provision," TEX. GOV'T CODE § 2001.174(2)(A); or (2) a suit for a pre-enforcement declaratory judgment alleging "that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff." *Id.* § 2001.038(a). The State contends that because either of those APA provisions permits Yogi and Momin to file suits that would redress their alleged injuries, they may not pursue relief under the UDJA.

We disagree with the State's assertion that a favorable decision under Section 2001.174 of the APA—authorizing courts to review administrative decisions—would obviate the need for the relief the Threaders seek. *See id.* § 2001.174 (allowing state courts to reverse or remand existing agency orders, but not enjoin future ones). The available remedies on appeal from an administrative finding are limited to reversal of the particular orders at issue. *Id.* But the Threaders seek more than a reversal of the citations issued to Momin and Yogi. They seek prospective injunctive relief against future agency orders based on the statutes and regulations. Accordingly, because the declaration sought goes beyond reversal of an agency order, Section 2001.174 of the APA does not provide a redundant remedy.

■■■ The State's contention that Section 2001.038 of the APA creates an avenue for pre-enforcement declaratory judgment that an agency rule is invalid and would redress the Threaders' alleged injuries is likewise unavailing. When a plaintiff files a proceeding that only challenges the validity of an administrative rule, the parties are bound by the APA and may not seek relief under the UDJA because such relief would be redundant. *See Leeper,* 893 S.W.2d at 443–44. The APA defines a rule as:

(A) ... a state agency statement of general applicability that:

 (i) implements, interprets, or prescribes law or policy; or

 (ii) describes the procedure or practice requirements of a state agency;

(B) includ[ing] the amendment or repeal of a prior rule; and

(C) ... not includ[ing] a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures.

Tex. Gov't Code § 2001.003(6). Here the Threaders challenge both rules as defined by the APA and statutes. Because the Threaders cannot attack the constitutionality of the statutes pursuant to Section 2001.038 of the APA, their UDJA claims are not barred by the redundant remedies doctrine.

Having concluded that the lower courts had jurisdiction, we turn to the merits.

## III. Constitutionality of the Statutes and Regulations

### A. Due Course of Law

Article I, § 19 of the Texas Constitution provides that

> No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.

Tex. Const. art. I, § 19.

We have at least twice noted that Texas courts have not been entirely consistent in the standard of review applied when economic legislation is challenged under Section 19's substantive due course of law protections. *See Trinity River Auth. v. URS Consultants, Inc.-Tex.*, 889 S.W.2d 259, 263 & n.5 (Tex.1994); *Garcia*, 893 S.W.2d at 525. The Threaders go beyond those two cases. They assert that courts considering as-applied substantive due process challenges under Section 19 have mixed and matched three different standards of review through the years. They label those standards as: (1) real and substantial, (2) rational basis including consideration of evidence, and (3) no-evidence rational basis.

The Threaders argue that the first referenced standard—"real and substantial"—is exemplified by cases such as *State v. Richards*, 157 Tex. 166, 301 S.W.2d 597 (1957); *Aladdin's Castle, Inc. v. City of Mesquite*, 713 F.2d 137, 138 n.2 (5th Cir. 1983) (applying Texas law); *Satterfield v. Crown Cork & Seal Co.*, 268 S.W.3d 190, 215 (Tex.App.–Austin 2008, no pet.); *Texas State Board of Pharmacy v. Gibson's Discount Center, Inc.*, 541 S.W.2d 884, 887–89 (Tex.Civ.App.–Austin 1976, writ ref'd n.r.e.); *City of Houston v. Johnny Frank's Auto Parts Co.*, 480 S.W.2d 774, 779 (Tex. Civ.App.–Houston [14th Dist.] 1972, writ ref'd n.r.e.); *Humble Oil & Refining Co. v. City of Georgetown*, 428 S.W.2d 405, 407–08 (Tex.Civ.App.–Austin 1968, no writ); and *City of Coleman v. Rhone*, 222 S.W.2d 646, 649 (Tex.Civ.App.–Eastland 1949, writ ref'd). They interpret this standard as one in which the reviewing court considers whether (1) the legislative purpose for the statute is a proper one, (2) there is a real and substantial connection between that purpose and the language of the statute as the statute functions in practice, and (3) the statute works an excessive or undue burden on the person challenging the statute in relation to the statutory purpose. They argue that the distinguishing characteristic of cases employing the standard is that the courts using it consider evidence concerning both the government's purpose for a law and the law's real-world impact on the challenging party.

The Threaders recognize that the real and substantial test affords less deference to legislative judgments than does the federal rational basis standard. But they point to *In the Interest of J.W.T.*, 872 S.W.2d 189, 197–98 & n.23 (Tex.1994); *Davenport v. Garcia*, 834 S.W.2d 4, 10 (Tex.1992); and *LeCroy v. Hanlon*, 713 S.W.2d 335, 338–41 (Tex.1986), as examples of cases in which this Court specifically said or implied that certain language in the Texas Constitution affords more protection than comparable text in the federal Constitution. They also reference the United States Supreme Court as having noted in *City of Mesquite v. Aladdin's*

*Castle, Inc.,* 455 U.S. 283, 293, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982), that Article I, § 19 of the Texas Constitution might afford more protections than does the Fourteenth Amendment. They claim that twenty other states utilize the "real and substantial" test.[2]

The Threaders present the second standard—"rational basis including consideration of evidence"—as being exemplified by cases such as *City of San Antonio v. TPLP Office Park Properties, L.P.,* 218 S.W.3d 60, 65–66 (Tex.2007); *Garcia,* 893 S.W.2d at 525–26; *Limon v. State,* 947 S.W.2d 620, 627–29 (Tex.App.–Austin 1997, no writ); and *Martin v. Wholesome Dairy, Inc.,* 437 S.W.2d 586, 590–600 (Tex.Civ. App.–Austin 1969, writ ref'd n.r.e.). Courts applying this test, the Threaders

**2.** The Threaders cite the following to support their position: *Khan v. State Bd. of Auctioneer Exam'rs,* 577 Pa. 166, 842 A.2d 936, 946–48 & n.7 (2004) (upholding auctioneer regulations designed to prevent fraud); *OMYA, Inc. v. Town of Middlebury,* 171 Vt. 532, 758 A.2d 777, 780 (2000) (upholding commercial traffic limits that reduced congestion, pollution, and property damage); *Peppies Courtesy Cab Co. v. City of Kenosha,* 165 Wis.2d 397, 475 N.W.2d 156, 158–59 (1991) (striking down taxicab dress code because it lacked a substantial relation to improving city's public image); *Katz v. S.D. State Bd. of Med. & Osteopathic Exam'rs,* 432 N.W.2d 274, 278–79 & n.6 (S.D.1988) (upholding medical-practice regulations designed to prevent malpractice and fraud); *Louis Finocchiaro, Inc. v. Neb. Liquor Control Comm'n,* 217 Neb. 487, 351 N.W.2d 701, 704–06 (1984) (striking down liquor wholesale price controls because they lacked any substantial relationship to public welfare); *Myrick v. Bd. of Pierce Cnty. Comm'rs,* 102 Wash.2d 698, 677 P.2d 140, 143–47 (1984) (en banc), *amended by* 102 Wash.2d 698, 687 P.2d 1152 (striking down most provisions of massage parlor regulations); *Red River Constr. Co. v. City of Norman,* 624 P.2d 1064, 1067 (Okla.1981) (striking down municipal ordinance prohibiting sand trucks from using certain streets because the ordinance actually increased traffic and the risk of accidents); *Rockdale Cnty. v. Mitchell's Used Auto Parts, Inc.,* 243 Ga. 465, 254 S.E.2d 846, 847 (1979) (reversing lower court ruling that zoning requirements were facially unconstitutional, but remanding to allow the plaintiff to show that the requirements had no real and substantial relationship to public health and safety); *In re Fla. Bar,* 349 So.2d 630, 634–35 (Fla.1977) (per curiam) (rejecting maximum contingency-fee schedule that failed to meaningfully address problem of excessive fees); *McAvoy v. H.B. Sherman Co.,* 401 Mich. 419, 258 N.W.2d 414, 422, 427–29 (1977) (upholding law requiring employers to pay 70% of workers' compensation award while appeal of the award was pending); *Dep't for Natural Res. & Envtl. Prot. v. No. 8 Ltd. of Va.,* 528 S.W.2d 684, 686–87 (Ky.1975) (striking down law that conditioned the grant of strip-mining permits on obtaining the surface owner's consent because it was ineffective as an environmental-protection measure); *Hand v. H & R Block, Inc.,* 258 Ark. 774, 528 S.W.2d 916, 923 (1975) (striking down minimum price for franchise agreements because it bore no relation to public health and safety); *Leetham v. McGinn,* 524 P.2d 323, 325 (Utah 1974) (striking down law restricting cosmetologists to women's hair); *Md. State Bd. of Barber Exam'rs v. Kuhn,* 270 Md. 496, 312 A.2d 216, 224–25 (1973) (same); *Colo ex rel. Orcutt v. Instantwhip Denver, Inc.,* 490 P.2d 940, 943–45 (Colo.1971) (striking down ban on so-called "filled milk" products because the ban bore no relationship to protecting public safety or preventing fraud); *Brennan v. Ill. Racing Bd.,* 42 Ill.2d 352, 247 N.E.2d 881, 882–84 (1969) (striking down regulation that conditioned a horse trainer's license on his horses' drug-testing results); *Coffee–Rich, Inc. v. Comm'r of Pub. Health,* 348 Mass. 414, 204 N.E.2d 281, 286–89 (1965) (striking down law banning the sale of imitation coffee cream because the law did not prevent fraud or market confusion); *Zale–Las Vegas, Inc. v. Bulova Watch Co.,* 80 Nev. 483, 396 P.2d 683, 691–93 (1964) (striking down law that bound third parties to noncompete provisions in private contracts because the law did not promote competition); *Berry v. Koehler,* 84 Idaho 170, 369 P.2d 1010, 1014–15 (1961) (upholding regulation of dental prosthetics as licensed dentistry because licensure meaningfully protected the public); *Christian v. La Forge,* 194 Or. 450, 242 P.2d 797, 804 (1952) (en banc) (striking down fixed barbering prices because they only benefitted barbers, not the public).

posit, lean heavily on the federal rational basis test and often weigh evidence—including expert testimony—to determine the purpose of a law and whether the law enacted to effect that purpose is reasonable.

The Threaders reference the third standard as "no evidence rational basis," which they say is embodied in cases such as *Barshop*, 925 S.W.2d at 625, 632–33; *Garcia v. Kubosh*, 377 S.W.3d 89, 98–100 (Tex. App.–Houston [1st Dist.] 2012, no pet.); *Lens Express v. Ewald*, 907 S.W.2d 64 (Tex.App.–Austin 1995, no writ); and *Texas Optometry Board v. Lee Vision Center, Inc.*, 515 S.W.2d 380, 385–86 (Tex.Civ. App.–Eastland 1974, writ ref'd n.r.e.). Under the no-evidence version of the rational basis test, they argue, economic regulations do not violate Section 19 if they have any conceivable justification in a legitimate state interest, regardless of whether the justification is advanced by the government or "invented" by the reviewing court, and evidence "seldom" matters.

The Threaders say both the "real and substantial" and "rational basis including consideration of evidence" standards have two prongs, with the first being the primary difference between them. The first prong of the real and substantial standard, they maintain, is whether the challenged statute or regulation has a real and substantial connection to a legitimate governmental objective. They contrast that test with the rational basis including consideration of evidence standard, which they argue is more lenient and favorable toward the government because it asks only whether a statute or regulation arguably *could* bear some rational relationship to a legitimate governmental objective. They further maintain that for both standards the second prong is whether, on balance, the challenged statute or rule imposes an arbitrary or unduly harsh burden on the challenger in light of the government's objective.

In light of the parties' contentions, we first briefly review the history of the due course of law language in Article I, § 19.

### B. Development of the Standard

The Declaration of Rights of the 1836 Republic of Texas Constitution included three separate rights guaranteeing "due course of law" or the "due course of the law of the land": (1) the sixth, which (among other protections) prevented an accused in a criminal proceeding from being "deprived of life, liberty, or property, but by due course of law"; (2) the eleventh, which provided that an injured person "shall have remedy by due course of law"; and (3) the seventh, which provided that "[n]o citizen shall be deprived of privileges, outlawed, exiled, or in any manner disenfranchised, except by due course of the law of the land." REP. OF TEX. CONST. OF 1836, Declaration of Rights 6–7, 11, *reprinted in* 1 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 1083 (Austin, Gammel Book Co. 1898).

In 1845, a group of delegates met to draft and propose Texas's first state constitution. The committee responsible for drafting the Bill of Rights proposed including two due course of law clauses—not the three clauses in the Declaration of Rights of the 1836 Republic of Texas Constitution. Comm. on Bill of Rights & Gen. Provisions, *Journals of the Convention, Assembled at the City of Austin on the Fourth of July, 1845, for the Purpose of Framing a Constitution for the State of Texas*, assembled July 11, 1845, at 34 (Austin, Mine & Cruger 1845), *available at* http://tarlton. law.utexas.edu/constitutions/texas1845/ journals. One of the suggested clauses protected an injured party's right to have "remedy by due course of law." *Id.* The other clause incorporated the criminal due

course of law protections from Section 6 of the Republic's Declaration of Rights into a composite due course guarantee: "No citizen of this state shall be deprived of life, liberty, property, or privileges, outlawed, exiled, or in any manner disenfranchised, except by due course of the law of the land." *Id.* Thus, the committee's proposal added "life, liberty, property" to the existing due course of law guarantee, while removing the same phrase from the protections for the criminally accused. *Id.* The proposal also added "of this state" after the word "citizen." The proposal was ratified as Article I, § 16 of the Texas Constitution of 1845.

The language in the Due Course of Law Clause was not changed in the Texas Constitutions adopted in 1861, 1866, and 1869. *See* TEX. CONST. OF 1861, art. I, § 16; TEX. CONST. OF 1866, art. I, § 16; TEX. CONST. OF 1869, art. I, § 16. But the Constitutional Convention of 1875 reexamined the clause and proposed changing it to its current language. Comm. on Bill of Rights, *Journal of the Constitutional Convention of the State of Texas, Begun and Held at the City of Austin, September 6th, 1875, assembled* Oct. 2, 1875, at 274 (Galveston, News Office 1875), *available at* http://tarlton.law.utexas.edu/constitutions/texas 1876/journals. The proposals were adopted, resulting in the clause reading as it now does. *See* TEX. CONST. art. I, § 19.

In 1873, two years before the convention that proposed the 1875 Texas Constitution, the United States Supreme Court interpreted the phrase "privileges or immunities" in the United States Constitution in the *Slaughter–House Cases,* 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1873). There, several butchers challenged a Louisiana statute granting a single slaughtering com-

pany a monopoly on the butchering of animals in New Orleans. *Id.* at 38–39. The statute was challenged under the Thirteenth and Fourteenth Amendments to the federal Constitution. *Id.* at 58–59. In rejecting the butchers' claims, the Court discerned a distinction in the text of the Fourteenth Amendment between the "privileges and immunities of citizens of the United States" and those of "citizens of the several states," and concluded that the Fourteenth Amendment protected only privileges and immunities which owed their existence to the federal government. *Id.* at 74, 78–79. It was the obligation of the states, according to the Supreme Court, to protect "privileges or immunities" founded in state citizenship, including even such fundamental rights as the right to acquire and possess property and to pursue and obtain happiness and safety. *Id.* at 74–78. Thus, discussions preceding proposal and adoption of the 1875 Texas Constitution were held against the backdrop of recent Supreme Court mandates placing guardianship of non-federal rights of individuals squarely in the hands of the states. *See* DEBATES IN THE TEXAS CONSTITUTIONAL CONVENTION OF 1875, 292 (Seth S. McKay ed., Univ. of Tex. 1930).

Ratification of the Fourteenth Amendment to the United States Constitution in 1868 seemed to hasten development of substantive due process jurisprudence. *See* THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 354–56 (1868). The view in Texas was the same, as exemplified by cases such as *Milliken v. City Council of Weatherford,* 54 Tex. 388 (1881).[3] There the Court addressed a

---

**3.** As to procedural due process relationships between the Fourteenth Amendment and Article I, § 19, see *City of Sherman v. Henry,* 928

S.W.2d 464, 472–73 & n.5 (Tex.1996) (citing *Univ. of Tex. Med. Sch. v. Than,* 901 S.W.2d 926, 929 (Tex.1995)), and *Mellinger v. City of*

claim by Weatherford's mayor that he had been improperly removed from office for violating a city ordinance that barred renting rooms to prostitutes without respect to whether the rooms were used for prostitution. *Id.* at 393. The Court concluded that the city could not prohibit prostitutes as a class from renting rooms because such action would be "unreasonable and in contravention of common right." *Id.* at 394. Although the Court did not mention "due course" or "due process" of law, its supporting citations included Article I, § 19. *See id.* And in *Houston & Texas Central Railway Co. v. City of Dallas*, 98 Tex. 396, 84 S.W. 648 (1905), the Court considered the constitutionality of a municipal ordinance governing railroad crossing grades. The Court explained that

it may often become necessary for courts, having proper regard to the constitutional safeguard ..., to inquire as to the existence of the facts upon which a given exercise of the [police] power rests, and into the manner of its exercise, and if there has been an invasion of property rights under the guise of this power, without justifying occasion, or in an unreasonable, arbitrary, and oppressive way, to give to the injured party that protection which the Constitution secures.

*Id.* at 653. In accord with decisions from the United States Supreme Court, this Court rejected the city's contention that a legislative judgment was conclusive. *Id.* at 653–54. The Court determined that the lower courts erred by upholding the ordinance without providing the railroad an opportunity to present evidence regarding the unreasonableness of the ordinance. *Id.*

Texas judicial decisions in the nineteenth and early twentieth century indicated that the Texas Due Course of Law

Clause and the federal Due Process Clause were nearly, if not exactly, coextensive. Such decisions generally tracked the thinking expressed by the Court in *Mellinger v. City of Houston*, 68 Tex. 37, 3 S.W. 249, 252–53 (1887), where the Court held that Article I, § 19 was not violated under the facts of that case because of the United States Supreme Court's interpretation of the Fourteenth Amendment in a similar case. During this period, Texas courts frequently addressed whether a legislative enactment was a proper exercise of the governmental unit's police power, examining justifications for the enactment and typically relying on decisions from the United States Supreme Court as guidance. *See, e.g., Mabee v. McDonald*, 107 Tex. 139, 175 S.W. 676, 680 (1915) (" 'Due process of law,' as used in the fourteenth amendment, and 'due course of the law of the land,' as used in Article I, § 19, of the Constitution of Texas, ... according to the great weight of authority, are, in nearly if not all respects, practically synonymous."), *rev'd on other grounds*, 243 U.S. 90, 92, 37 S.Ct. 343, 61 L.Ed. 608 (1917) (holding that federal Due Process Clause was violated); *St. Louis Sw. Ry. Co. of Tex. v. Griffin*, 106 Tex. 477, 171 S.W. 703, 704–07 (1914) (holding statute impairing corporation's right to discharge employees at will violated liberty of contract protected by both federal and state Constitutions); *Bruhl v. State*, 111 Tex.Crim. 233, 13 S.W.2d 93, 94–95 (1928) (statute prohibiting non-optometrist merchant from assisting a customer in purchase of eyeglasses violated both Article I, § 19 and the Fourteenth Amendment). Occasionally, Texas courts mentioned that a proper review involved examining the enactment for a "real or substantial" relationship to the government's police power interest in public

*Houston*, 68 Tex. 37, 3 S.W. 249, 252–53 (1887).

health, morals, or safety—a standard consistent with decisions of the United States Supreme Court. *See, e.g., Ex parte Flake,* 67 Tex.Crim. 216, 149 S.W. 146, 148–50 (1911) (quoting *Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887)).

As to federal due process standards, this period before 1935 is sometimes referred to as the *"Lochner* period" in reference to the United States Supreme Court's decision in *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). There, the Court considered a statute regulating the number of hours that bakers could work, enacted ostensibly for the purpose of protecting the health of bakers. *Id.* at 45–47, 58, 25 S.Ct. 539. The Court determined that the legislatively declared purpose for an enactment could be disregarded by a court reviewing challenges to the statute and that

> [t]he purpose of a statute must be determined from the natural and legal effect of the language employed; and whether it is or is not repugnant to the Constitution of the United States must be determined from the natural effect of such statutes when put into operation, and not from their proclaimed purpose....
>
> ...[T]his section of the statute ... has no such direct relation to, and no such substantial effect upon, the health of the employee, as to justify us in regarding the section as really a health law.

*Id.* at 64, 25 S.Ct. 539. The Court held that the law was intended only "to regulate the hours of labor between the master and his employees" despite the legislature's stated purpose of concern for the health of bakers. *Id.* Because the Fourteenth Amendment did not permit such a regulation without a legitimate health and safety justification, the Court struck down the law. Justice Holmes, in dissent, advanced

a much more deferential standard of review:

> We [have] said that the power of the courts to review legislative action in respect of a matter affecting the general welfare exists *only* when that which the legislature has done comes within the rule that, if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law.... *If there be doubt as to the validity of the statute, that doubt must therefore be resolved in favor of its validity, and the courts must keep their hands off, leaving the legislature to meet the responsibility for unwise legislation. If the end which the legislature seeks to accomplish be one to which its power extends, and if the means employed to that end, although not the wisest or best, are yet not plainly and palpably unauthorized by law, then the court cannot interfere.*

*Id.* at 68, 25 S.Ct. 539 (Holmes, J., dissenting) (emphasis added) (internal quotation marks omitted).

The Court remained within the bounds charted by *Lochner* for several years. *See, e.g., Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *N.Y. Life Ins. Co. v. Dodge,* 246 U.S. 357, 38 S.Ct. 337, 62 L.Ed. 772 (1918); *Truax v. Raich,* 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915); *Coppage v. Kansas,* 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441 (1915), *overruled in part by Phelps Dodge Corp. v. Nat'l Labor Relations Bd.,* 313 U.S. 177, 187, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); *Adair v. United States,* 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436 (1908), *overruled in part by Phelps Dodge Corp.,* 313 U.S. at 187, 61 S.Ct. 845. Basically, then, during the *"Lochner* era," substantive due process

was a touchstone by which courts analyzed both the purpose and the effect of governmental economic regulation by scrutinizing them with a somewhat equivocal deference to the legislative body's pronounced purpose for a law and its choice of the method embodied in the law to achieve that purpose.

The federal landscape changed in 1938. In *United States v. Carolene Products Co.*, 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938), the Supreme Court pronounced that

> regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless in the light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis.

*Id.* at 152, 58 S.Ct. 778. Ensuing federal decisions tracked Carolene Products' guidance that economic regulatory laws were presumed to be constitutional absent evidence or judicially known facts demonstrating that no rational basis existed for the regulation. For example, in 1955 in *Williamson v. Lee Optical of Oklahoma, Inc.*, the Supreme Court explained that

> [t]he day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought.

348 U.S. 483, 488, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

Texas courts were faced with the question of whether, after *Carolene Products*, to stay the course as to prior decisions interpreting Article I, § 19's due course of law provision, or follow the lead of the United States Supreme Court as to the Fourteenth Amendment's Due Process Clause. That is, Texas courts had to decide whether "due process of law," as used in the Fourteenth Amendment, and "due course of law of the land," as used in Article I, § 19 of the Texas Constitution, remained "in nearly if not all respects, practically synonymous," or whether the meaning of the Texas Constitution remained the same as it had been earlier interpreted because the Constitution's language had not been amended through the political process. *See Mabee*, 175 S.W. at 680. As the parties to this case—and numerous Texas courts and commentators—have pointed out, the answer has not been made clear as to substantive due process challenges to governmental regulation of economic interests. As set out more fully above, the Threaders argue that in some cases this Court[4] as well as courts of appeals have continued using a less deferential, heightened-scrutiny standard of review, while in some cases different ones have been applied.

▮ Following the lead of our prior jurisprudence, we conclude that the Texas due course of law protections in Article I, § 19, for the most part, align with the protections found in the Fourteenth Amendment to the United States Constitution. But, that having been said, the drafting, proposing, and adopting of the 1875 Constitution was accomplished short-

---

4. *See, e.g., Tex. Power & Light Co. v. City of Garland,* 431 S.W.2d 511, 517–20 (Tex.1968) (holding ordinance must be reasonable exercise of city's police power, meaning ordinance must directly promote the general health, safety, welfare, or morals, and must have a "real and substantial" relation to such pur-

pose); *State v. Richards,* 157 Tex. 166, 301 S.W.2d 597, 602 (1957) (explaining it is essential that the police power "be used for the purpose of accomplishing, and in a manner appropriate to the accomplishment of, the purposes for which it exists").

ly after the United States Supreme Court decision in the *Slaughter–House Cases* by which the Court put the responsibility for protecting a large segment of individual rights directly on the states. Given the temporal legal context, Section 19's substantive due course provisions undoubtedly were intended to bear at least some burden for protecting individual rights that the United States Supreme Court determined were not protected by the federal Constitution. That burden has been recognized in various decisions of Texas courts for over one hundred and twenty-five years. We continue to do so today: the standard of review for as-applied substantive due course challenges to economic regulation statutes includes an accompanying consideration as reflected by cases referenced above: whether the statute's effect as a whole is so unreasonably burdensome that it becomes oppressive in relation to the underlying governmental interest. *See, e.g., Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 938 (Tex. 1998) (stating that an ordinance "will violate substantive due process only if it is *clearly* arbitrary and unreasonable") (emphasis in original); *Garcia,* 893 S.W.2d at 525 (determining statute was "sufficiently *rational and reasonable* to meet constitutional due course requirements") (emphasis added); *Trinity River Auth.,* 889 S.W.2d at 264 (identifying statute as constitutional because it "strikes a *fair balance*" between the legislative purpose and rights of litigants) (emphasis added); *Hous. & Tex. Cent. Ry. Co.,* 84 S.W. at 653 (noting the constitutional inquiry was whether statute's effect was justified, or operated in "an unreasonable, arbitrary, and oppressive way"); *Milliken,* 54 Tex. at 394 (stating the constitutional inquiry was whether statute operated "unreasonabl[y] and in contravention of common right").

In sum, statutes are presumed to be constitutional. To overcome that presumption, the proponent of an as-applied challenge to an economic regulation statute under Section 19's substantive due course of law requirement must demonstrate that either (1) the statute's purpose could not arguably be rationally related to a legitimate governmental interest; or (2) when considered as a whole, the statute's actual, real-world effect as applied to the challenging party could not arguably be rationally related to, or is so burdensome as to be oppressive in light of, the governmental interest.

To be clear, the foregoing standard includes the presumption that legislative enactments are constitutional, *e.g., Smith v. Davis,* 426 S.W.2d 827, 831 (Tex.1968), and places a high burden on parties claiming a statute is unconstitutional. *See, e.g., Tex. State Bd. of Barber Exam'rs v. Beaumont Barber Coll., Inc.,* 454 S.W.2d 729, 732 (Tex.1970). The presumption of constitutionality and the high burden to show unconstitutionality would apply as well to regulations adopted by an agency pursuant to statutory authority. *See Trapp v. Shell Oil Co.,* 145 Tex. 323, 198 S.W.2d 424, 428 (1946). Although whether a law is unconstitutional is a question of law, the determination will in most instances require the reviewing court to consider the entire record, including evidence offered by the parties. *Garcia,* 893 S.W.2d at 520.

### C. Application: The Texas Cosmetology Statutes and Regulations

The Threaders do not contend that the State's licensing of the commercial practice of cosmetology is not rationally related to a legitimate governmental inter-

est.[5] But they strongly urge that the number of hours of training required to obtain even an esthetician license has an arbitrary and unduly burdensome effect as applied to them because the 750–hour requirement has no rational connection to reasonable safety and sanitation requirements, which the State says are the interests underlying its licensing of threaders. In resolving the issue, we consider the entire record. *Garcia*, 893 S.W.2d at 520.

Several statutes address safety standards and sanitary conditions relating to cosmetology. *See* TEX. OCC. CODE §§ 1602.001, 1603.001. Commission rules also address public safety and sanitary conditions. *E.g.*, 16 TEX. ADMIN. CODE §§ 83.50(a), .53(a)-(b), .70(i), .71(b), .100-.115. To address competency of cosmetologists in Texas, the Legislature and Commission have imposed specific educational and training requirements for cosmetologists, estheticians, and salon operators. TEX. OCC. CODE §§ 1602.001, .254, .255, .257. To become a licensed esthetician, threaders must take at least 750 hours of instruction in a Commission-approved training program, *id.* § 1602.254(b)(3), and take State-prescribed practical and written examinations. *See* 16 TEX. ADMIN. CODE §§ 83.20(a)(6), .21(c), .21(e). Those training programs must devote at least 225 hours of instruction to facial treatments, cleansing, masking, and therapy; 90 hours to anatomy and physiology; 75 hours to electricity, machines, and related equipment; 75 hours to makeup; 50 hours to orientation, rules, and laws; 50 hours to

chemistry; 50 hours to care of clients; 40 hours to sanitation, safety, and first aid; 35 hours to management; 25 hours to superfluous hair removal; 15 hours to aroma therapy; 10 hours to nutrition; and 10 hours to color psychology. *Id.* § 83.120(b). Commission-approved beauty schools are not required to teach threading techniques. The schools are required to provide 25 hours of instruction in superfluous hair removal, which encompasses threading, but individual schools decide which techniques to teach. The record reflects that fewer than ten of the 389 Commission-approved Texas beauty schools teach threading techniques, and only one of those devotes more than a few hours to them. Further, threading techniques are not required to be part of the mandated tests. Both the practical and written tests are administered and scored by a third-party testing firm. The firm's testing guidelines show that the practical examination is an hour and thirty minutes in length and includes sanitation, disinfection and hair removal, but does not include threading, although a test-taker may *elect* to remove six hairs from the model's eyebrow using thread instead of tweezers during part of the exam. Nor does the written examination include questions as to threading techniques, although it includes globally relevant questions about sanitation, disinfection, and safety.

As shown above, of the 750 hours of required instruction for an esthetician license, 40 are required to be directly devoted to sanitation, safety, and first aid. *Id.*

---

5. The State has regulated the practice of cosmetology since 1935. *See* Act of Apr. 25, 1935, 44th Leg., R.S., ch. 116, 1935 Tex. Gen. Laws 304, 304–11, *repealed by* Act of May 13, 1999, 76th Leg., R.S., ch. 388, §§ 1, 6, 1999 Tex. Gen. Laws 1431, 2182–2206, 2439–40 (repealing former Act while also adopting the Occupations Code). The stated intent of the initial legislation was to "prevent the spread ing of contagious and infectious diseases." *Id.* at 304, 311 (observing that the purpose of the Act was to "protect the public from inexperienced and unscrupulous beauty parlors and beauty culture schools" in response to the public being "daily exposed to disease due to insufficient care as to sanitation and hygiene").

But in addition, hygiene and sanitation are covered as they relate to four other portions of the curriculum: facial treatment, anatomy, rules and laws, and superfluous hair removal. Hygiene and sanitation are also addressed in the written and practical licensing exams, along with other topics including disinfection and safety.

One argument the Threaders make, which at its core challenges the rationality of *any* required training, is that the unlicensed practice of eyebrow threading is simply not a threat to public health and safety. In support of the argument they reference their expert witness who submitted a report addressing all of the available medical literature on eyebrow threading, as well as her own empirical analysis of the technique's safety. Based on her investigation and professional experience with eyebrow threading, the expert concluded that threading is safe and, from a medical perspective, requires nothing more than basic sanitation training.

But the Threaders' expert also raised public health concerns during her testimony. She testified that threading may lead to the spread of highly contagious bacterial and viral infections, including flat warts, skin-colored lesions known as mulluscum contagiosum, pink eye, ringworm, impetigo, and staphylococcus aureus, among others. She also agreed that failure to utilize appropriate sanitation practices—for example, proper use of disposable materials, cleaning of work stations, effective handwashing techniques, and correct treatment of skin irritations and abrasions—can further expose threading clients to infection and disease.

Moving beyond the argument that threading does not pose health risks to begin with, the Threaders contend that as many as 710 of the required 750 training hours for an esthetician license are not related to properly training threaders in hygiene and sanitation, considering the activities they actually perform. The State argues that the Threaders greatly exaggerate the number of unrelated hours, but concedes that as many as 320 of the curriculum hours are not related to activities threaders actually perform.

■ Differentiating between types of cosmetology practices is the prerogative of the Legislature and regulatory agencies to which the Legislature properly delegates authority. And it is not for courts to second-guess their decisions as to the necessity for and the extent of training that should be required for different types of commercial service providers. But we note in passing that persons licensed to apply eyelash extensions—a specialty involving the use of chemicals and a high rate of adverse reactions—are required to undergo only 320 hours of training. *See id.* We also note that when the Threaders filed suit, hair braiders were required to undergo only 35 hours of training, 16 of which were in health and safety. *See id.* § 83.120(b). Hair braiding, however, has since been deregulated by the Legislature. *See* Act of May 13, 1999, 76th Leg., R.S., ch. 388, § 1, sec. 1602.002(2), 1999 Tex. Gen. Laws 1431, 2186, *repealed by* Act of May 22, 2015, 84th Leg., R.S., H.B. 2717 (to be codified at TEX. OCC. CODE §§ 1601.003, 1602.003(b)(8)).

The fact that approximately 58% of the minimum required training hours are arguably relevant to the activities threaders perform, while 42% of the hours are not, is determinative of the aspect of the second prong of the as-applied standard which asks whether the effect of the requirements as a whole could be rationally related to the governmental interest. They could be. But the percentage must also be considered along with other factors, such as the quantitative aspect of the hours represented by that percentage and the

costs associated with them when determining the other aspect of the second prong—whether the licensing requirements as a whole are so burdensome as to be oppressive to the Threaders. Where the number of hours required and the associated costs are low, the ratio of required hours to arguably relevant hours is less important as to the burdensome question. But its importance increases as the required hours increase. For example, if the statute and Commission's rules required ten hours of training for a threader to be licensed and 58 percent, or 5.8 hours, were arguably relevant to what threaders do, the burden of the irrelevant hours would weigh less heavily in determining whether the effect of the requirements as a whole on aspiring threaders is oppressive. In the case of the Threaders, however, the large number of hours not arguably related to the actual practice of threading, the associated costs of those hours in out-of-pocket expenses, and the delayed employment opportunities while taking the hours makes the number highly relevant to whether the licensing requirements as a whole reach the level of being so burdensome that they are oppressive.

The dividing line is not bright between the number of required but irrelevant hours that would yield a harsh, but constitutionally acceptable, requirement and the number that would not. Even assuming that 430 hours (a number the Threaders dispute) of the mandated training are arguably relevant to what commercial threaders do in practice, that means threaders are required to undergo the equivalent of eight 40–hour weeks of training unrelated to health and safety as applied to threading. The parties disagree about the costs of attending cosmetology training required for a license to practice threading. The Threaders point to evidence that the cost averages $9,000. The State says the $9,000 cost is for private

schools while public schools charge only $3,500. Given the record as to the number of hours of training required for subjects unrelated to threading, our decision neither turns on, nor is altered by, the exact cost. But the admittedly unrelated 320 required training hours, combined with the fact that threader trainees have to pay for the training and at the same time lose the opportunity to make money actively practicing their trade, leads us to conclude that the Threaders have met their high burden of proving that, as applied to them, the requirement of 750 hours of training to become licensed is not just unreasonable or harsh, but it is so oppressive that it violates Article I, § 19 of the Texas Constitution.

## IV. Response to the Dissents

The dissenting Justices say four things that bear responding to. First, they say that measuring the effects of the provisions by an "oppressive" standard is to measure it by no standard at all. *Post* at 135 (Hecht, C.J., dissenting); *post* at 142 (Guzman, J., dissenting). The actuality of the matter is that the standard they propose for measuring the effects of the provisions is for all practical purposes no standard. The only way an enactment could fail the test the dissenters advocate is if the purpose of the enactment were completely mismatched with—that is, it bore no rational relationship to—the provisions enacted to effect it. For example, assume in this case the record demonstrated conclusively, or the State conceded, that the Threaders are right and only 40 hours of the required training are relevant to safety and sanitation in performing threading. It would not matter under the CHIEF JUSTICE's proposed standard. For under that standard, so long as at least some part of the required training could be rationally related to safety and sanitation, the entire

750 hours are rationally related because the provisions as a whole "might achieve the objective." *Post* at 139. The logical result of such standard would be that if the State were to require 1,500 or even more hours of training, the increased requirement would pass constitutional muster. Why is that so? Because if 40 hours of training might conceivably effect the Legislature's purpose and be constitutional, then any greater number that included that same 40 hours would also.

Second, the CHIEF JUSTICE references a small minority of other states that require threaders to be licensed either explicitly or by generally requiring licensing of those who commercially remove superfluous hair. *Post* at 128. But the Threaders neither contest the rationality of the State's requiring them to be licensed, nor the requirement that they take training in subjects such as sanitation and hygiene. What they contest is the excessiveness of the training requirements given the magnitude of the irrelevant training. And whether that excessive requirement violates the Texas Constitution is not determined by the relationship between other states' statutes and regulations and their respective constitutions.

Third, the CHIEF JUSTICE says that articulating and weighing factors such as the cost and relevance of the required training in considering the constitutionality of the provisions is "generally referred to as legislating" and should not be done by judges, *post* at 135, and JUSTICE GUZMAN asserts that any line drawing in this case should be done by the Legislature, *post* at 143. But providing standards for measuring the constitutionality of legislative enactments is not only a judicial prerogative—it is necessary in order to make the law predictable and not dependent on the proclivities of whichever judge or judges happen to be considering the case. Indeed, the

dissenting Justices would reach the result they propose by measuring the licensing provisions against standards—the standards of "rational relationship" jurisprudence—just different standards. *Post* at 138–39. Expressing factors by which a statute's constitutionality is to be measured and by which we reach our decision is not legislating; it is judging and providing guidance for courts to use in future challenges to statutes or regulations, which history tells us will come.

Fourth, the CHIEF JUSTICE refers to rediscovering and unleashing "the *Lochner* monster" if legislative enactments are measured against a standard other than the rational relationship standard. *Post* at 138. But as discussed above, Texas courts, including this Court, have expressed and applied various standards for considering as-applied substantive due process claims for over a century. And it is those decisions on which the standards we set out today are based. Surely if those cases represented a "monster" running amuck in Texas, this Court would have long ago decisively dealt with it.

Courts must extend great deference to legislative enactments, apply a strong presumption in favor of their validity, and maintain a high bar for declaring any of them in violation of the Constitution. But judicial deference is necessarily constrained where constitutional protections are implicated.

### V. Conclusion

The provisions of the Texas Occupations Code and Commission rules promulgated pursuant to that Code requiring the individual Threaders to undergo at least 750 hours of training in order to obtain a state license before practicing commercial threading violate the Texas Constitution.

We reverse the judgment of the court of appeals and remand the case to the trial

court for further proceedings in accordance with this opinion.

Justice Willett filed a concurring opinion, in which Justice Lehrmann and Justice Devine joined.

Justice Boyd filed a concurring opinion.

Chief Justice Hecht filed a dissenting opinion, in which Justice Guzman and Justice Brown joined.

Justice Guzman filed a dissenting opinion.

Justice Willett, joined by Justice Lehrmann and Justice Devine, concurring.

*To understand the emotion which swelled my heart as I clasped this money, realizing that I had no master who could take it from me—that it was mine—that my hands were my own, and could earn more of the precious coin.... I was not only a freeman but a free-working man, and no master Hugh stood ready at the end of the week to seize my hard earnings.*[1]

Frederick Douglass's irrepressible joy at exercising his hard-won freedom captures just how fundamental—and transformative—economic liberty is. Self-ownership, the right to put your mind and body to productive enterprise, is not a mere luxury to be enjoyed at the sufferance of govern-mental grace, but is indispensable to human dignity and prosperity.[2]

Texans are doubly blessed, living under two constitutions sharing a singular purpose: to secure individual freedom, the essential condition of human flourishing. In today's age of staggering civic illiteracy—when 35 percent of Americans cannot correctly name a single branch of government—it is unsurprising that people mistake majority rule as America's defining value.[3] But our federal and state charters are not, contrary to popular belief, about "democracy"—a word that appears in neither document, nor in the Declaration of Independence. Our enlightened 18th- and 19th-century Founders, both federal and state, aimed higher, upended things, and brilliantly divided power to enshrine a *promise* (liberty), not merely a *process* (democracy).

One of our constitutions (federal) is short, the other (state) is long—like *really long*—but both underscore liberty's primacy right away. The federal Constitution, in the first sentence of the Preamble, declares its mission to "secure the Blessings of Liberty."[4] The Texas Constitution likewise wastes no time, stating up front in the Bill of Rights its paramount aim to recognize and establish "the general, great and essential principles of liberty and free government."[5] The point is unsubtle and undeniable: Liberty is not *provided* by gov-

1. FREDERICK DOUGLASS, THE LIFE AND TIMES OF FREDERICK DOUGLASS 259 (photo. reprint 2001) (1882).

2. Honest work, Pope Francis recently reflected, means more than just earning our daily bread: "Where there is no work, there is no dignity." Pope Francis (Pontifex). June 11, 2014, 1:11 a.m. Tweet. *Available at* https://twitter.com/Pontifex/status/608909 299704709120.

3. Press Release, Annenberg Pub. Policy Ctr. of the Univ. of Penn., Americans know surprisingly little about their government, survey finds (Sept. 17, 2014), *available at* http://cdn. annenbergpublicpolicycenter.org/wp-content/ uploads/Civics-survey-press-release-09-17-2014-for-PR-Newswire.pdf (last visited June 25, 2015); *see also* ANNENBERG PUB. POLICY CTR., CIVICS SURVEY APPENDIX at 2 (2014) (providing the methodology for the study), http://www. annenbergpublicpolicycenter.org/wp-content/ uploads/Civics-survey-appendix-09-17-14.pdf (last visited June 25, 2015).

4. U.S. CONST. pmbl.

5. TEX. CONST. art. I.

ernment; liberty *preexists* government. It is not a gift from the sovereign; it is our natural birthright. Fixed. Innate. Unalienable.

\* \* \* \* \* \*

*Democracy is two wolves and a lamb voting on what to have for lunch. Liberty is a well-armed lamb contesting the vote.*[6]

This case concerns the timeless struggle between personal freedom and government power. Do Texans live under a presumption of liberty or a presumption of restraint? The Texas Constitution confers power—but even more critically, it constrains power. What *are* the outer-boundary limits on government actions that trample Texans' constitutional right to earn an honest living for themselves and their families? Some observers liken judges to baseball umpires, calling legal balls and strikes, but when it comes to restrictive licensing laws, just how generous is the constitutional strike zone? Must courts rubber-stamp even the most nonsensical encroachments on occupational freedom? Are the most patently farcical and protectionist restrictions nigh unchallengeable, or are there, in fact, judicially enforceable limits?

This case raises constitutional eyebrows because it asks building-block questions about constitutional architecture—about how we as Texans govern ourselves and about the relationship of the citizen to the State. This case concerns far more than whether Ashish Patel can pluck unwanted hair with a strand of thread. This case is fundamentally about the American Dream and the unalienable human right to pursue happiness without curtsying to government on bended knee. It is about whether government can connive with rent-seeking factions to ration liberty unrestrained, and whether judges must submissively uphold even the most risible encroachments.

The U.S. Supreme Court has repeatedly declared that the right to pursue a lawful calling "free from unreasonable governmental interference" is guaranteed under the federal Constitution,[7] and is "objectively, deeply rooted in this Nation's history and tradition."[8] A pro-liberty presumption is also hardwired into the Texas Constitution, which declares no citizen shall be "*deprived* of life, liberty, property, [or] privileges or immunities"[9]—phrasing that indicates citizens already possess these freedoms, and government cannot take them "except by the due course of the law of the land."[10] Texans are thus presumptively free, and government must justify its deprivations. So just how nonsensically can government stifle your constitutional right to put your know-how and gumption to use in a gainful trade?

I recognize the potential benefits of licensing: protecting the public and preventing charlatanism. I also recognize the proven benefits of constitutional constraints: protecting the public and preventing collectivism. Invalidating irrational laws does not beckon a Dickensian world of run-amok frauds and pretenders. The Court's view is simple, and simply stated: Laws that impinge your constitu-

---

6. Widely, if not assuredly, attributed to Benjamin Franklin.

7. *Greene v. McElroy*, 360 U.S. 474, 492, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959).

8. *Washington v. Glucksberg*, 521 U.S. 702, 703, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997);

*see also* 1 WILLIAM BLACKSTONE, COMMENTARIES \*427 ("At common law every man might use what trade he pleased...").

9. TEX. CONST. art. I, § 19 (emphasis added).

10. *Id.*

tionally protected right to earn an honest living must not be preposterous.

By contrast, the dissents see government power in the economic realm as infinitely elastic, and thus limited government as entirely fictive, troubling since economic freedom is no less vulnerable to majoritarian oppression than, say, religious freedom—perhaps more so. Exalting the reflexive deference championed by Progressive theorists like Justice Oliver Wendell Holmes, Jr., the dissents would seemingly uphold even the most facially protectionist actions. Stranger still, the principal dissent, while conceding that our state and federal Constitutions protect economic liberty, quotes liberally from Justice Holmes, who rejected that the Fourteenth Amendment does any such thing.[11]

In any event, as Justice Holmes cruelly proved, dogmatic majoritarianism can exact a ruthless price. In *Buck v. Bell*, the U.S. Supreme Court considered whether Carrie Buck, a Virginia teenager raped and impregnated by her foster parents' nephew, could be forcibly sterilized on grounds that she was "feeble minded."[12] Speaking through Justice Holmes, the Court credulously accepted at face value the government's assertion that public welfare was a good-enough reason to forbid the "manifestly unfit from continuing their kind."[13] Compulsory sterilization was preferable to waiting to "execute degenerate offspring for crime, or to let them starve for their imbecility."[14] Nothing—not even coercive eugenics—trumped judicial submissiveness to whatever the majority decreed. Justice Holmes was unyielding, thundering one of the most heartless, ignominious lines in Supreme Court history: "Three generations of imbeciles are enough."[15]

Justice Holmes later boasted to a friend that "[it] gave me pleasure, establishing the constitutionality of a law permitting the sterilization of imbeciles."[16] Unquestioning deference necessarily meant civil

---

11. The principal dissent dramatically—and predictably—accuses the Court of seeking to unleash the *"Lochner* monster," trying to resurrect *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), in which the U.S. Supreme Court invalidated on federal "liberty of contract" grounds a state maximum-hours law for bakery workers. Post, at 12. (Hecht, C.J., dissenting). The *Lochner* bogeyman is a mirage but a ready broadside aimed at those who apply rational basis rationally. As one constitutional law scholar noted a generation ago, " '*Lochnerizing*' has become so much an epithet that the very use of the label may obscure attempts at understanding." LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 435 (1st ed. 1978).

I doubt the 3–0 panel of the U.S. Court of Appeals for the Fifth Circuit and Judge Sparks of the Western District of Texas believed they were unleashing any monsters, or, scarier still, *legislating from the bench!*—when they recently struck down state economic regulations on rational-basis grounds. *See St. Joseph Abbey v. Castille,* 712 F.3d 215 (5th Cir.), *cert. denied,* —— U.S. ——, 134 S.Ct.

423, 187 L.Ed.2d 281 (2013) (invalidating the Louisiana "casket cartel"); *Brantley v. Kuntz,* No. A–13–CA–872–SS, 98 F.Supp.3d 884, 2015 WL 75244 (W.D.Tex. Jan. 5, 2015) (invalidating Texas barber-school regulations as applied to African hair braiding). Indeed, the Fifth Circuit in the casket cartel case dismissed the tired *Lochner* charge head-on, denying that the "ghost of *Lochner* [was] lurking about." *St. Joseph Abbey,* 712 F.3d at 227.

12. 274 U.S. 200, 205, 47 S.Ct. 584, 71 L.Ed. 1000 (1927).

13. *Id.* at 207, 47 S.Ct. 584.

14. *Id.*

15. *Id.*

16. Letter from Oliver Wendell Holmes, Jr. to Lewis Einstein (May 19, 1927), *in* THE HOLMES-EINSTEIN LETTERS: CORRESPONDENCE OF MR. JUSTICE HOLMES AND LEWIS EINSTEIN 1903– 1935 267 (James Bishop Peabody, ed., 1964).

liberties were trampled, but Justice Holmes's pro-statism minced no words: "a law should be called good if it reflects the will of the dominant forces of the community even if it will take us to hell."[17] In fact, said Justice Holmes, "if my fellow citizens want to go to Hell I will help them. It's my job."[18]

Like the Court, I favor a less hard-hearted and more liberty-minded view for Texas, one that sees the judiciary as James Madison did when he introduced the Bill of Rights, as an "impenetrable bulwark" against imperious government.[19] The Texas Constitution enshrines structural principles meant to advance individual freedom; they are not there for mere show. Our Framers opted for constitutional—that is, *limited*—government, meaning majorities don't possess an untrammeled right to trammel. The State would have us wield a rubber stamp rather than a gavel, but a written constitution is mere meringue if courts rotely exalt majoritarianism over constitutionalism, and thus forsake what Chief Justice Marshall called their "painful duty"—"to say, that such an act was not the law of the land."[20]

To be sure, the Capitol, not this Court, is the center of policymaking gravity, and judges are lousy second-guessers of the other branches' economic judgments. Lawmakers' policy-setting power is unrivaled—but it is not unlimited. Preeminence does not equal omnipotence. Politicians decide if laws pass, but courts decide if those laws pass muster. Cases stretch-

ing back centuries treat economic liberty as constitutionally protected—we crossed that Rubicon long ago—and there is a fateful difference between active judges who defend rights and activist judges who concoct rights. If judicial review means *anything*, it is that judicial restraint does not allow *everything*. The rational-basis bar may be low, but it is not subterranean.

I support the Court's "Don't Thread on Me" approach: Threaders with no license are less menacing than government with unlimited license.

## I.

This case lays bare a spirited debate raging in legal circles, one that conjures legal buzzwords and pejoratives galore: activism vs. restraint, deference vs. dereliction, adjudication vs. abdication. The rhetoric at times seems overheated, but the temperature reflects the stakes. It concerns the most elemental—if not elementary—question of American jurisprudence: the proper role of the judiciary under the Constitution.

Judicial duty requires courts to act judicially by adjudicating, not politically by legislating. So when *is* it proper for a court to strike down legislative or executive action as unconstitutional? There are people of goodwill on both sides, and as this case demonstrates, it seems a legal Rorschach test, where one person's "judicial engagement" is another person's "judi-

---

17. Ken I. Kersch, Constructing Civil Liberties: Discontinuities in the Development of American Constitutional Law 151 (2004).

18. Letter from Oliver Wendell Holmes, Jr. to Harold Laski (Mar. 4, 1920), *in* 1 Holmes-Laski Letters: The Correspondence of Mr. Justice Holmes and Harold J. Laski 1916–1935 249 (Mark DeWolfe Howe ed., 1953). Holmesian deference was praised by turn-of-

the-century Progressives who craved a pervasive regulatory state, and got it via the New Deal-era U.S. Supreme Court.

19. *See* 1 Annals of Cong. 439 (1789) (Joseph Gales ed., 1843).

20. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 423, 4 L.Ed. 579 (1819).

cial usurpation."[21]

There are competing visions, to put it mildly, of the role judges should play in policing the other branches, particularly when reviewing economic regulations. On one side is the Progressive left, joined by some conservatives, who favor absolute judicial deference to majority rule. Judge Robert Bork falls into this camp. A conservative luminary, Bork is heir to a Progressive luminary, Justice Holmes, who also espoused judicial minimalism. Both men believed the foremost principle of American government was not individual liberty but majoritarianism.[22] As Judge Bork put it, "majorities are entitled to rule, if they wish, simply because they are majorities."[23]

The other side advocates "judicial engagement" whereby courts meaningfully enforce constitutional boundaries, lest judicial restraint become judicial surrender.[24] The pro-engagement camp argues the ju-

diciary should be less protective of Leviathan government and more protective of individual freedom. Government exists, they contend, to secure pre-existing rights, as the Declaration makes clear in its first two paragraphs.[25] Thus, when it comes to judicial review of laws burdening economic freedoms, courts should engage forthrightly, and not put a heavy, pro-government thumb on the scale.

This much is clear: Spirited debates over judicial review have roiled America since the Founding, from *Marbury v. Madison*,[26] to *Worcester v. Georgia*[27] (against which President Jackson bellowed, "John Marshall has made his decision—now let him enforce it."[28]), to the late 19th and early 20th centuries, when Progressives opposed judicial enforcement of economic liberties, all the way to present-day battles over the Patient Protection and Affordable Care Act.[29] In the 1920s and 1930s, liberals began backing judicial pro-

**21.** When it comes to the "judicial activism" label, some observers throw up their hands entirely and insist it all turns on whose ox is gored. Justice Kennedy responds to charges of judicial activism this way: "An activist court is a court that makes a decision you don't like." Hon. Anthony Kennedy, Address at Forum Club of the Palm Beaches, Florida (May 14, 2010), *available at* http://www.c-span.org/video/?293521-1/justice-kennedy-remarks-supreme-court.

**22.** Judge Bork believed legislative majorities should wield near-absolute power, not just with economic policy as favored by turn-of-the-century Progressives, but across the board, including the unenumerated rights enshrined during the so-called "rights revolution" of the mid–20th century.

**23.** Robert H. Bork, The Tempting of America 139 (1990).

**24.** Timothy Sandefur, The Right to Earn a Living-Economic Freedom and the Law (2010) (tracing the history of the right to earn a living as it was understood by the Founders, through the Civil War Amendments, the Pro-

gressive era, and current controversies over restrictive licensure laws); Damon Root, Overruled—The Long War For Control of the U.S. Supreme Court (2014) (chronicling the conflicting visions of judicial review and the degree to which courts should intervene to protect individual rights against government encroachment).

**25.** *See* The Declaration of Independence para. 1–2 (U.S. 1776).

**26.** 5 U.S.( 1 Cranch 137) 2 L.Ed. 60 (1803).

**27.** 31 U.S. (6 Pet. 515) 8 L.Ed. 483 (1832).

**28.** Horace H. Hagan, Eight Great American Lawyers 79 (Fred B. Rothman & Co. 1987) (1923).

**29.** *See, e.g.*, Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB), —— U.S. ——, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012); *Burwell v. Hobby Lobby Stores, Inc.*, —— U.S. ——, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014); *King v. Burwell*, 759 F.3d 358 (4th Cir.2014), *affirmed*, —— U.S. ——, 135 S.Ct. 2480, 192 L.Ed.2d 483 (2015).

tection of *non*economic rights, while resisting similar protection for property rights and other economic freedoms. The Progressives' preference for judicial nonintervention was later embraced by post-New Deal conservatives like Judge Bork. The judicial-review debate, both raucous and reasoned, is particularly pitched today within the broader conservative legal movement. A prominent fault line has opened on the right between traditional conservatives who champion majoritarianism and more liberty-minded theorists who believe robust judicial protection of economic rights is indispensable to limited government.[30]

When it comes to regulating the economy, Holmesian deference still dominates, as seen in the Supreme Court's landmark 2012 decision upholding the constitutionality of the Affordable Care Act.[31] During oral argument, the Solicitor General—echoing the dissenters in today's case—admonished that striking down President Obama's signature health-care law would amount to judicial activism that would "import *Lochner*-style substantive due process."[32] The Court, he implored, "has a solemn obligation to respect the judgments of the democratically accountable branches of government."[33] A few days later, the President himself charged it would constitute raw judicial activism if the Court took the "unprecedented, extraordinary step of overturning a law that was passed by a strong majority of a democratically elected Congress,"[34] adding, "We have not seen a court overturn a law that was passed by Congress on an economic issue ... for decades"—"We're going to the '30s, pre-New Deal."[35] We know how the story ended. The Court upheld the ACA on tax-power grounds, with Chief Justice Roberts famously stating, "It is not our job to protect the people from the consequences of their political choices."[36]

30. Judge Bork favored both constitutional originalism and judicial deference to the democratic process, two ideals that sometimes clash, producing what Professor Ilya Somin calls the "Borkean dilemma." Ilya Somin, *The Borkean Dilemma: Robert Bork and the Tension Between Originalism and Democracy*, 80 U. OF CHI. L. REV. DIALOGUE 243 (2013). Originalism sometimes requires judicial invalidation of laws that contradict the Constitution's original meaning. But striking down laws contradicts Bork's preference for judicial minimalism. So while Judge Bork favored judicial deference, he also criticized as "judicial activism" certain New Deal-era Court decisions that expanded government control over the economy. BORK, *supra* note 23, at 56–57 (discussing *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), and lamenting that the Court's "new, permissive attitude toward congressional power was a manifestation of judicial activism").

31. *NFIB*, 132 S.Ct. at 2566.

32. Transcript of Oral Argument at 30, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, —— U.S. ——, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012), *available at* http://www.archives.gov/research/court-records/supreme-court/11-398-tuesday.pdf.

33. *Id.* at 110. The Chief Justice rejected the *Lochner* epithet and turned the tables, saying if the Court adopted the government's theory of the Commerce Clause, limited only to regulating insurance, it "would be going back to *Lochner*"—with courts selectively allowing Congress to use its commerce power to impose a health-insurance mandate but not an eat-your-broccoli mandate. *Id.* at 39.

34. Jeff Mason, *Obama takes a shot at Supreme Court over healthcare*, REUTERS, Apr. 2, http://www.reuters.com/article/2012/04/02/us-obama-healthcare-idUSBRE8310WP20120402.

35. Greg Jaffe, *Why does President Obama criticize the Supreme Court so much?*, WASH. POST, June 20, 2015, http://www.washingtonpost.com/politics/why-does-president-obama-criticize-the-supreme-court-so-much/2015/06/20/b41667b4-1518-11e5-9ddc-e3353542100c_story.html.

Today's case arises under the *Texas* Constitution, over which we have final interpretive authority, and nothing in its 60,-000—plus words requires judges to turn a blind eye to transparent rent-seeking that bends government power to private gain, thus robbing people of their innate right—antecedent to government—to earn an honest living. Indeed, even if the Texas Due Course of Law Clause mirrored perfectly the federal Due Process Clause, that in no way binds Texas courts to cut-and-paste federal rational-basis jurisprudence that long post-dates enactment of our own constitutional provision, one more inclined to freedom.

The principal dissent claims "the rational basis standard invokes objective reason as its measure," a contention difficult to take seriously.[37] Legal fictions abound in the law, but the federal "rational basis test" is something special; it is a misno-mer, wrapped in an anomaly, inside a contradiction. Its measure often seems less objective reason than subjective rationalization. The dissent also says the fact that other states regulate threading provides "strong evidence that Texas's regulatory framework has a rational basis."[38] In my view, what happens in the Aloha State makes not the slightest constitutional difference in the Lone Star State. Unconstitutional encroachments reach across time zones and centuries. Just this week, in a case that took almost 80 years to bring, the U.S. Supreme Court struck down as unconstitutional a New Deal-era, raisin-confiscation regime that had spanned thirteen Presidents.[39]

The test adopted today bears a passing resemblance to "rational basis"-type wording, but this test is rational basis with bite, demanding actual *rationality*, scrutinizing the law's actual *basis*, and applying an actual *test*.[40] In my view, the principal

---

**36.** *NFIB*, 132 S.Ct. at 2579. Two years earlier, however, in a political-speech case that involved a more searching standard of review, the Chief Justice declared, "there is a difference between judicial restraint and judicial abdication." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 375, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010).

**37.** Post, at 135. (Hecht, C.J., dissenting).

**38.** *Id.*

**39.** *Horne v. Dep't of Agric.*, —— U.S. ——, 135 S.Ct. 2419, 192 L.Ed.2d 388 (2015).

**40.** While the dissenting Justices favor federal-style deference in economic matters, there is a notable distinction between the Texas Constitution and the federal Constitution as interpreted by federal courts. The Texas Constitution protects not just life, liberty, and property, but also "privileges or immunities," language the U.S. Supreme Court read out of the Fourteenth Amendment in the *Slaughter–House Cases*, 83 U.S. (16 Wall. 36) 21 L.Ed. 394 (1872). *Slaughter–House* involved special-interest favoritism masquerading as a public-health measure, a law granting a pri-vate corporation an exclusive benefit at the expense of hundreds of local butchers. A few years earlier, when the Fourteenth Amendment was adopted to counter the Black Codes and other oppressive state laws, the amendment's author, antislavery Representative John Bingham, confirmed the liberties it protected included "the right to work in an honest calling and contribute by your toil in some sort to the support of your fellowmen and to be secure in the enjoyment of the fruits of your toil." CONG. GLOBE, 42D CONG., 1ST SESS., 86 app. (1871). The Fourteenth Amendment was a response to a host of post-Civil War actions to oppress former slaves. Section One, drafted by Representative Bingham, includes three clauses to safeguard individual rights: the Privileges or Immunities Clause, the Due Process Clause, and the Equal Protection Clause. So what *are* an American citizen's privileges and immunities? According to perhaps the leading Fourteenth Amendment history, anti-slavery abuses spurred Congress to fortify all Americans' civil rights against overbearing state governments, and to restore the Constitution's original purpose as "a document protecting liberty." MICHAEL KENT CURTIS, NO STATE SHALL

dissent is unduly diffident, concluding the threading rules, while "excessive"[41] and "obviously too much"[42] are not "clearly arbitrary."[43] If these rules are not arbitrary, then the definition of "arbitrary" is itself arbitrary. Without discussing (or even citing) recent federal cases striking down nonsensical licensing rules under the supine federal test,[44] the dissents sever "rational" from "rational basis," loading the dice—relentlessly—in government's favor.[45] Their test is tantamount to no test at all; at most it is pass/fail, and government never fails.[46]

ABRIDGE: THE FOURTEENTH AMENDMENT AND THE BILL OF RIGHTS 7 (1986). *See also* AKHIL REED AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 166 (1998) (noting that the words "privileges," "immunities," "rights," and "freedoms" are "roughly synonymous"). Citing Madison and other founders who used the words "rights," "liberties," "privileges," and "immunities" interchangeably, CURTIS, *supra* at 64–65, Curtis found similar usage in William Blackstone's influential 1765 *Commentaries on the Laws of England,* which described "privileges and immunities" as a blend of rights and liberties—although Curtis notes that Blackstone "divided the rights and liberties of Englishmen into those 'immunities' that were the residuum of natural liberties and those 'privileges' that society had provided in lieu of natural rights." CURTIS, *supra* at 64. Boiled down, privileges are state-given civil rights while immunities are God-given natural rights.

When the Court in *Slaughter–House* upheld 5–4 the Louisiana monopoly law, it stressed that the Privileges or Immunities Clause only protected rights guaranteed by the United States and did not restrict state police power. What's the consensus view today of *Slaughter–House?* "Virtually no serious modern scholar—left, right, or center—thinks [that *Slaughter–House*] is a plausible reading of the [Fourteenth] Amendment." Akhil R. Amar, *Foreword: The Document and the Doctrine,* 114 HARV. L. REV. 26, 123 n.327 (2000).

The important point for today's case is that *Slaughter–House,* while holding that the Fourteenth Amendment's Privileges or Immunities Clause offered no protection for individual rights against state officials, underscored that states themselves possess power to protect their citizens' privileges or immunities, including the right to pursue an honest living against illegitimate state intrusion. As the Court correctly notes, the drafters of the Texas Constitution were doubtless aware of this reservation of power to the states when they passed our own Privileges or Immunities Clause just two years later in 1875. One question lurking in today's case was whether this Court would do to *our* Privileges or Immunities Clause what the U.S. Supreme Court did to the federal clause—nullify it by judicial fiat.

41. Post, at 131. (Hecht, C.J., dissenting).

42. *Id.*

43. *Id.* at 139.

44. *See, e.g., St. Joseph Abbey v. Castille,* 712 F.3d 215 (5th Cir.), *cert. denied,* —— U.S. ——, 134 S.Ct. 423, 187 L.Ed.2d 281 (2013); *Brantley v. Kuntz,* No. A–13–CA–872–SS, 98 F.Supp.3d 884, 2015 WL 75244 (W.D.Tex. Jan. 5, 2015).

45. The principal dissent cites our 1957 decision in *State v. Richards,* 157 Tex. 166, 301 S.W.2d 597 (1957), the last time we examined the constitutional protections due innocent property owners facing government seizure of their property. It merits mention that at least three members of this Court believe the modern asset-forfeiture regime "deserves attentive constitutional reconsideration, if not recalibration." *El–Ali v. State,* 428 S.W.3d 824, 826 (Tex.2014) (Willett, J., joined by Lehrmann, J., and Devine, J., dissenting to denial of pet.). And two others are open to reconsidering *Richards* in a future case. *Id.* at 824 (Boyd, J., concurring, joined by Guzman, J.).

46. The dissents side with Justice Holmes's oft-quoted *Lochner* dissent, even though Justice Holmes rejected there what the dissents reaffirm here: The Constitution *does* protect economic liberty. Justice Holmes indeed seems to exalt majority rule above all—except when he doesn't. After he famously said, "I think that the word 'liberty,' in the Fourteenth Amendment, is perverted when it is held to prevent the natural outcome of a dominant opinion," he added this sweeping caveat: "unless it can be said that a rational and fair man necessarily would admit that the statute

proposed would infringe fundamental principles as they have been understood by the traditions of our people and our law." *Lochner v. New York*, 198 U.S. 45, 76, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (Holmes, J., dissenting). This proviso, according to Judge Robert Bork, "spoiled it all" and prompted Bork to accuse Justice Holmes, a fellow judicial minimalist, of activism himself. BORK, *supra* note 23, at 45. ("So Holmes, after all, did accept substantive due process, he merely disagreed ... about which principles were fundamental.").

A quick word on *Lochner*. While the vote was 5–4, eight of nine Justices (all but Justice Holmes) agreed that the Constitution protects economic liberty. And *Lochner* was not the first Supreme Court case to say so. That happened eight years earlier in *Allgeyer v. Louisiana*, which defined "liberty" in the Fourteenth Amendment to include the freedom "to pursue any livelihood or avocation; and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purposes above mentioned." 165 U.S. 578, 589, 17 S.Ct. 427, 41 L.Ed. 832 (1897). As Justice Harlan acknowledged in the principal *Lochner* dissent, "there is a liberty of contract which cannot be violated even under the sanction of direct legislative enactment." 198 U.S. at 68, 25 S.Ct. 539 (Harlan, J., dissenting). Government may not "unduly interfere with the right of the citizen to enter into contracts" or to "earn his livelihood by any lawful calling, to pursue any livelihood or avocation." *Id.* at 65, 25 S.Ct. 539.

Historical note: This is the *first* Justice Harlan, The Great Dissenter, not his grandson who served on the Court in the mid–20th century. The first Justice Harlan, a strong proponent of natural rights, famously dissented in *Plessy v. Ferguson*, 163 U.S. 537, 552, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) (Harlan, J., dissenting), *overruled by Brown v. Bd. of Ed.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and also in the *Civil Rights Cases*, 109 U.S. 3, 33, 3 S.Ct. 18, 27 L.Ed. 835 (1883) (Harlan, J., dissenting), that struck down federal antidiscrimination laws. Some scholars believe that Justice Harlan's dissent in *Lochner* had initially garnered a five-vote majority, but someone switched his vote.

While Justice Harlan's dissent, unlike Justice Holmes's dissent, believed economic liberty was constitutionally enshrined, he understood that states have a valid police-power interest in advancing public welfare. *Id.*

("liberty of contract is subject to such regulations as the state may reasonably prescribe for the common good and the well-being of society"). A law should be struck down only if there is "no real or substantial relation between the means employed by the state and the end sought to be accomplished by its legislation." *Id.* at 69, 25 S.Ct. 539. Justice Harlan would have upheld the New York maximum-hours law, but he stressed the presumption of constitutionality can be rebutted by evidence showing the restriction was arbitrary, unreasonable, or discriminatory. He simply found the government's health-and-safety justification plausible.

Importantly, there was no disagreement—none—between the *Lochner* majority and Justice Harlan's dissent over whether courts can legitimately scrutinize economic regulations. Nobody seriously disputes a state's omnibus power to safeguard its citizens' health and safety via economic regulation. Of course states have broad, inherent police power to enact general-welfare laws. Indeed, a few months after *Lochner*, the Court reaffirmed states' "firmly established" authority "to prescribe such regulations as may be reasonable, necessary and appropriate" to advance "the general comfort, health, and general prosperity of the state." *Cal. Reduction Co. v. Sanitary Reduction Works*, 199 U.S. 306, 318, 26 S.Ct. 100, 50 L.Ed. 204 (1905). And just three years later, the Court upheld a maximum hours law for women. *Muller v. Oregon*, 208 U.S. 412, 28 S.Ct. 324, 52 L.Ed. 551 (1908). In fact, the *Lochner*-era Court upheld many more economic regulations than it overturned. Thomas Colby & Peter J. Smith, *The Return of Lochner*, 100 CORNELL L. REV. 527, 539–40 (2015). The disagreement in *Lochner* was over who bears the burden—the government to prove legitimacy, or the challenger to prove illegitimacy. Justice Harlan believed the latter: "when the validity of a statute is questioned, the burden of proof ... is upon those who assert it to be unconstitutional." *Lochner*, 198 U.S. at 68, 25 S.Ct. 539 (citations omitted) (Harlan, J., dissenting). The Court today agrees, adopting an approach some might say tracks the principal Lochner dissent more than the *Lochner* majority.

The core question is one of constitutional limitation. Should judges blindly accept government's health-and-safety rationale, or instead probe more deeply to ensure the aim is not suppressing competition to benefit entrenched interests? A century and a half of pre-*Lochner* precedent allowed for judicial

## II.

*You take my house when you do take the prop /*
*That doth sustain my house; you take my life /*
*When you do take the means whereby I live.*[47]

Government understandably wants to rid society of quacks, swindlers, and incompetents. And licensing is one of government's preferred tools, aiming to protect us from harm by credentialing certain occupations and activities. You can't practice medicine in Texas without satisfying the Board of Medical Examiners. You can't zoom down SH–130 outside Austin at 85 miles per hour (reportedly the highest speed limit in the Western Hemisphere) without a driver's license. Sensible rules undoubtedly boost our quality of life. And senseless rules undoubtedly weaken our quality of life. Governments at every level—national, state, and local—wield regulatory power, but not always with regulatory prudence, which critics say stymies innovation, raises consumer prices,[48] and impedes economic opportunity with little or no concomitant public benefit.[49] The academic literature has attained consensus: "a licensing restriction can only be justified where it leads to better quality professional services—and for many restrictions, proof of that enhanced quality is

---

scrutiny of laws to ensure the laws actually intend to serve the public rather than a narrow faction. *See generally* Howard Gillman, The Constitution Besieged: The Rise and Demise of Lochner Era Police Powers Jurisprudence (1993) (discussing the origins of *Lochner*-era jurisprudence). *Lochner* focused on a narrow issue: whether the maximum-hours law was truly intended to serve the general welfare or "other motives," namely to advantage the bakers' union and unionized bakeries over small, non-union bakeries, many of which employed disfavored immigrants.

Interestingly, some of the Texas commentary immediately following Lochner was quite favorable, including in the Dallas Morning News, which wrote "The right of contract is one of the most sacred rights of the freeman, and any interference with such privilege by Legislatures or courts is essentially dangerous and vicious." In Which the Right of Contract is Upheld, Dallas Morning News, Apr. 20, 1905, at 6.

A wealth of contemporary legal scholarship is reexamining *Lochner*, its history and correctness as a matter of constitutional law, and its place within broader originalist thought, specifically judicial protection of unenumerated rights such as economic liberty. *See supra* note 24. Long story short: Legal orthodoxy about *Lochner* is evolving among many leading constitutional theorists. *See, e.g.,* Colby & Smith, *supra* at 527; David E. Bernstein, Rehabilitating Lochner—Defending Individual Rights Against Progressive Reform (2011).

47. William Shakespeare, The Merchant of Venice, act 4 sc. 1.

48. Licensing restrictions impact price "along four dimensions" according to one recent study:

> First, professional licensing can act as a barrier to entry into the profession. Second, licensing can establish rules of practice, like advertising bans, that restrict competition. Third, state boards can suppress interstate competition by recognizing licenses only from their own state. Finally, a profession can prevent competition by broadening the definition of its practice, bringing more potential competitors under its licensing scheme. These 'scope-of-practice' limitations tend to oust low-cost competitors that operate at the fringes of an established profession.

Aaron Edlin & Rebecca Haw, *Cartels by Another Name: Should Licensed Occupations Face Antitrust Scrutiny?*, 162 U. PA. L. Rev. 1093, 1112 (2014) (footnotes and citations omitted).

49. Some government labor economists have concluded that "mandatory entry requirements of licensing cannot necessarily be relied upon to raise the quality of services." Carolyn Cox & Susan Foster, Bureau of Econ., FTC, The Costs and Benefits of Occupational Regulation 21–27, 40 (1990), *available at* http://www.ramblemuse.com/articles/cox_foster.pdf.

lacking."[50]

It merits repeating: Judicial duty does not include second-guessing everyday policy choices, however improvident. The question for judges is not whether a law is sensible but whether it is constitutional. Does state "police power"—the inherent authority to enact general-welfare legislation—*ever* go too far? Does a Texas Constitution inclined to limited government have *anything* to say about government irrationally subjugating the livelihoods of Texans?

## A.

The Republic of Texas regulated just one profession: doctors.[51] In 1889, the State of Texas added one more: dentists.[52] Until the mid–20th century, occupational regulation in the Lone Star State was rare (aside from the post-Prohibition alcohol industry)[53] and was generally limited to professions with a clear public-safety impact: nurses, pharmacists, optometrists, engineers, etc.

Since World War II, however, the economy, both nationally and here in Texas, has undergone a profound shift. States now assert licensing authority over an ever-increasing range of occupations, particularly in the fast-growing service sector, which makes up "three-quarters of gross domestic product and most job growth in the U.S."[54] During the 1950s, fewer than five percent of American workers needed a state license.[55] By 1970 it had doubled to 10 percent, and by 2000 had doubled again.[56] In 2006, nearly one-third of U.S.

**50.** Edlin and Haw, *supra* note 48, at 1111–12 n.101 and accompanying text (citing numerous academic studies questioning the putative benefits of licensure).

**51.** Interim Report To The 83rd Tex. Leg., 82d Tex. H. Comm. On Gov't Efficiency & Reform 57 (Jan. 2013), *available at* http://www.house.state.tx.us/_media/pdf/committees/reports/82interim/House-Committee-on-Goverement-Efficiency-and-Refrom-Interim-Report.pdf.

**52.** *Id.*

**53.** Traditionally, only the medical and legal professions were subject to occupational licensing. J.R.R., II, *Note, Due Process Limitations on Occupational Licensing*, 59 Va. L. Rev. 1097, 1097 (1973). Later, as women, minorities and immigrants—those lacking political power—entered the labor market, incumbent interests lobbied politicians to erect barriers to thwart newcomers. For example, California called a constitutional convention in 1878 to combat what the Workingmen's Party called the "Chinese Menace," an influx of immigrant laborers from China. The result, cheaper labor costs and thus cheaper goods and services, was intolerable to incumbent interests, who imposed severe barriers to entry. One convention delegate confessed his goal forthrightly: "to hamper them in every way that human ingenuity could invent." Sandefur, *supra* note 24, at 146.

One such xenophobic law targeted Chinese launderers, who dominated San Francisco's laundry market. The U.S. Supreme Court said no. In *Yick Wo v. Hopkins*, the Court rejected efforts to persecute disfavored interests through arbitrary permitting laws. 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (striking down San Francisco's laundry-permitting ordinance, which, while couched in public-safety rhetoric, plainly aimed to eliminate competition from Chinese operators). The Court minced no words: "the very idea that one man may be compelled to hold his life, or the means of living ... at the mere will of another seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself." *Id.* at 370, 6 S.Ct. 1064.

**54.** Stephanie Simon, *A License to Shampoo: Jobs Needing State Approval Rise*, Wall St. J., Feb. 7, 2011, *available at* http://www.wsj.com/articles/SB10001424052748703445904576118030935929752.

**55.** Morris M. Kleiner & Alan B. Krueger, *The Prevalence and Effects of Occupational Licensing*, British J. of Industrial Relations 676, 678 (2010).

**56.** *Id.* at 679.

workers needed government permission to do their job.[57]

This spike in licensing coincides with a decline in labor-union membership. "In fact, [occupational licensing] has eclipsed unionization as the dominant organizing force of the U.S. labor market."[58] Twice as many workers today are covered by licensing as by labor contracts.[59] Moreover, the pervasiveness of licensing seems unrelated to whether a state is labeled "red" or "blue" politically. Occupational regulation seems wholly disconnected from party-specific ideology. In addition, most economic regulations are enacted not by legislatures answerable to voters but by administrative bodies, often with scant oversight by elected officials.

The Lone Star State is not immune from licensure proliferation. An ever-growing number of Texans must convince govern-ment of their fitness to ply their trade, spurring the House Committee on Government Efficiency and Reform in 2013 to lament the kudzu-like spread of licensure: "The proliferation of occupational licensing by the State of Texas can be to the detriment of the very consumer the licensing is professing to protect."[60] Today the number of regulated occupations exceeds 500 [61] —about 2.7 million individuals and businesses,[62] roughly one-third of the Texas workforce,[63] higher than the national average [64]—with many restrictions backed by heavy fines and even jail time. Importantly, these statistics reflect state-only regulations; local and federal rules raise the number of must-be-licensed workers higher still.[65]

Unlike some states, Texas doesn't yet require florists,[66] interior designers,[67] horse massagers,[68] ferret breeders,[69] or

---

**57.** *Id.* at 678. *See also* MORRIS M. KLEINER, LICENSING OCCUPATIONS: ENSURING QUALITY OR RESTRICTING COMPETITION? 1 (W.E. Upjohn Institute for Employment Research, 2006); Morris M. Kleiner, *Occupational Licensing: Protecting the Public Interest or Protectionism?* 1 (W.E. Upjohn Institute for Employment Research, Policy Paper No. 2011–009, 2011).

**58.** Edlin and Haw, *supra* note 48, at 1102. Today, licensing substitutes to some extent for unionization. *See* Suzanne Hoppough, *The New Unions*, FORBES, Feb. 25, 2008, *available at* http://www.forbes.com/part_forbes/2008/0225/100.html.

**59.** Alan B. Krueger, *Do You Need a License to Earn a Living? You Might Be Surprised at the Answer*, N.Y. TIMES, Mar. 2, 2006, at C3.

**60.** INTERIM REPORT, *supra* note 51, at 58.

**61.** *Id.*

**62.** *Id.*

**63.** *Id.*

**64.** *Id.* (citing KLEINER, LICENSING OCCUPATIONS, *supra* note 57, at 12).

**65.** Kleiner & Krueger, *supra* note 55, at 678.

**66.** Louisiana is the only state in the country that requires licenses for florists. *See* LA. REV. STAT. ANN. §§ 3:3804(A)(2), (3), (4), (C), (D), 3:3809 (2014). And until 2010, part of the licensing exam for aspiring florists included a flower-arranging demonstration ... judged by their future competition. *See id.* § 3:3807(B)(2) (2008), *amended by* H.B. 1407, 2010 Leg., Reg. Sess. (La. 2010); *see also* Robert Travis Scott, *Florist bill delivered to Gov. Bobby Jindal's desk*, THE TIMES-PICAYUNE (June 16, 2010), available athttp://www.nola.com/politics/index.ssf/2010/06/florists_bill_delivered_to_gov.html.

**67.** *See, e.g.,* FLA. STAT. ANN. §§ 481.213 (West 2015); LA. REV. STAT. ANN. § 37:3176 (West 2014); NEV. REV. STAT. ANN. § 623.180(1) (West 2014); D.C. CODE § 47–2853.103 (2015).

**68.** In Arizona and Nebraska, you can't be a horse masseuse without a license. *See* ARIZ. REV. STAT. ANN. § 32–2231(A)(4) (West 2015) (defining practice of veterinary medicine); 172 NEB. ADMIN. CODE § 182–004.02D (2015) (eligibility for licensure as an Animal Therapist in Massage Therapy); *see also* ANIMAL MASSAGE LAWS BY STATE, INT'L ASSOC. OF ANIMAL MASSAGE AND BODYWORK, http://www.iaamb.org/reference/state-laws-2013.html (last visited June 25, 2015).

fortune tellers[70] to get state approval (though the soothsayers would presumably see it coming). But the Lone Star State *does* require state approval to be a shampoo apprentice.[71] And to be an in-person auctioneer[72] (though not to be an *internet* auctioneer). And while you don't need a license to be a bingo caller in Texas, you must be listed on the Registry of Approved Bingo Workers in order to yell out numbers and letters.[73]

The "sum of good government," Thomas Jefferson said in his first inaugural, was one "which shall restrain men from injuring one another"—indisputably true—but "shall leave them otherwise free to regulate their own pursuits of industry and improvements."[74] Without question, many licensure rules are justified by legitimate public health and safety concerns. And isolating the point at which a rule becomes unconstitutionally "irrational" eludes mathematical precision. But it is no more imprecise as when judges ascertain under the Constitution when a search is "unreasonable"[75] or bail "excessive"[76] or cause "probable"[77] or punishment "cruel and unusu-

al."[78] Degree of difficulty aside, judges exist to be judgmental, hence the title.

The Texas Constitution has something to say when barriers to occupational freedom are absurd or have less to do with fencing out incompetents than with fencing in incumbents. As Nobel economist Milton Friedman observed, "the *justification*" for licensing is always to protect the public, but "the *reason*" for licensing is shown by observing who pushes for it—usually those representing not consumers but vested, already-licensed practitioners.[79] In other words, government's coercive power is often wielded to quash newcomers. As two federal appellate judges provocatively put it, "The practical effect of rational basis review of economic regulation is the absence of any check on the group interests that all too often control the democratic process. It allows the legislature free reign to subjugate the common good and individual liberty to the electoral calculus of politicians, the whims of majorities, or the self-interest of factions."[80] Summarizing: "Rational basis review means property is at the mercy of the pillagers.

---

69. *See, e.g.,* Mass. Gen. Laws Ann. ch. 131 § 77(2) (West 2015) ("[N]o person shall possess a ferret for breeding purposes without obtaining a license from the director....").

70. *See id.* ch. 140 § 185I(2) ("No person shall tell fortunes for money unless a license therefor has been issued by the local licensing authority.").

71. Tex. Occ. Code § 1602.267. In Tennessee, a shampoo license has a 300 hour instructional requirement. *See* Shampoo Technician, Tn. Dep't of Comm. & Ins. (last visited June 25, 2015), https://www.tn.gov/commerce/article/cosmo-shampoo-technician. Alabama also requires a license to practice as a "shampoo assistant." *See* Ala. Code § 34-7b-1(21) (2014). *See also* Simon, *supra* note 54 (surveying trade regulations in several states, including shampooing regulations in Texas and barber regulations in California).

72. Tex. Occ. Code § 1802.051(a).

73. 16 Tex. Admin. Code § 402.402(b).

74. President Thomas Jefferson, First Inaugural Address (Mar. 4, 1801), *in* 8 The Writings of Thomas Jefferson 3–4 (Henry A. Washington ed., 1854).

75. U.S. Const. amend. IV.

76. *Id.* amend. VIII.

77. *Id.* amend. IV.

78. *Id.* amend. VIII.

79. Milton Friedman & Rose Friedman, Free To Choose 240 (1980) (emphasis in original).

80. *Hettinga v. United States,* 677 F.3d 471, 482–83 (D.C.Cir.2012) (Brown, J., joined by Sentelle, C.J. concurring).

The constitutional guarantee of liberty deserves more respect—a lot more."[81]

Indeed, some fret that the focus of occupational regulation has morphed from protecting the public from unqualified providers to protecting practitioners from unwanted competition. Courts are increasingly asking whether societal benefits are being subordinated to the financial benefits of those lucky enough to be licensed. The U.S. Court of Appeals for the Fifth Circuit recently buried the so-called "casket cartel" in Louisiana, siding 3–0 with a group of woodworking Benedictine monks who supported their monastery by selling handcrafted pine coffins. State-licensed funeral directors found the competition unwelcome, and the monks were threatened with a fine and jail time for breaching Louisiana law that said only state-licensed funeral directors could sell "funeral merchandise." In striking down the anticompetitive law, the Fifth Circuit explained: "The great deference due state economic regulation does not demand judicial blindness to the history of a challenged rule or to the context of its adoption nor does it require courts to accept nonsensical explanations for regulation."[82] While acknowledging that *Williamson v. Lee Optical*[83]—the Supreme Court's authoritative treatment of rational-basis scrutiny—dictates deference to state policymakers, the Fifth Circuit underscored that "*Williamson* insists upon a rational basis," adding, "a hypothetical rationale, even post hoc, cannot be fantasy" or impervious to "evidence of irrationality."[84]

A similar casket-cartel law was invalidated in 2002 by the U.S. Court of Appeals for the Sixth Circuit, the first federal appellate court since the New Deal to invalidate an economic regulation for offending economic liberties secured by the Fourteenth Amendment.[85] The court found no

81. *Id.* at 483.

82. *St. Joseph Abbey v. Castille*, 712 F.3d 215, 226 (5th Cir.), *cert. denied*, — U.S. —, 134 S.Ct. 423, 187 L.Ed.2d 281 (2013).

83. 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

84. *Id.* at 223.

85. *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002). The U.S. Supreme Court grounds economic liberty in the Fourteenth Amendment, but as discussed above, it does so within the judicially invented concept of "substantive due process" rather than within the textual Privileges or Immunities Clause of the Fourteenth Amendment. The Clause, drafted by the Committee on Reconstruction, was specifically enacted to relieve rigid constraints on economic liberty, including post-Civil War licensing systems that hamstrung the economic activities of freed slaves. *See generally* HAROLD M. HYMAN & WILLIAM M. WIECEK, EQUAL JUSTICE UNDER LAW 319 (1982). Constitutionalizing well-understood rights, including the economic rights protected by the Civil Rights Act of 1866—making freedom actually meaningful—was the overriding point. And these protected economic rights included the right to practice a chosen trade. Jeffrey Rosen, *Translating the Privileges or Immunities Clause*, 66 GEO. WASH. L. REV. 1241, 1250–51 (1998). As noted above, the Clause's abolitionist author explained that it was intended to safeguard "the liberty ... to work in an honest calling and contribute by your toil in some sort to the support of yourself, to the support of your fellowmen, and to be secure in the enjoyment of the fruits of your toil." CONG. GLOBE, 42D CONG., 1ST SESS., 86 app. (1871). The Fourteenth Amendment's legislative record is replete with indications that "privileges or immunities" encompassed the right to earn a living free from unreasonable government intrusion. *Id.*

As explained above, the U.S. Supreme Court's nullification of the federal Privileges or Immunities Clause in *Slaughter–House* began the process of undermining the amendment's civil-rights protections for black Americans in the South. *See, e.g., United States v. Cruikshank*, 92 U.S. 542, 23 L.Ed. 588 (1875); *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) *overruled by Brown*

sensible connection between the onerous licensing requirements and the law's alleged "health and safety" purpose. The court rejected the state's predictable cries of "*Lochner*ism" and said the alleged bases for the law came close to "striking us with 'the force of a five-week-old, unrefrigerated dead fish.' "[86] The Sixth Circuit concluded it was ludicrous to see the law as anything but "an attempt to prevent economic competition,"[87] and that "protecting a discrete interest group from economic competition is not a legitimate governmental purpose."[88] Granting special economic favors to preferred interests may be a *common* government purpose—"the favored pastime of state and local governments," as the Tenth Circuit put it [89]—but common doesn't mean constitutional. Merely asserting—and accepting—"Because government says so" is incompatible with individual freedom. Courts need not be contortionists, ignoring obvious absurdities to contrive imaginary justifications for

laws designed to favor politically connected citizens at the expense of others.

More and more, courts—even comedians [90]—are scrutinizing the entry barriers imposed by occupational regulations. Earlier this year, a federal district court in Austin rejected the state's attempt to force a teacher of African hair braiding to meet state barber-school regulations.[91] Isis Brantley was vexed as to why her Institute of Ancestral Braiding needed a 2,000–square foot facility, 10 barber chairs, and 5 sinks to teach people how to twist and braid hair.[92] The court examined means and ends and agreed the requirements were senseless.[93] Why require sinks, for example, when braiders don't wash hair, and state law allows braiders to use just hand sanitizer?[94] The court refused to accept blindly the state's purported justifications. It conducted an actual judicial inquiry and observed the state was trying to "shoehorn two unlike professions 'into a

*v. Bd. of Ed.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). *Slaughter–House* has been accused of "strangling the privileges or immunities clause in its crib." Akhil R. Amar, *The Bill of Rights and the Fourteenth Amendment*, 101 YALE L.J. 1193, 1259 (1992). Worse, it emboldened legislatures to enact notorious Jim Crow laws. Scholars across the political spectrum agree that *Slaughter–House* reflects a deeply flawed understanding of constitutional history.

**86.** *Craigmiles*, 312 F.3d at 225 (quoting *United States v. Searan*, 259 F.3d 434, 447 (6th Cir.2001)).

**87.** *Id.*

**88.** *Id.* at 224.

**89.** *Powers v. Harris*, 379 F.3d 1208, 1221 (10th Cir.2004).

**90.** A few years ago, Jon Stewart's *The Daily Show* lampooned state efforts to regulate hair braiding. *See The Daily Show* (Comedy Central television broadcast June 3, 2004), *avail-

able at* http://thedailyshow.cc.com/videos/adygsa/the-braidy-bill.

**91.** *See Brantley v. Kuntz*, No. A–13–CA–872–SS, 98 F.Supp.3d 884, 894, 2015 WL 75244, *8 (W.D.Tex. Jan. 5, 2015) ("[T]he regulatory scheme ... exclude[s] Plaintiffs from the market absent a rational connection ...").

**92.** *See id.* at 887–88, 2015 WL 75244 at *2.

**93.** *See id.* at 893–94, 2015 WL 75244 at *7.

**94.** *See id.* at 892–93, 2015 WL 75244 at *6. *The Oregonian* recently profiled a hair braider in Oregon, where braiders must have a cosmetology license, who daily crosses the border into Washington, where braiders are exempt. Most of her clients cross the border, too. The options for customers are simple: pay the cartel price or find an illicit braider. *See* Anna Griffin, *Braiding African American Hair at center of overregulation battle in Oregon*, THE OREGONIAN (Aug. 11, 2012), http://www.oregonlive.com/politics/index.ssf/2012/08/braiding_african_american_hair.html.

single, identical mold, by treating hair braiders—who perform a very distinct set of services—as if they were [barbers].' "[95] The court stressed "the logical disconnect inherent in the scheme which contemplates the existence of hair-braiding schools but makes it prohibitively difficult for a hair-braiding school to enter the market."[96] The court concluded the rules lacked any "rational relationship to any legitimate government interest"[97] and were thus unconstitutional under the Fourteenth Amendment.[98]

Tellingly, the state declined to appeal, saying it would instead launch "a comprehensive review of the barber and cosmetology statutes" and "work with [the] legislative oversight committees on proposals to remove unnecessary regulatory burdens for Texas businesses and entrepreneurs."[99] Legislative response was swift—and unanimous—and Governor Abbott 15 days ago signed House Bill 2717 to deregulate hair braiding.[100] But as with many matters (*e.g.*, public school finance), it took a judi-cial ruling on constitutionality to spark legislative action.

The U.S. Supreme Court itself recently examined how states regulate professions, scrutinizing whether licensing boards dominated by industry incumbents are rightly focused on weeding out scammers and inept practitioners or wrongly focused on weeding out newcomers.[101] Earlier this year in *North Carolina State Board of Dental Examiners v. FTC*,[102] the High Court held that a state dental board controlled by "active market participants" could be sued under federal antitrust law for cracking down on non-dentists who were offering teeth-whitening treatments.[103] The decision brought a smile to licensure critics who had long argued that self-regulation invites self-dealing and that state licensing boards prone to regulatory capture deserved no immunity for Sherman Act[104] abuses. Ever since *Parker v. Brown* 80-plus years ago,[105] such boards were deemed outside the Act's ban on cartels because, unlike traditional cartels, they were sanctioned by the state.[106] No

**95.** *Brantley*, 98 F.Supp.3d at 893–94, 2015 WL 75244, at *7 (quoting *Clayton v. Steinagel*, 885 F.Supp.2d 1212, 1215 (D.Utah 2012)) (quoting *Clayton v. Steinagel*, 885 F.Supp.2d 1212, 1215 (D.Utah 2012)).

**96.** *Id.*

**97.** *Id.* at 894, 2015 WL 75244 at *8.

**98.** *Id.*

**99.** Angela Morris, *Braider Wins Against State Barber Regulations*, TEXAS LAWYER, Jan. 19, 2015, *available at* http://www.texaslawyer. com/id=1202715320677/Braider-Wins-Against-State-Barber-Regulations.

**100.** Act of May 22, 2015, 84th Leg., R.S., ch. 413, § 2, 2015 Tex. Sess. Law Serv. 2717 (to be codified at Tex.Occ.Code § 1601.003(2)(E)), *available at* http://www. capitol.state.tx.us/tlodocs/84R/billtext/pdf/HB 02717F.pdf#navpanes=0.

**101.** *See* Morris M. Kleiner, *Occupational Licensing*, 14 J. ECON. PERSPECTIVES 189, 191

(2000) (describing the composition of state licensing boards).

**102.** —— U.S. ——, 135 S.Ct. 1101, 191 L.Ed.2d 35 (2015).

**103.** *Id.* t 1110.

**104.** *See generally* 15 U.S.C. §§ 1–7 (2004).

**105.** 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). *See also Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 63 L.Ed.2d 233 (stating two standards for *Parker* state action immunity: (1) state articulation of its purpose to displace competition, and (2) active state supervision).

**106.** *See Parker*, 317 U.S. at 351, 63 S.Ct. 307 ("The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state.").

more. *Parker* no longer insulates regulated regulators regulating to anticompetitive effect. Licensing boards comprised of private competitors will face Sherman Act liability if they flex power to smother aspiring entrepreneurs.[107]

## B.

As today's case shows, the Texas occupational licensure regime, predominantly impeding Texans of modest means, can seem a hodge-podge of disjointed, logic-defying irrationalities, where the burdens imposed seem almost farcical, forcing many lower-income Texans to face a choice: submit to illogical bureaucracy or operate an illegal business? Licensure absurdities become apparent when you compare the wildly disparate education/experience burdens visited on various professions. The disconnect between the strictness of some licensing rules and their alleged public-welfare rationale is patently bizarre:

*Emergency Medical Technicians.* EMTs are entrusted with life-and-death decisions. But in Texas, entry-level EMTs need only 140 hours of training before rendering life-saving aid.[108] Contrast that with the radically more onerous education/experience requirements for barbers (300 hours),[109] massage therapists (500 hours),[110] manicurists (600 hours),[111] estheticians (750 hours),[112] and full-service cosmetologists (1,500 hours).[113]

*Backflow Prevention Assembly Testers.* Of the number of states and the District of Columbia that require licenses for backflow prevention assembly testers, the Lone Star State is the only place where it takes more than two weeks of training/experience—*way* more. Fifty times more. Not two weeks but two *years.*[114]

State licensing impacts our lives from head to toe. Literally. Starting at the

---

**107.** *See N.C. State Bd. of Dental Exam'rs,* 135 S.Ct. at 1110–11 ("But while the Sherman Act confers immunity on the States' own anticompetitive policies out of respect for federalism, it does not always confer immunity where, as here, a State delegates control over a market to a non-sovereign actor.... For purposes of *Parker,* a nonsovereign actor is one whose conduct does not automatically qualify as that of the sovereign State itself.") (citation omitted).

**108.** 25 Tex. Admin. Code § 157.32(c)(2)(B).

**109.** Tex. Occ. Code § 1601.253(c)(2).

**110.** *Id.* § 455.156(b)(1).

**111.** *Id.* § 1601.257(b)(3).

**112.** *Id.* § 1602.257(b)(3).

**113.** *Id.* § 1602.254(b)(3). A Class A Barber who completes an additional 300 hours of instruction in cosmetology—total of 600 hours of training—may also be eligible to become a full-service cosmetologist. *Id.* § 1602.254(c).

**114.** *See* Tex. Health & Safety Code § 341.034(c); 30 Tex. Admin. Code § 30.60. Although one can begin working as a backflow prevention assembly tester with only 40 hours of instruction in Texas, obtaining a license requires two years of work experience. *See, e.g.,* 30 Tex. Admin. Code § 30.60(4)–(5). In contrast, other states do not require pre-licensure work experience in addition to knowledge-based examinations. *See* Idaho Admin Code Ann. § r.24.05.01.335 (2014) (requirements for a backflow assembly tester license); Minn. Stat. § 326B.42 (West 2015) (defining "backflow prevention tester" as an individual qualified by training prescribed by the Plumbing Board); Minn. Dep't of Labor & Indus., Minnesota backflow agreement 2013, ASSE Int'l Ltr. (Oct. 15, 2013) (determining the requirements for certification), *available at* http://www.dli.mn.gov/CCLD/PDF/pe_agree.pdf; Mo. Code Regs. Tit. 10, § 60–11.030 (2015) (providing for certification upon completion of a written exam); Utah Admin. Code r. 309–305–5 (2015) (providing for certification upon completion of written and practical examinations).

top, where does hair end and the beard begin? Texas law has been quite finicky on the matter, leading Texas barbers and cosmetologists to spend years splitting legal hairs and clogging Texas courts. Both of these state-licensed professionals may cut hair, but until 2013 only barbers, not cosmetologists, had state permission to wield a razor blade to shave *facial* hair. Before 2013, if you wanted your beard shaved, you had to visit a barber (probably a man) and not a cosmetologist (probably a woman).[115] And what *is* a "beard" anyway? Why, it's the facial hair below the "line of demarcation" as defined in the Administrative Code.[116] Even the Attorney General of Texas got all shook up wondering whether Elvis's famous sideburns "were hair which a cosmetologist might trim, or a partial beard which could be serviced only [by] a barber."[117]

At the other bodily extreme, what's the demarcation between the foot (which podiatrists can treat) and the ankle (which they can't)? These are high-stakes disputes, and sometimes the licensing bodies have jurisdictional spats with each other, usually over "scope of practice" issues. So where *does* the foot end and the ankle begin? In 2010, this Court ended a nearly ten-year legal battle between, in one corner, the Texas Medical Association and Texas Orthopedic Association, and in the other, the Texas State Board of Podiatric Medical Examiners and Texas Podiatric Medical Association.[118]

According to the academic literature, the real-world effects of steroidal regulation are everywhere: increased consumer cost; decreased consumer choice; increased practitioner income; decreased practitioner mobility[119]—plus shrunken economic prospects for lower income, would-be entrepreneurs.[120] Thomas Edison, with little formal schooling, likely could not be a licensed engineer today, nor could Frank Lloyd Wright be a licensed architect.[121]

---

**115.** Prior to the 1960s and 1970s, rigid state laws codified sexual stereotypes that distinguished male barbers and barbershops from female cosmetologists (or beauticians) and beauty parlors. Unisex hair salons became in vogue in the late 1960s through the 1970s as courts invalidated these state statutes under the equal protection clause of the Fourteenth Amendment.

Today, although there is hardly a distinction between most barber and cosmetology services, there is plenty of opportunity for overzealous regulators to tag unsuspecting shop owners with "gotcha" fines. *See, e.g., Tex. Dep't of Licensing & Regulation v. Roosters MGC, LLC*, No. 03–09–00253–CV, 2010 WL 2354064 (Tex.App.–Austin June 10, 2010, no pet.) (discussing whether a cosmetologist's use of a safety razor to remove hair from a customer's neck or face violates state law controlling what services can be provided exclusively by barbers).

**116.** 16 Tex. Admin. Code §§ 82.10(8), (23).

**117.** Tex. Att'y Gen. Op. No. JC–0211 (2000) ("We think it likely that most observers would consider the sideburns worn by the late Elvis Presley at the time of his early success in 1956 as part of his hair. On the other hand, whether the muttonchops which adorned his face at the time of his death were hair which a cosmetologist might trim, or a partial beard which could be serviced only a barber, is a question which in the absence of any articulated standard might well present difficulties to a cosmetologist who wished to remain within his or her licensed practice.").

**118.** *Tex. Orthopaedic Ass'n v. Tex. State Bd. of Podiatric Med. Exam'rs*, 254 S.W.3d 714 (Tex. App–Austin 2008, pet. denied) (invalidating the Texas State Board of Podiatric Medical Examiners rule defining the word "foot").

**119.** *See e.g.,* Sandefur, *supra* note 24, at 24.

**120.** *Id.* (noting that monopoly laws and restrictive licensing schemes were "often used to give economic favors to politically influential lobbyists . . .").

**121.** One powerful way regulations handicap innovation is through sweeping, inflexible, one-size-fits-all measures that crowd out nov-

### III.

*No man is allowed to be a judge in his own cause, because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity.*[122]

Anyone acquainted with human nature understands, as Madison did, that when people, or branches of government, are free to judge their own actions, nothing is prohibited. The Court recognizes that Texans possess a basic liberty under Article I, Section 19 to earn a living. And to safeguard that guarantee, the Court adopts a test allergic to nonsensical government encroachment. I prefer authentic judicial scrutiny to a rubber-stamp exercise that stacks the legal deck in government's favor.

My views are simply stated:

1. *The economic-liberty test under Article I, Section 19 of the Texas Constitution is more searching than the minimalist test under the Fourteenth Amendment to the United States Constitution.*

Even under the lenient rational-basis test—"the most deferential of the standards of review"[123]—the would-be threaders should win this case. It is hard to imagine anything more irrational than forcing people to spend thousands of dollars and hundreds of hours on classes that teach everything they don't do but nothing they actually do. Not one of the 750 required hours of cosmetology covers eyebrow threading. Government-mandated barriers to employment should actually bear some meaningful relationship to reality.

It is instructive to consider the U.S. Supreme Court's first occupational licensing case, from 1889. In *Dent v. West Virginia*[124]—which has never been overruled and is still cited approvingly[125]—the Court upheld a physician-licensing regime, calling it a way to protect "the general welfare of [the] people" and "secure them against the consequences of ignorance and incapacity, as well as of deception and fraud."[126] But the Court cautioned that constitutional limits exist. Government is free to mandate requirements "appropriate to the calling or profession," but not those that "have no relation to such calling or

---

el services. For example, in the recent teeth-whitening case at the U.S. Supreme Court, the state dental board defined dentistry broadly to include teeth whitening. *N.C. State Bd. of Dental Exam'rs*, —— U.S. ——, 135 S.Ct. 1101, 1120, 191 L.Ed.2d 35 (2015). In today's case, eyebrow threaders want to thread eyebrows—and *only* want to thread eyebrows—but Texas defines the regulated trade of cosmetology so broadly, and irrationally, that threaders must take pricey and time-consuming classes to learn, well, *nothing* about threading but *lots* about non-threading. These Texans aim to provide a single service, but the government—exercising maximum will but minimum judgment—shackles creativity and innovation by lumping threading in with licensed, full-fledged cosmetology and requiring people to spend untold hours and dollars learning wholly irrelevant cosmetology techniques. The result, disproportionately affecting the poor, is the so-called "Cadillac effect": would-be entrepreneurs squashed by exorbitant start-up costs, and would-be consumers forced to either (1) pay a higher-than-necessary price (a Cadillac) when all they want to buy is a discrete service at a lower price (a Kia), or (2) go without, or perhaps try to do it themselves.

122. THE FEDERALIST No. 10, at 79 (James Madison) (Clinton Rossiter ed., 1961).

123. BLACK'S LAW DICTIONARY 1453 (10th ed. 2009).

124. 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623 (1889).

125. *See, e.g., Conn v. Gabbert*, 526 U.S. 286, 292, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999) (citing *Dent* with approval but declining to extend).

126. *Dent*, 129 U.S. at 122, 9 S.Ct. 231.

profession."[127] Why? Because that would "deprive one of his right to pursue a lawful vocation."[128] Restrictions must have a reasonable connection to the person's fitness or capacity. That explains the High Court's 1957 ruling in *Schware v. Board of Bar Examiners*,[129] the only time the Court has struck down a licensing restriction under rational-basis review. In Schware, the Court invalidated New Mexico's attempt to bar a Communist Party member from practicing law: "any qualification must have a rational connection with the applicant's fitness or capacity to practice."[130]

The federal rational-basis requirement debuted amid Depression-era upheaval in 1934, when the Court in *Nebbia v. New York*,[131] criminalizing the sale of milk below the government-approved price, held "a State is free to adopt whatever economic policy may reasonably be deemed to promote public welfare,"[132] so long as it is not "unreasonable or arbitrary."[133] *Nebbia* was a constitutional bombshell, and its abandonment of strong judicial protection for economic liberty presaged a vast expansion of government power. Twenty years later came the Court's authoritative guidance on Fourteenth Amendment review of economic regulation: *Williamson v. Lee Optical*.[134] In *Lee Optical*, the Court, while implicitly recognizing a liberty right to pursue one's chosen occupation, held that economic regulation—here, forbidding opticians from putting old lenses in new frames—would be upheld if the court could conjure out of thin air any hypothetical reason why lawmakers *might* have enacted the law.[135] Uncertainty has persisted for decades, partly because, as the Court acknowledges, "Our cases have not elaborated on the standards for determining what constitutes a 'legitimate government interest.'"[136] Some federal circuits, including the Fifth, have held it is improper to regulate solely to insulate incumbent business from competition.[137] But with a few notable exceptions, like the

127. *Id.*

128. *Id.*

129. 353 U.S. 232, 238–39, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) (holding that former communist ties are not sufficiently related to the practice of law to warrant disbarment).

130. *Id.* at 239, 77 S.Ct. 752.

131. 291 U.S. 502, 530, 54 S.Ct. 505, 78 L.Ed. 940 (1934).

132. *Id.* at 537, 54 S.Ct. 505.

133. *Id.* at 530, 54 S.Ct. 505.

134. 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

135. *Id.* at 487–89, 75 S.Ct. 461.

136. *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 834, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). Indeed, the label "rational basis" is misleading because the federal test doesn't require the law to actually make sense. Rather, it asks whether a lawmaker maybe, possibly, conceivably, plausibly, imaginably, hypothetically *might* have thought it was a good idea. It doesn't even matter if lawmakers actually *intended* to violate the Constitution. The law will be upheld so long as a court can conjure *any* legitimate public purpose for the law. One complication: The U.S. Supreme Court has yet to articulate with precision what constitutes a "legitimate" government interest. But how can one make sense of the "legitimate state interest" requirement unless and until the Court explains what purposes are and are not acceptable? Answering the question would necessarily require the Court to state straightforwardly that some things are illegitimate state interests.

137. *See, e.g., Craigmiles v. Giles*, 312 F.3d 220 (6th Cir.2002); *Merrifield v. Lockyer*, 547 F.3d 978 (9th Cir.2008); *St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir.), *cert. denied*, —— U.S. ——, 134 S.Ct. 423, 187 L.Ed.2d 281 (2013).

recent "casket cartel"[138] and African hair-braiding cases,[139] rational-basis review under the Fourteenth Amendment is largely a judicial shrug.

Indeed, federal-style scrutiny is quite unscrutinizing, with many burdens acing the rational-basis test while flunking the straight-face test. As the U.S. Supreme Court held almost 80 years ago in *United States v. Carolene Products*,[140] government has no obligation to produce evidence to sustain the rationality of its action; rather, "the existence of facts supporting the legislative judgment is to be presumed."[141] Courts "never require a legislature to articulate its reasons for enacting a statute" and will uphold a law "if there is any reasonably conceivable state of facts that could provide a rational basis" for it.[142] Indeed, it is "entirely irrelevant" whether the purported justification for a burdensome law "actually motivated the legislature."[143] Challengers must negate every conceivable basis that might support it,[144] and judges are exhorted to invent a colorable justification if the one articulated by the government falls short. All this explains why critics charge the test is less "rational basis" than "rationalize a basis."

The dissents would subordinate concrete scrutiny to conjectural scrutiny that grants a nigh-irrebuttable presumption of constitutionality. It is elastic review where any conceivable, theoretical, imaginary justification suffices. In my view, Texas judges should instead conduct a genuine search for truth—*as they do routinely in countless other constitutional areas*—asking "What is government actually up to?" When constitutional rights are imperiled, Texans deserve actual scrutiny of actual assertions with actual evidence.

- Should Texas courts reflexively accept disingenuous or smokescreen explanations for the government's actions? No.

- Is government allowed to prevail with purely illusory or pretextual justifications for a challenged law? No.

- Must citizens negate even purely hypothetical justifications for the government's infringement of liberty? No.

- Are Texas courts obliged to jettison their truth-seeking duty of neutrality and help government contrive post hoc justifications? No.

Texas judges should discern whether government is seeking a constitutionally valid end using constitutionally permissible means. And they should do so based on real-world facts and without helping government invent after-the-fact rationalizations. I believe the Texas Constitution requires an earnest search for truth, not the turn-a-blind-eye approach that prevails under the federal Constitution.[145]

138. *See St. Joseph Abbey*, 712 F.3d at 215.

139. *Brantley v. Kuntz*, No. A–13–CA–872–SS, 98 F.Supp.3d 884, 2015 WL 75244 (W.D.Tex. Jan. 5, 2015).

140. 304 U.S. 144, 152, 58 S.Ct. 778, 82 L.Ed. 1234 (1938).

141. *Id.* at 152.

142. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).

143. *Id.* at 315, 113 S.Ct. 2096.

144. *Id.* at 314–15, 113 S.Ct. 2096.

145. As mentioned above, the Texas Constitution has its own "privileges or immunities"-like language, and while *Slaughter–House* nullified federal protection, the U.S. Supreme Court declared that states were proper guardians of the "privileges or immunities" of state citizenship, including the right to pursue a calling. *Slaughter–House Cases*, 83 U.S. (16 Wall. 36), 77–78, 21 L.Ed. 394 (1873). Texas did exactly that in its 1875 Constitution, act-

2. *The Texas Constitution narrows the difference in judicial protection given to "fundamental" rights (like speech or religion) and so-called "non-fundamental" rights (like the right to earn a living).*

The jurisprudential fact of the matter is that courts are more protective of some constitutional guarantees than others. One bedrock feature of 20th-century jurisprudence, starting with the U.S. Supreme Court's New Deal-era decisions, was to relegate economic rights to a more junior-varsity echelon of constitutional protection than "fundamental" rights. Nothing in the federal or Texas Constitutions requires treating certain rights as "fundamental" and devaluing others as "non-fundamental" and applying different levels of judicial scrutiny, but it is what it is: Economic liberty gets less constitutional protection than other constitutional rights.

This is not opinion but irrefutable, demonstrable fact. Ever since what is universally known as "the most famous footnote in constitutional law" [146]—footnote four in *Carolene Products* in 1938 [147]—the U.S. Supreme Court has applied varying tiers of scrutiny to constitutional challenges. Simplified, the Court divides constitutional rights into two discrete categories: fundamental and non-fundamental. Upshot: Your favored First Amendment speech rights receive stronger judicial protection than your disfavored Fifth Amend-

ment property rights. The fragmentation is less logical than rhetorical, and is anchored less in principle than in power. Under the post-New Deal picking and choosing, speech gets preferred status while economic liberty is treated as "a poor relation" [148]—despite the Due Process Clause's explicit inclusion of "property" (and given the High Court's nullification of the Privilege or Immunities Clause in *Slaughter–House*). Speech rights get no-nonsense "strict scrutiny" to ensure government is behaving itself while property rights get servile, pro-government treatment.

For example, when courts decide an Establishment Clause challenge under the First Amendment, they normally defer to a State's asserted secular purpose. But such deference is not blind. Courts don't simply take government's word for it; they are careful to ensure that a "statement of such purpose be sincere and not a sham." [149] Same with gender classifications. The Court in 1996 struck down Virginia's exclusion of women from Virginia Military Institute, explaining that government's asserted justification must be "genuine," as opposed to one that's been "hypothesized or invented *post hoc* in response to litigation." [150]

Digital privacy under the Fourth Amendment is another constitutional area

---

ing quickly on the Court's statement that protection of individuals' non-federal privileges and immunities was a state concern. As the Court notes, however, the plaintiffs did not raise a separate privileges or immunities challenge.

**146.** *See, e.g.,* Felix Gilman, *The Famous Footnote Four: A History of the* Carolene Products Footnote, 465 S. Tex. L. Rev. 163, 165 (2004).

**147.** 304 U.S. 144, 152 n.4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938) (creating a dichotomy between laws that regulate economic affairs,

which get deferential judicial review, and laws that curtail important personal liberties or that target "discrete and insular minorities," which get more searching judicial scrutiny).

**148.** *Dolan v. City of Tigard,* 512 U.S. 374, 392, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994).

**149.** *Edwards v. Aguillard,* 482 U.S. 578, 586–87, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987).

**150.** *United States v. Virginia,* 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996).

where the U.S. Supreme Court requires real-world evidence rather than putting a pro-government thumb on the scale. Recently, in the landmark case *Riley v. California*,[151] prosecutors, citing concerns for officer safety and preserving evidence, insisted they did not need a warrant before searching an arrested suspect's smartphone. The Court unanimously rejected the prosecutors' excuses, making clear that justifications for burdening constitutional rights must be concrete, non-imaginary concerns "based on actual experience."[152] The Court held there was no real and documented evidence that warrantless searches were necessary to protect officers.[153] As for evidence destruction, the Court was likewise unmoved, noting again the absence of actual evidence to back the State's assertion, adding that in any event, law enforcement has "more targeted ways to address those concerns."[154]

Some constitutional rights fall somewhere in between, like "commercial speech," not because the Constitution draws that distinction but because judges do. Commercial speech—advertisements and other business-related speech—is a hybrid under U.S. Supreme Court precedent, involving speech rights (protected vigorously) and economic rights (protected not so vigorously).[155] Imagine a law that makes it illegal to advertise Axe Body Spray because lawmakers believe it endangers the public. This law plainly burdens speech, but it burdens *economic* speech, which receives less judicial protection than, say, political speech.[156] Nonetheless, commercial speech restrictions still get meaningful judicial review. Courts would examine three factors: (1) whether government has a "substantial interest" in burdening the speech; (2) whether the restriction actually furthers that interest; and (3) whether there are less restrictive ways to achieve the stated goal so that speech is restricted as little as necessary.[157] Government bears the burden of proof, and the law receives a serious judicial pat-down, including whether it was honestly driven by a desire to serve public interests or was merely a pretext to serve private interests. Now imagine a different law, one banning the *sale* of Axe Body Spray. With this law, the legal deck is shuffled differently, and a judge would apply a less-rigorous test because the law targets not commercial *speech* but commercial *activity*, a so-called *non*-fundamental right. Because this law focuses on economic activity, government wouldn't have to prove its health claims, or show that less restrictive means were available, or convince a judge that the law's purported purpose was a pretext to mask its true purpose.[158]

---

151. —— U.S. ——, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014).

152. *Id.* at 2485.

153. *Id.* at 2494.

154. *Id.* at 2487.

155. The Court first recognized the right "to follow any lawful calling, business, or profession he may choose" in *Dent v. West Virginia*, 129 U.S. 114, 121, 9 S.Ct. 231, 32 L.Ed. 623 (1889). For 126 years the Court has reaffirmed that right, even though judicial protection of it has waned. See *supra* notes 124–29 and accompanying text.

156. *Sorrell v. IMS Health Inc.*, —— U.S. ——, 131 S.Ct. 2653, 2672, 180 L.Ed.2d 544 (2011) ("Indeed the government's legitimate interest in protecting consumers from 'commercial harms' explains 'why commercial speech can be subject to greater governmental regulation than noncommercial speech.' ") (citations omitted).

157. *Id.* at 2672–84.

158. The constitutional double standard becomes perplexing in cases where fundamental and non-fundamental rights overlap. A few years ago, the Eleventh Circuit upheld the constitutionality of an Alabama law banning

But "economic" and "noneconomic" rights indisputably overlap. As the U.S. Supreme Court has recognized, freedom of speech would be meaningless if government banned bloggers from owning computers. Economic freedom is indispensable to enjoying other freedoms—for example, buying a Facebook ad to boost your political campaign. A decade (and three days) ago in *Kelo v. City of New London*,[159] the landmark takings case that prompted a massive national backlash,[160] Justice Thomas's dissent lamented the bias against economic rights this way: "Something has gone seriously awry with this Court's interpretation of the Constitution. Though citizens are safe from the government in their homes, the homes themselves are not."[161]

*Kelo* is indeed illustrative, as the rational-basis test applies in eminent-domain cases, too, notwithstanding the assurance in footnote four of *Carolene Products* that alleged violations of the Bill of Rights deserve heightened scrutiny. Even though the Fifth Amendment explicitly protects property, the U.S. Supreme Court has supplanted the *Carolene Products* bifurcation with rational-basis deference in takings cases. The *Kelo* Court stressed its "longstanding policy of deference to legislative judgments,"[162] and its unwillingness to "second-guess"[163] the city's determination as to "what public needs justify the use of the takings power."[164] Justice O'Connor's scathing dissent, forcefully accused her colleagues of shirking their constitutional duty.[165]

A few years later in *District of Columbia v. Heller*,[166] which struck down D.C.'s ban on handguns and operable long guns, the Court divided on what measure of deference was appropriate in the Second Amendment context. In dissent, Justice Stevens lauded New Deal-era Justice Frankfurter and accused the Court of aggressive activism, chastising, "adherence to a policy of judicial restraint would be far wiser than the bold decision announced today."[167]

the commercial distribution of sex toys. *Williams v. Morgan*, 478 F.3d 1316 (11th Cir. 2007). The case involved the collision of sexual activity (deemed fundamental) and commercial activity (deemed non-fundamental). Plaintiffs aimed for strict scrutiny by framing the case in sexual-privacy terms because they knew if the case was treated as an economic-rights case, the ban would likely survive rational-basis review. The Eleventh Circuit applied rational-basis review and upheld the law, viewing the case as one about *accessing* sex toys and not about *using* sex toys. Result: Purchasing items for the bedroom can be regulated, but using them consensually cannot. The Fifth Circuit held the opposite way, saying a similar Texas ban violated the Due Process Clause in *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 740 (5th Cir.2008).

**159.** 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005) (upholding the power of government to condemn private property for economic-development purposes).

**160.** In the wake of *Kelo*, 45 states enacted property-rights reform to curb eminent domain. *See* Ilya Somin, *The political and judicial reaction to* Kelo, WASH. POST, June 4, 2015, *available at* http://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/06/04/the-political-and-judicial-reaction-to-kelo/.

**161.** *Kelo*, 545 U.S. at 518, 125 S.Ct. 2655 (Thomas, J., dissenting).

**162.** *Id.* at 469, 125 S.Ct. 2655.

**163.** *Id.* at 488, 125 S.Ct. 2655.

**164.** *Id.* at 483, 125 S.Ct. 2655.

**165.** *Id.* at 494, 125 S.Ct. 2655 (O'Connor, J., dissenting).

**166.** 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008).

**167.** *Id.* at 680 n.39, 128 S.Ct. 2783 (Stevens, J., dissenting).

I would not have Texas judges condone government's dreamed-up justifications (or dream up post hoc justifications themselves) for interfering with citizens' constitutional guarantees. As in other constitutional settings, we should be neutral arbiters, not bend-over-backwards advocates for the government. Texas judges weighing state constitutional challenges should scrutinize government's *actual* justifications for a law—what policymakers *really* had in mind at the time, not something they dreamed up after litigation erupted. And judges should not be obliged to concoct speculative or far-fetched rationalizations to save the government's case.

3. *Texas courts need not turn a blind eye to the self-evident reasons why an increasing number of Texans need a government permission slip to work in their chosen field.*

Today's decision recognizes another key contributor to the irrationalities afflicting occupational licensing: the hard-wired inclination to reduce competition. This metabolic impulse—Human Nature 101—has always existed.

English courts protected the right to earn a living since the early Seventeenth Century, long before the U.S. Constitution was adopted. In 1614, the Court of King's Bench invalidated a law that required an apprenticeship with the local guild before someone could become an upholsterer, dismissing the cries of licensed upholsterers who warned of inexpert practitioners. Lord Chief Justice Coke, Britain's highest

judicial officer, was unpersuaded, holding "no skill" was required, "for [someone] may well learn this in seven hours."[168] Lord Coke wrote that Magna Carta (now 800 years old) and English common law safeguarded the right of "any man to use any trade thereby to maintain himself and his family."[169] He compared the proponents of barriers, invariably incumbent businesses, to someone rowing a boat: "they look one way and row another: they pretend public profit, intend private."[170] That is, they speak of public welfare (increasing competence) but seek private welfare (decreasing competition). Guilds in England wielded licensing to create "artificial scarcity," prompting English courts to declare the right to earn a living one of "nationalistic concern for increasing the wealth of the realm."[171] Lord Coke said legal redress, not licensing, was preferred for most occupations, explaining the "possibility that a practitioner might do a bad job was not a good excuse for restricting economic freedom, raising costs to consumers, and depriving entrepreneurs of economic opportunity."[172]

Adam Smith echoed Coke a century and a half later in *The Wealth of Nations*, calling efforts to thwart people from exercising their dexterity and industry as they wish "a plain violation of this most sacred property."[173] Economic freedom was indeed prized in the colonies, which lacked a guild system, but the right was extolled less as a national wealth creator and more as man's natural birthright. In 1775, Thomas Jefferson previewed a principle he

---

168. *Allen v. Tooley,* (1613) 80 Eng. Rep. 1055 (K.B.) 1057; 2 Bulstrode 186, 189.

169. *Id.* at 1055.

170. R.H. COASE, *The Lighthouse in Economics* (1974), *in* THE FIRM, THE MARKET, AND THE LAW 187, 196 (1988) (quoting Chief Justice Sir Edward Coke) (spelling modernized).

171. SANDEFUR, *supra* note 24, at 23.

172. *Id.*

173. ADAM SMITH, AN INQUIRY INTO THE NATURE AND CAUSES OF THE WEALTH OF NATIONS 122 (Edwin Cannon, ed., Random House 1937).

would underscore in the Declaration—the right to pursue happiness[174]—lamenting British laws that "prohibit us from manufacturing, for our own use, the articles we raise on our own lands, with our own labour."[175] Like what? Colonists were forbidden from making iron tools. Why? To enrich British toolmakers. Colonists were forbidden from making their own hats from the fur of American animals. Why? To enrich British hatmakers. Adam Smith, who considered economic choice "the most sacred and inviolable of rights," likewise observed the tendency of trades to raise wages by reducing the supply of skilled craftsmen.[176]

What is past is indeed prologue.[177] Fast forward almost 250 years, and a prized taxi medallion in New York City now costs $1.25 million, quadruple the price of just a decade ago.[178] But the unalienable right to pursue happiness is not merely the right to possess things or to participate in activities we enjoy; it necessarily includes the right to improve our lot in life through industry and ingenuity.

A raft of modern research by Nobel Prize-winning economist Gary Becker and various social scientists confirms that practitioners desire to stifle would-be competitors.[179] In 2013, the Texas House Committee on Government Efficiency and Reform found this anticompetitive impulse alive and well in Texas, where licensure affords "clear advantages to members of the licensed profession, such as reduced competition and increased earnings."[180] The Committee observed that stiffer occupational regulations rarely originate with consumer and consumer advocacy groups; rather, they are pushed by entrenched industry members to secure "less competition, improved job security, and greater profitability."[181] The Committee, recognizing the myriad harms of occupational overregulation—measured in damage to "job growth and consumer choice"[182]—and fearing that Texas was headed towards "more, large-scale occupational licensing programs,"[183] made this recommendation: "The Legislature should implement a process to review proposals to regulate new occupations, as well as existing licensing programs, based on real and documented harm to the public."[184]

The Legislature responded by passing House Bill 86, which creates a mechanism to critically examine whether existing occupational regulations are still needed, and

174. Jefferson echoed phrasing from the Virginia Declaration of Rights, written by Jefferson's friend George Mason just one month before Jefferson's masterpiece was issued, who extolled "the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety." *See* Va. Declaration of Rights § 2 (1776), *in* 1 BERNARD SCHWARTZ, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 234–35 (1971).

175. THOMAS JEFFERSON, *A Summary View of the Rights of British America* (1774), *in* THE JEFFERSONIAN ENCYCLOPEDIA 963, 964 (John P. Foley ed., Funk & Wagnalls Co. 1900).

176. SMITH, *supra* note 173, at 121–22.

177. *See* WILLIAM SHAKESPEARE, THE TEMPEST act 2, sc. 1.

178. Matt Flegenheimer, *$1 Medallions Stifling the Dreams of Cabdrivers*, N.Y. TIMES, Nov. 14, 2013, at A24.

179. Gary S. Becker, *A Theory of Competition Among Pressure Groups for Political Influence*, Q.J. ECON., 371–400 (1983).

180. INTERIM REPORT, *supra* note 51, at 59.

181. *Id.*

182. *Id.*

183. *Id.* at 60.

184. *Id.* at 62.

to phase out those deemed unnecessary. Specifically, the new law requires the Sunset Advisory Commission, in assessing "an agency that licenses an occupation or profession," to probe whether, and how, existing occupational regulations actually serve the public interest.[185] The new law also allows a legislator to submit to the Commission for review and analysis any proposed legislation that would create a new or significantly modify an existing occupational licensing program.[186]

Courts need not be oblivious to the iron political and economic truth that the regulatory environment is littered with rent-seeking by special-interest factions who crave the exclusive, state-protected right to pursue their careers. Again, smart regulations are indispensable, but nonsensical regulations inflict multiple burdens—on consumers (who pay more for goods and services, or try to do the work themselves),[187] on would-be entrepreneurs (who find market entry formidable, if not impossible), on lower-income workers (who can't break into entry-level trades), and on the wider public (who endure crimped economic growth while enjoying no tangible benefit whatsoever).[188]

## IV.

*In Europe, charters of liberty have been granted by power. America has set the example ... of charters of power granted by liberty.*[189]

The Founders pledged their lives, fortunes, and sacred honors to birth a new

185. Tex. Gov't Code § 325.0115(b). The Commission is required to assess:
 (1) whether the occupational licensing program:
 (A) serves a meaningful, defined public interest; and
 (B) provides the least restrictive form of regulation that will adequately protect the public interest;
 (2) the extent to which the regulatory objective of the occupational licensing program may be achieved through market forces, private or industry certification and accreditation programs, or enforcement of other law;
 (3) the extent to which licensing criteria, if applicable, ensure that applicants have occupational skill sets or competencies that correlate with a public interest and the impact that those criteria have on applicants, particularly those with moderate or low incomes, seeking to enter the occupation or profession; and
 (4) the impact of the regulation, including the extent to which the program stimulates or restricts competition and affects consumer choice and the cost of services. *Id.* at § 325(b)(1)–(4).

186. The new law authorizes the Commission's chair to deny such a request for review on the recommendation of the executive director. The bill requires the Commission to report its review findings to the Legislature before the start of the next legislative session. The bill also requires the Commission, in analyzing legislation proposing the creation of an occupational licensing program, to determine whether the unregulated practice of the occupation would be inconsistent with the public interest, whether the public can reasonably be expected to benefit from an assurance of initial and continuing professional skill sets or competencies, and whether the public can be more effectively protected by means other than state regulation. *Id.* § 325.023(c)(1)–(3).

187. Howard Baetjer, Jr., Free Our Markets-A Citizens' Guide to Essential Economics 95–96 (2013).

188. Kleiner, Licensing Occupations, *supra* note 57, at 53.

189. James Madison, *Charters* (Jan. 19, 1792), *in* James Madison—Writings 733, 736 (Jack N. Rakove ed., 1999). *See also* 1 James Wilson, *Of the Study of the Law in the United States, in* The Works of James Wilson: Associate Justice of the Supreme Court, and Professor of Law In the College of Philadelphia 1, 6–7 (James De Witt Andrews ed., Callaghan & Co. 1895) ("Without liberty, law loses its nature and its name, and becomes oppression. Without law, liberty also loses its nature and its name, and becomes licentiousness.").

type of nation—one with a radical design: three separate, co-equal, and competing branches. Three rival branches deriving power from three unrivaled words: "We the People." Both the Texas and federal Constitutions presume the branches will be structural adversaries—that legislators, for example, will jealously guard their law-making prerogative if the executive begins aggrandizing power. Indeed, inter-branch political competition is a precondition to advancing inter-firm economic competition—that is, the judicial branch asserting judicial power to ensure that the political branches don't arbitrarily insulate established practitioners from newcomers.

Madison, lead architect of the U.S. Constitution, saw his bedrock constitutional mission as ensuring that America does not "convert a limited into an unlimited Govt."[190] Enlightenment philosopher Montesquieu likewise warned of power concentrated: "When the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no liberty."[191] Madison paid homage to "the celebrated Montesquieu" in Federalist 10, which gave voice to Madison's gravest worry: the risk of runaway majorities trampling individual liberty.[192] Madison turned 85 on the day delegates adopted the Constitution of the Republic of Texas. "He lived barely 100 days more, just long enough to see Texas free."[193] And just like Madison's handiwork, the *Texas* Constitution—then and today—exists to secure liberty.

### A.

As mentioned earlier, the term "judicial activism" is a legal Rorschach test. I oppose judicial activism, inventing rights not rooted in the law. But the opposite extreme, judicial passivism, is corrosive, too—judges who, while not activist, are not *active* in preserving the liberties, and the limits, our Framers actually enshrined. The Texas Constitution is irrefutably framed in proscription, imposing unsubtle and unmistakable limits on government power. It models the federal Constitution in a fundamental way: dividing government power so that each branch checks and balances the others. But as we recently observed, "the Texas Constitution takes Madison a step further by including, unlike the federal Constitution, an explicit Separation of Powers provision to curb overreaching and to spur rival branches to guard their prerogatives."[194] The Texas Constitution constrains government power in another distinctive way: It lacks a Necessary and Proper Clause, often invoked to expand Congress's powers beyond those specifically enumerated.[195] Moreover, as noted above, it contains a Privileges or Immunities Clause that, unlike the federal version, has never been judicially nullified.[196]

---

**190.** James Madison, *Letter to Spencer Roane* (Sept. 2, 1819), *in* JAMES MADISON: WRITINGS, *supra* note 189, at 736.

**191.** 1 CHARLES DE SECONDAT MONTESQUIEU, THE SPIRIT OF LAWS 181 (1st Amer. from the 5th London ed. 1802).

**192.** THE FEDERALIST No. 51, at 298 (James Madison) (Clinton Rossiter ed., 1961) (citing Montesquieu for the proposition that the three branches of government, yet intertwined, do not violate the principle of separation of powers).

**193.** *In re State Bd. for Educator Certification,* 452 S.W.3d 802, 808 n.38 (Tex.2014).

**194.** *Id.* at 808 n.39 (citing TEX. CONST. art. II, § 1).

**195.** U.S. CONST. art. I, § 8, cl. 18.

**196.** *See supra* notes 40, 86, and 146, and accompanying text.

As judges, we have no business second-guessing *policy* choices, but when the Constitution is at stake, it is not impolite to say "no" to government. Liberties for "We the People" necessarily mean limits on "We the Government." That's the very reason constitutions are written: to stop government abuses, not to ratify them. Our supreme duty to our dual constitutions and to their shared purpose—to "secure the Blessings of Liberty"[197]—requires us to check constitutionally verboten actions, not rubber-stamp them under the banner of majoritarianism. For people to live their lives as they see fit, a government of limited powers must exercise that power not with force but with reason. And an independent judiciary must *judge* government actions, not merely rationalize them. Judicial restraint doesn't require courts to ignore the nonrestraint of the other branches, not when their actions imperil the constitutional liberties of people increasingly hamstrung in their enjoyment of "Life, Liberty and the pursuit of Happiness."[198]

The power to "protect the public" is a heady and fearsome one.[199] Government is charged with promoting the general welfare, but it must always act within consti-

tutional constraints. Our two constitutions exist to advance two purposes: individual liberty through limited government. Our federal and state Founders saw liberty as America's natural, foundational value, and our rights as too numerous to be exhaustively listed. Liberty both *justifies* government (to erect basic civic guardrails) and *limits* government (to minimize abridgements on human freedom). In other words, our dual constitutional charters exist not to *exalt* majority rule but to protect prepolitical rights that *limit* majority rule. Majoritarianism cannot be permitted to invert our bottom-line constitutional premise. The might of the majority, whatever the vote count, cannot trample individuals' rights recognized in both our federal and state Constitutions, not to mention in our nation's first law, the Declaration.[200]

### B.

*Our State Constitution, like Madison's Federal handiwork, is infused with Newtonian genius: three rival branches locked in synchronous orbit by competing interests—ambition checking ambition.*[201]

197. U.S. CONST. pmbl. *See also* TEX. CONST. art. I (declaring its utmost mission to safeguard "the general, great and essential principles of liberty and free government").

198. THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776) (underscoring that governments are "instituted among Men" in order to "secure" our "unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness").

199. *See, supra* notes 12–18 (discussing *Buck v. Bell*, 274 U.S. 200, 47 S.Ct. 584, 71 L.Ed. 1000 (1927), which upheld forcible sterilization of the "feeble-minded").

200. Congress placed the Declaration of Independence at the outset—page 1, volume 1—of the United States Code, under this heading:

"Organic Laws of the United States of America." Lincoln describes the Declaration of Independence as a lens through which just laws become clear—as the framework for interpreting the law—when he calls the Declaration an "apple of gold," and the Constitution the "frame of silver" around it. ABRAHAM LINCOLN, *Fragment on the Constitution and the Union* (Jan. 1861), *in* 4 THE COLLECTED WORKS OF ABRAHAM LINCOLN 169 (Roy P. Basler ed., 1953). The Constitution, indeed all laws, must not be considered independently of the ultimate purpose for which they are designed: not to unhinge democracy, but to secure liberty.

201. *In re State Bd. for Educator Certification,* 452 S.W.3d 802, 808 (2014).

Isaac Newton died in 1727, before James Madison, the Father of the U.S. Constitution, was even born, but our Founders, both state and federal, understood political physics: "power seized by one branch necessarily means power ceded by another."[202] Newton's Third Law of Motion, while a physical law, also operates as a political law. When one branch of government exerts a force, there occurs an equal and opposite counterforce. The Laws of Constitutional Motion require these rival branches to stay within their sphere, flexing competing forces so that power is neither seized nor ceded.

Our Framers understood that government was inclined to advance its own interests, even to the point of ham-fisted bullying, which is precisely why the Constitution was written—to keep *government* on a leash, not We the People. But individual liberty pays the price when our ingenious system of checks and balances sputters, including when the judiciary subordinates liberty to the congeries of group interests that dictate majoritarian outcomes. Daily and undeniably, there exist government incursions that siphon what Thomas Jefferson called our "due degree of liberty"[203]—"siphoning that often occurs subtly, with such drop-by-drop gentleness as to be imperceptible."[204]

Police power is undoubtedly an attribute of state sovereignty, but sovereignty ultimately resides in "the people of the State of Texas."[205] The Texas Constitution limits government encroachments, and does so on purpose. "Our Bill of Rights is not mere hortatory fluff; it is a purposeful check on government power."[206] And everyday Texans, and the courts that serve them, must remain vigilant. Government will always insist it is acting for the public's greater good, but as Justice Brandeis warned in his now-celebrated *Olmstead* dissent: "Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent."[207]

Before solving a problem, you must first define it. The Lone Star State boasts a spirit of daring and rugged independence, virtues essential to personal and economic

---

**202.** *Id.*

**203.** Letter from Thomas Jefferson to James Madison, Paris (1787), *in* The Jeffersonian Encyclopedia: A Comprehensive Collection of the Views of Thomas Jefferson 277 (John P. Foley ed., 1900). *See also* Edmund Burke, *Speech on Moving His Resolutions for Conciliation with the Colonies*, Mar. 22, 1775, *in* Edmund Burke: Selected Writings and Speeches 147, 158 (Peter J. Stanlis ed., Doubleday & Co. 1968) ("In this character of the Americans a love of freedom is the predominating feature which marks and distinguishes the whole: and as an ardent is always a jealous affection, your colonies become suspicious, restive, and untractable, whenever they see the least attempt to wrest from them by force, or shuffle from them by chicane, what they think the only advantage worth living for. This fierce spirit of liberty is stronger in the English colonies, probably, than in any other people of the earth . . .").

**204.** *Robinson v. Crown Cork & Seal, Inc.*, 335 S.W.3d 126, 165 (Tex.2010) (Willett, J., concurring). Or, as 18th-century philosopher David Hume cautioned, "It is seldom, that liberty of any kind is lost all at once." Rather, suppression "must steal in upon [people] by degrees, and must disguise itself in a thousand shapes, in order to be received." David Hume, Of the Liberty of the Press (1741), *in* David Hume: Political Essays 3 n.4 (Knud Haakonssen ed., 1994).

**205.** Tex. Const. pmbl.

**206.** *Robinson*, 335 S.W.3d at 164 (Willett, J., concurring).

**207.** *Olmstead v. United States*, 277 U.S. 438, 479, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting), *overruled by Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

dynamism, but bureaucratic headwinds imperil that vitality. Almost two centuries ago, around the time of Texas independence, Alexis de Tocqueville, a keen observer of early America, warned of "soft despotism" wrought by government that "covers the surface of society with a network of small complicated rules" that "even the most original and energetic characters cannot penetrate."[208] Tocqueville's warnings for 1835 America apply equally to 2015 Texas, where "administrative despotism," though doubtless well meaning, inflicts a real-world toll on honest, hardworking Texans:

> The will of man is not shattered, but softened, bent, and guided; men are seldom forced by it to act, but they are constantly restrained from acting. Such a power does not destroy, but it prevents existence; it does not tyrannize, but it compresses, enervates, extinguishes, and stupefies a people, till each nation is reduced to nothing better than a flock of timid and industrious animals, of which government is the shepherd.[209]

Government's conception of its own power as limitless is hard-wired. But under the Texas Constitution, government may only pursue constitutionally permissible ends. Naked economic protectionism, strangling hopes and dreams with bureaucratic red tape, is not one of them. And such barriers, often stemming from interest-group politics, are often insurmountable for Texans on the lower rungs of the economic ladder (who unsurprisingly lack political power)—not to mention the harm inflicted on consumers deprived of the fruits of industrious entrepreneurs. Irrational licensing laws oppress hard-working Texans of modest means, men and women struggling to do what Texans of all generations have done: to better their families through honest enterprise.[210]

## V.

*[W]hile baseball may be the national pastime of the citizenry, dishing out special economic benefits to certain in-state industries remains the favored pastime of state and local governments.*[211]

Governments are "instituted among Men" to "secure" preexisting, "unalienable Rights."[212] Our federal and Texas Constitutions are charters of liberty, not wellsprings of boundless government power. Madison adroitly divided political power because he prized a "We the People" system that extolled citizens over a monarchical system of rulers and subjects. The trick was to give government its requisite powers while structurally hemming in that power so that fallible men wouldn't become as despotic as the hereditary monarchs they had fled and fought.

Economic liberty is "deeply rooted in this Nation's history and tradition,"[213] and the right to engage in productive enterprise is as central to individual freedom as

---

208. ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA 319 (P. Bradley ed. 1994).

209. *Id.*

210. To the degree that "footnote four" of *Carolene Products* says "discrete and insular minorities" in the political arena deserve special judicial protection, it is tough to imagine a group more disadvantaged by the majoritarian political process than would-be entrepreneurs denied their calling by Byzantine, State-

enforced barriers enacted at the behest of entrenched, politically powerful interests.

211. *Powers v. Harris*, 379 F.3d 1208, 1221 (10th Cir.2004).

212. THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776).

213. *Washington v. Glucksberg*, 521 U.S. 702, 703, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997).

the right to worship as one chooses. Indeed, Madison declared that "protection" of citizens' "faculties of acquiring property" is the "first object of government,"[214] and admonished that a government whose "arbitrary restrictions" deny citizens "free use of their faculties, and free choice of their occupations" was "not a just government."[215] When it comes to occupational licensing—often less about protecting the public than about bestowing special privileges on political favorites—government power has expanded unchecked. But government doesn't get to determine the reach of its own power, something that subverts the original constitutional design of limited government. The Texas Constitution imposes limits, and imposes them intentionally.[216] Bottom line: Police power cannot go unpoliced.

I believe judicial passivity is incompatible with individual liberty and constitutionally limited government. Occupational freedom, the right to earn a living as one chooses, is a nontrivial constitutional right entitled to nontrivial judicial protection. People are owed liberty by virtue of their very humanity—"endowed by their Creator," as the Declaration affirms.[217] And while government has undeniable authority to regulate economic activities to protect the public against fraud and danger, freedom should be the general rule, and restraint the exception.

The Founders understood that a "limited Constitution" can be preserved "no other way than through the medium of courts of justice, whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing."[218] Judicial duty—"so arduous a duty," Hamilton called it—requires courts to be "bulwarks of a limited Constitution against legislative encroachments,"[219] including holding irrational anticompetitive actions unconstitutional. Such is life in a constitutional republic, which exalts constitutionalism over majoritarianism precisely in order to tell government "no." That's the paramount point, to tap the brakes rather than punch the gas.

The Court today rejects servility in the economic-liberty realm, fortifying protections for Texans seeking what Texans have always sought: a better life for themselves and their families. There remains, as Davy Crockett excitedly wrote his children, "a world of country to settle."[220]

Justice Boyd, concurring in judgment.

I concur in the Court's judgment but do not fully agree with its reasoning. Specifically, I do not agree with the Court's

---

**214.** The Federalist No. 10, at 78 (James Madison) (Clinton Rossiter ed., 1961).

**215.** Madison, *Property* (Mar. 29, 1792), *in* James Madison: Writings, *supra* note 189, at 516. The author of the Declaration agreed: "[E]very one has a natural right to choose that [vocation] which he thinks most likely to give him comfortable subsistence." Thomas Jefferson, Thoughts on Lotteries (1826), *in* The Jeffersonian Encyclopedia 609 (John P. Foley ed., Funk & Wagnalls Co. 1900).

**216.** As discussed above, *see supra* notes 194–96 and accompanying text, the Texas Constitution does not mirror exactly the U.S. Constitution, and our Privileges or Immunities Clause, best I can tell, is alive and well, unlike its federal counterpart.

**217.** The Declaration of Independence para. 2 (U.S. 1776).

**218.** The Federalist No. 78, at 466 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

**219.** *Id.* at 469.

**220.** Letter from David Crockett to his children (Jan. 9, 1836), in H.W. Brands, Lone Star Nation 332 (2004).

adoption of a new alternative test under which the Texas Constitution's "due course of law" provision invalidates any law that is "so unreasonably burdensome that it becomes oppressive in relation to the underlying governmental interest." *Ante* at 87. Nevertheless, I conclude that the Texas statute requiring the petitioners—who merely remove superfluous hair using tweezing techniques—to obtain an esthetician's license is arbitrary and unreasonable, and therefore oppressive, because it has no rational relationship to a legitimate government interest.

The Texas Constitution provides that "[n]o citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." TEX. CONST. art. I, § 19. Under our precedent, this guarantee "contains both a procedural component and a substantive component." *Barshop v. Medina Cnty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 632 (Tex.1996). The issue here is whether requiring the petitioners to obtain an esthetician's license as a condition for practicing their trade of eyebrow threading violates their substantive rights to liberty, property, privileges, or immunities without due course of law.

As the Court notes, this Court has "not been entirely consistent" in its articulation of the standard by which we review the constitutionality of economic regulations under the due course of law provision. *Ante* at 80. Through the years, for example, we have variously said that laws are presumed to be constitutional and a law is invalid only if:

- it is "unreasonable and in contravention of common right," *Milliken v. City Council of Weatherford*, 54 Tex. 388, 394 (1881);
- it invades rights "without justifying occasion, or in an unreasonable, arbi-

trary, and oppressive way," *Hous. & Tex. Cent. Ry. Co. v. City of Dall.*, 84 S.W. 648, 653 (Tex.1905);
- it is not "sufficiently rational and reasonable," *Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 525 (Tex.1995);
- it has "no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare in its proper sense," *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 938 (Tex.1998) (quoting *Nectow v. City of Cambridge*, 277 U.S. 183, 187–88, 48 S.Ct. 447, 72 L.Ed. 842 (1928));
- it is not "designed to accomplish an objective within the government's police power and [no] rational relationship exists between the ordinance and its purpose," *id.*;
- the "enacting body could [not] have rationally believed at the time of enactment that the ordinance would promote its objective," *id.*;
- it is not "at least fairly debatable that the [Legislature's] decision was rationally related to legitimate government interests," *id.*; or
- it is "*clearly* arbitrary and unreasonable," *id.*

These precedents illustrate the difficulty the Court has had articulating the appropriate standard. I would read our prior descriptions together, to provide that a law violates the substantive due course of law provision only if it is arbitrary and unreasonable, and therefore oppressive, because it has no rational relationship to a legitimate government interest. The Court, by contrast, holds that a law is invalid if its "purpose could not arguably be rationally related to a legitimate governmental interest" or "when considered as a whole, [its]

actual, real-world effect as applied to the challenging party could not arguably be rationally related to, *or is so burdensome as to be oppressive in light of,* the governmental interest." *Ante* at 87 (emphasis added). In other words, the Court holds that a law is invalid if it is "burdensome" and "oppressive in light of" the legitimate governmental interest, even if it is rationally related to that interest. As the CHIEF JUSTICE notes in his dissent, "[n]either this Court nor any other the Court can find has ever used 'oppressive' as a test for substantive due process." *Post* at 126; *see Hous. & Tex. Cent. Ry. Co.,* 84 S.W. at 653 (holding Constitution prohibits laws that invade substantive rights "without justifying occasion, or in an unreasonable, arbitrary, and oppressive way," not *"or* oppressive way"*).

I agree that the Court's new burdensome/oppressive standard is "loose"—too "loose," in fact, to be useful in our analysis of these types of constitutional challenges. *See post* at 135 (Hecht, C.J., dissenting). Determining what "burdensome" or "oppressive" means in this context will be nigh impossible, unless we use those terms, as we have in our prior opinions, to refer to the burdens that result from a law that is not rationally related to a legitimate government interest. Like JUSTICE GUZMAN, "I have significant doubts that this standard is workable in practice." *Post* at 142. And like both dissenting Justices, I believe the burdensome/oppressive standard makes it too easy for courts to invalidate regulations for their own personal policy reasons. *See post* at 135 (Hecht, C.J., dissenting); *post* at 141 (Guzman, J., dissenting). Because, as JUSTICE GUZMAN notes, courts cannot and should not "legislate from the bench," *post* at 140, the bar should be set very high, to ensure that it is indeed the Constitution, and not merely a court, that invalidates a law.

But the bar cannot be insurmountable, and if the application of any regulatory licensing scheme were ever constitutionally invalid, this one is. I need not repeat my colleagues' descriptions, because everyone (including the State and both dissenting Justices) agrees that requiring eyebrow threaders to complete the current requirements necessary to obtain an esthetician's license "is obviously too much." *Post* at 131 (Hecht, C.J., dissenting); *post* at 142–43 (Guzman, J., dissenting). Certainly, "[i]f there is room for a fair difference of opinion as to the necessity and reasonableness of a legislative enactment on a subject which lies within the domain of the police power, the courts will not hold it void." *State v. Richards,* 301 S.W.2d 597, 602 (1957). But there is no difference of opinion here: requiring eyebrow threaders to obtain an esthetician's license is neither necessary nor reasonable. Requiring them to obtain training in sanitation and safety is rational, but requiring them to get an esthetician's license is not.

The CHIEF JUSTICE suggests that "there is ... evidence from which the Legislature could reasonably conclude that the required instruction and testing would further its goal of protecting public health and safety through the regulation of cosmetology." *Post* at 140. I agree that protecting public health and safety is a legitimate government interest, but I do not agree that requiring eyebrow threaders to meet the current requirements for obtaining an esthetician's license is *rationally* related to achieving that interest. Under the dissenting Justices' approach, if the Legislature decided to require eyebrow threaders to obtain a medical license, we would have to uphold that decision because that licensing scheme also "instruct[s] in general sanitation and safety practices." *Post* at 140 (Hecht, C.J., dissenting).

It may be convenient to impose the existing esthetician licensing scheme on eyebrow threaders, but in my view it is also arbitrary and unreasonable, and therefore oppressive, because doing so is not rationally related to the legitimate government interest in promoting public health and safety. Courts should not second-guess the Legislature, but in the end, as the CHIEF JUSTICE agrees, "the final authority to interpret and apply the Constitution belongs to the Judiciary[.]" *Post* at 126. Although that authority is "not lightly to be exercised," *post* at 126 (Hecht, C.J., dissenting), the Court is right to exercise it here.

I therefore concur in the judgment.

Chief Justice Hecht, joined by Justice Guzman and Justice Brown, dissenting.

This is one of those cases in which, once the Court has decided whom it wants to win, the less said the better. Result is an inapt tool for shaping principle; it's supposed to work the other way around. And when principle ends up being mutilated, it can no longer be used to guide other results. Since it turns out that the Court thinks substantive due process means whatever judges say it means, it would be best to leave bad enough alone rather than pretend the idea has any support in the Constitution's text or history. The Court runs the risk that what passes for constitutional analysis around here will be seen as just picking words out of the air.

The Threaders deserve to have the yoke of the regulatory state thrown off, the shackles on their free enterprise shattered, in short—although brevity is not the hallmark of some of today's writings—to stick it to the man. And what better way to do all that than by having judges hold the State's 80-year-old cosmetology licensing scheme, also found in ten other states, unconstitutional as applied to eyebrow threading. The trouble is, this Court, like the United States Supreme Court, has repeatedly held that a statute with a rational basis does not violate substantive due process, and applying that standard here will not help the Threaders. Casting about, the Court comes up with "oppressive", a brand-new entrant in the substantive due process lexicon. Neither this Court nor any other the Court can find has ever used "oppressive" as a test for substantive due process. Which is great because the Court is now free—as free as the grateful Threaders from public health and safety regulation—to make up substantive due process from scratch.

Whether eyebrow threaders need 750 hours' training, or only 430, or 40, or 1, to practice their trade on the public is not for us to say, as long as the Legislature, whose job it is to say, is making a rational effort to protect public health and safety. As the Court acknowledges at one point, "it is not for courts to second-guess [legislative and agency] decisions as to the necessity for and the extent of training that should be required for different types of commercial service providers."[1] The question for us is whether, by requiring 750 hours' training, the Legislature has violated substantive due process by depriving eyebrow threaders of their fundamental liberty without the due course of law guaranteed by the Texas Constitution.

Because the final authority to interpret and apply the Constitution belongs to the Judiciary, only the people themselves, by constitutional amendment, can alter the Court's substantive due process decisions. The Judiciary's authority is enormous and not lightly to be exercised. Justice Powell once observed that "[t]he history of sub-

---

1. *Ante* at 89.

stantive due process counsels caution and restraint."[2] The history to which he referred was the Supreme Court's own adventure with substantive due process beginning with *Lochner v. New York*,[3] in which the Court abrogated a state statute as "unreasonable, unnecessary and arbitrary",[4] and ending with *United States v. Carolene Products Company*,[5] in which the Court established that a statute with any rational basis will be upheld. The Court disregards the federal courts' experience with substantive due process in *Lochner* and its progeny, invents a new test unprecedented in American jurisprudence, and ushers in a new era of government by judges.

The Court, and JUSTICE WILLETT's concurring opinion in its wild championing of economic liberty, seem oblivious to the reality that social liberty is no less important. The same substantive due process that can free eyebrow threaders from onerous training requirements can also be used to establish a right of privacy not otherwise to be found in the Constitution.[6] Are restrictions on abortion "oppressive"? How about restrictions on marriage? Unconstrained by any meaningful standard, substantive due process allows judges to define liberty according to their personal policy preferences. History and reason warn that the Court has gone too far.

I respectfully dissent.

# I

The Legislature has regulated cosmetic services for 80 years. The original impetus was concern for public health and safety. "[T]he public," the Legislature found in the Cosmetology Act of 1935, "is daily exposed to disease due to insufficient care as to sanitation and hygiene [and should be protected by the Act] from inexperienced and unscrupulous beauty parlors and beauty culture schools".[7] Protection of the public health and welfare remains the driv-

---

**2.** *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 229, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (Powell, J., concurring) (citations omitted).

**3.** 198 U.S. 45, 58–59, 25 S.Ct. 539, 49 L.Ed. 937 (1905).

**4.** *Id.* at 56, 25 S.Ct. 539.

**5.** 304 U.S. 144, 152, 58 S.Ct. 778, 82 L.Ed. 1234 (1938).

**6.** *See, e.g., Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

**7.** Act of Apr. 25, 1935, 44th Leg., R.S., ch. 116, § 26, 1935 Tex. Gen. Laws 304, 311, *amended by* Act of Nov. 14, 1935, 44th Leg., 2d C.S., ch. 469, §§ 1–2, 1935 Tex. Gen. Laws 1846, 1846–1848. The 1935 Act and its successor provisions were codified first as article 734b in the former Penal Code, later as former article 734c, then "transferred" to former article 8451a of the Texas Revised Civil Statutes, which was in turn replaced by Chapter 1602 of the new Occupations Code. *See* Act of May 28, 1971, 62d Leg., R.S., ch. 1036, § 49, 1971 Tex. Gen. Laws 3389, 3402 (adopting a new Penal Code and repealing former articles); Act of May 24, 1973, 63d Leg., R.S., ch. 399, § 5, 1973 Tex. Gen. Laws 883, 995, 996a, 996c (adopting a new Penal Code and transferring certain provisions to the Revised Civil Statutes); Act of May 13, 1999, 76th Leg., R.S., ch. 388, §§ 1, 6, 1999 Tex. Gen. Laws 1431, 2182–2206, 2439–2440 (adopting the Occupations Code, including Chapter 1602, and repealing former article 8451a); *see also* Act of May 28, 2005, 79th Leg., R.S., ch. 798, §§ 1.01, 6.01–.02, 2005 Tex. Gen. Laws 2734, 2735, 2759–2760 (adopting Chapter 1603 of the Occupations Code and repealing or amending related provisions in Chapters 1601 and 1602).

Before 1935, a statute required registration, but not licensing, of "beauty parlor" owners and operators, imposed certain health and cleanliness requirements, and set fines for statutory violations. *See* Act of 1921, 37th Leg., R.S., ch. 79, 1921 Tex. Gen. Laws 155, 155–158, codified in TEX. PEN. CODE arts. 728–733 (Vernon's 1925).

ing force for regulating cosmetology.[8] Beauty schools, salons, and practitioners are subject to "sanitation rules to prevent the spread of an infectious or contagious disease",[9] inspections to ensure compliance,[10] and investigation of public complaints.[11] The 1935 Act made it unlawful to practice, provide, or teach cosmetology—broadly defined to include any practice for beautifying the upper body[12]— without a license.[13] Applicants were required to complete 1,000 hours of training at a licensed school of beauty culture and pass an examination.[14]

In 1971, the Legislature rewrote the Act. An expanded definition of cosmetology specifically included "removing superfluous hair from the body by use of depilatories[15] or tweezers".[16] The revised Act was more discriminating, creating five classes of licenses with different restrictions on the activities in which a holder could engage.[17] Training requirements ranged from 1,500 hours down to 150 hours,[18] and applicants had to pass written and practical examinations.[19] Since then, the Legislature has repeatedly adjusted the kinds of licenses and the training requirements for each.[20] There are now six classes of licenses with required training ranging from 1,500 hours to 320 hours.[21]

**8.** *See* House Comm. on Gov't Org., Bill Analysis, Tex. S.B. 384, 66th Leg., R.S. (1979) ("The need for regulation has primarily been based on the protection of the public health and welfare."); House Comm. on Public Health, Bill Analysis, Tex. S.B. 127, 69th Leg., R.S. (1985) ("The need for regulation has primarily been based on the protection of the public health and welfare.").

**9.** Tex. Occ. Code § 1603.102.

**10.** *Id.* §§ 1603.103, 1603.104.

**11.** *Id.* § 51.252; *see also id.* § 1603.151.

**12.** Act of Apr. 25, 1935, 44th Leg., R.S., ch. 116, § 3(a), 1935 Tex. Gen. Laws at 304, codified as former Tex. Pen. Code art. 734b, § 3(a) ("Any person who with hands, or mechanical or electrical apparatus or appliances, or by the use of cosmetological preparations, antiseptics, tonics, lotions or creams, engages in any one or combination of the following practices for remuneration or pay, to-wit: cleansing, beautifying, or any kindred work of the scalp, face, neck, arm, bust, or upper part of the body or manicuring the nails of any person, shall be construed to be practicing the occupation of a cosmetologist.").

**13.** *Id.* § 1, 1935 Tex. Gen. Laws at 304, codified as former Tex. Pen. Code art. 734b, § 1.

**14.** *Id.* §§ 9, 11(a), 1935 Tex. Gen. Laws at 306–307, codified as former Tex. Pen. Code art. 734b, §§ 9, 11(a).

**15.** A depilatory is "a cosmetic for the temporary removal of undesired hair". Webster's Third New International Dictionary 605 (2002).

**16.** Act of May 28, 1971, 62d Leg., R.S., ch. 1036, § 1(3)(C), 1971 Tex. Gen. Laws 3389, 3389, codified as former Tex. Pen. Code art. 734c, § 1(3)(c).

**17.** *Id.* §§ 13–17, 1971 Tex. Gen. Laws at 3392–3394, codified as former Tex. Pen. Code art. 734c, §§ 13–17.

**18.** *Id.*

**19.** *Id.* §§ 4(d), 13–17, 1971 Tex. Gen. Laws. at 3391–3394, codified as former Tex. Pen. Code art. 734c §§ 4(d), 13–17.

**20.** *See, e.g.*, Act of May 28, 1979, 66th Leg., R.S., ch. 606, § 1, 1979 Tex. Gen. Laws 1340, 1343–1344 (amending former Tex. Rev. Civ. Stat. art. 8451a, §§ 10–12); Act of May 27, 1991, 72d Leg., R.S., ch. 626, § 11, 1991 Tex. Gen. Laws 2260, 2265 (adding § 13A to former Tex. Rev. Civ. Stat. art. 8451a); Act of May 27, 2011, 82d Leg., R.S., ch. 1241, §§ 15–17, 2011 Tex. Gen. Laws 3319, 3325–3326 (amending Tex. Occ. Code § 1602.257 and adding §§ 1602.2571, 1602.2572, and 1602.261).

**21.** Tex. Occ. Code §§ 1602.254–.2572, 1602.261, *amended by* Act of May 22, 2015, 84th Leg., R.S., H.B. 2717, *available at* http://www.capitol.state.tx.us/tlodocs/84R/billtext/pdf/HB02717F.pdf.

In 2005, the Legislature assigned the regulation of cosmetology to the Texas Department of Licensing and Regulation ("the Department"),[22] "the primary state agency responsible for the oversight of businesses, industries, general trades, and occupations that are regulated by the state and assigned to the department by the legislature."[23] The Department is managed by an executive director[24] and governed by the Texas Commission of Licensing and Regulation ("the Commission").[25] The Commission is comprised of seven members appointed by the Governor and confirmed by the Senate,[26] each of whom must be "a representative of the general public."[27] The Commission soon became aware of the practice of eyebrow threading, and in 2008 it began to insist that threading be included in the regulatory scheme like other forms of hair removal. In a 2011 case, the court of appeals was skeptical of the Department's position,[28] but after the decision issued, the Legislature amended the definition of cosmetology to include "removing superfluous hair from a person's body using depilatories, preparations, or *tweezing techniques*".[29] The Department then amended its regulations to define "tweezing techniques" as "the extraction of hair from the hair follicle by use of ... an instrument, appliance or implement ... made of ... thread or other material."[30]

The Department requires an esthetician specialty license for threading.[31] The license covers various skin care treatments such as facials and cleansing, "beautifying a person's face, neck, or arms" with preparations or other products, and removing superfluous hair from the skin.[32] An applicant for an esthetician specialty license must complete 750 hours of instruction in a

**22.** Act of May 28, 2005, 79th Leg., R.S., ch. 798, §§ 1.01, 6.01–.02, 2005 Tex. Gen. Laws 2734, 2735, 2759–2760 (adopting Chapter 1603 of the Occupations Code and repealing or amending related provisions in Chapters 1601 and 1602); *see* Tex. Occ. Code § 1603.002.

**23.** Tex. Occ. Code § 51.051(a).

**24.** *Id.* §§ 51.101, 51.103.

**25.** *Id.* § 51.051(b).

**26.** *Id.* § 51.052(a).

**27.** *Id.* § 51.053(a).

**28.** *Kuntz v. Khan,* No. 03–10–00160–CV, 2011 WL 182882, *7–8 (Tex.App.–Austin, Jan. 21, 2011, no pet.) (mem. op.), *available at* http://www.search.txcourts.gov/Case.aspx?cn=03-10-00160-CV&=coa03. In an interlocutory appeal from the trial court's partial denial of the governmental defendants' plea to the jurisdiction and temporary injunction barring defendants from taking any action to further investigate, regulate, or otherwise disrupt Khan's business, the Department argued that eyebrow threading constitutes the practice of cosmetology in three ways: threading involves "beautifying a person's face" using an "appliance", "administering a facial treatment", and "removing superfluous hair from a person's body using depilatories". *See* Tex Occ. Code §§ 1602.002(7), 1602.002(8), 1602.002(9). In affirming the temporary injunction, the court of appeals concluded, *inter alia,* that the trial court reasonably determined that Khan had shown "a probable right to recovery based on the plain language of the statute". *Khan,* 2011 WL 182882, at *8.

**29.** Act of May 27, 2011, 82d Leg., R.S., ch. 1241, § 12, 2011 Tex. Gen. Laws 3319, 3323–3324 (emphasis in original) (amending Tex. Occ. Code § 1602.002(a)(9) to substitute "tweezing techniques" for "mechanical tweezers").

**30.** 37 Tex. Reg. 681, 681 (Feb. 10, 2012), codified at 16 Tex. Admin. Code § 83.10(36).

**31.** Tex. Occ. Code § 1602.257 (eligibility for esthetician specialty license).

**32.** *Id.* § 1602.257(a) (setting out the services that the holder of an esthetician license is authorized to perform).

licensed beauty culture school,[33] half the hours required for an "operator license" allowing the performance of "any practice of cosmetology."[34] The instruction for an esthetician specialty license covers the following subjects [35]:

orientation, rules and laws...50 hours

sanitation, safety, and first aid...40 hours

anatomy and physiology...90 hours

facial treatment, cleansing, masking, therapy...225 hours

superfluous hair removal...25 hours

electricity, machines, and related equipment...75 hours

makeup...75 hours

chemistry...50 hours

care of client...50 hours

management...35 hours

aroma therapy...15 hours

nutrition...10 hours

color psychology...10 hours

Depending on the school, the training can take from nine to sixteen months and cost anywhere from $3,500 for a public junior college to $22,000 for a private school. Threading is not a required part of the curriculum, which generally covers "superfluous hair removal", and only a handful of schools offer instruction in threading. Health, safety, and sanitation issues are covered as part of the first five subjects listed above; these subjects account for 430 of the prerequisite hours.

An applicant must also pass a written and a practical examination.[36] The examinations test on safety, sanitation, and disinfectant criteria as well as the ability to perform various services. Hair removal is part of the practical exam, though threading is not, but an applicant may use threading to demonstrate her hair-removal ability.[37]

Cosmetology regulations require eyebrow threaders, like other cosmetologists, to wash their hands or use a liquid hand sanitizer before performing any services on a customer; dispose of all single-use items that have come in contact with the client's skin; store thread in sealed bags or covered containers and in a clean, dry, and debris-free storage area; and clean, disinfect, and sterilize or sanitize all multi-use items prior to each service.[38] Regulations further require cosmetologists and estheticians to clean the client's skin before performing hair removal services.[39] Special precautions must be taken with items such as creams, astringents, lotions, and other preparations, which are subject to possible cross-contamination.[40] Single-use items used to apply these products— such as tissue, cotton pads, or cotton balls—must be discarded in a trash recep-

**33.** *Id.* § 1602.257(b)(3).

**34.** *Id.* §§ 1602.254(a) (permitting "any practice of cosmetology"), (b)(3) (required hours).

**35.** 16 Tex. Admin. Code § 83.120(b) (esthetician curriculum).

**36.** *Id.* §§ 83.20(a)(6), (b)(6), 83.21; *see also* Tex. Occ. Code §§ 1602.254(c)(3), 1602.262(a)(2).

**37.** Petitioners argue that they could not do so because the examinee is required to "hold the [client's] skin taut" while removing the hairs,

and the threading technique requires two hands. *But the record shows that it is nevertheless necessary that the client's skin be held taut during threading and that the usual practice is to direct the client to hold her own skin taut during the threading process. The record does not tell us whether or not this would suffice during the examination.*

**38.** 16 Tex. Admin. Code §§ 83.102(c), (d), (f), 81.104(a), (d), (e), 83.105(a), (c), (e), (f).

**39.** *Id.* § 83.105(b).

**40.** *Id.* § 83.104(g).

tacle that is emptied daily and kept clean by washing or using plastic liners.[41] Facial chairs, beds, and headrests must be cleaned and disinfected before service is provided to a client.[42] Regulations also provide specific procedures to follow whenever a cosmetology service causes bleeding.[43]

The Threaders acknowledge that threading poses health risks. In the trial court, they offered evidence from a physician, Dr. Patel (no relation to Petitioner Ashish Patel), that removing a hair from its follicle opens a portal through which bacteria or a virus can permeate the skin. Dr. Patel opined that threading may lead to "redness, swelling, itching, inflammation of the hair follicles, discoloration, and ... superficial bacterial and viral infections." She testified that threading could cause the spread of infections such as flat warts, skin-colored lesions known as molluscum contagiosum, pink eye, ringworm, impetigo, and methicillin-resistant staphylococcus aureus (often called a "staph infection"). She opined that a threader's failure to use appropriate sanitation practices—such as using disposable materials properly, cleaning the work station, using effective hand-washing techniques, and correctly treating skin irritations and abrasions—can expose threading clients to infection and disease. She also testified that these health risks can be fully addressed by giving threaders one hour's training in sanitation and hygiene.

The Threaders allege that, as applied to them, the cosmetology licensing scheme violates substantive due process—that is, that it deprives them of economic liberty without due course of law in violation of Article I, Section 19 of the Texas Constitu-

tion. The Threaders assert that Texas' regulation of cosmetology "places senseless burdens on eyebrow threaders and threading businesses without any actual benefit to public health and safety." But the Threaders acknowledge that Texas' longstanding regulation of cosmetology, including superfluous hair removal, is needed to protect the public health. They argue only that it is excessive.

## II

On our record, Texas' regulation of threading seems excessive and misguided as a matter of policy, though I hasten to add, nothing of what prompted the regulation is before us. We have conducted no investigations and held no hearings. As in any case, we know what the parties have told us, and nothing more. This distinguishes the Judiciary from the Legislature. We are ill-equipped to set policy because we have no way of summoning the various interests for input or exploring all considerations. But on this record, threading regulation is obviously too much.

Is it also unconstitutional? Federal and Texas constitutional protections of due process are closely related. The Fifth Amendment to the United States Constitution, adopted by Congress in 1789 and ratified by the states two years later, provides that no person shall "be deprived of life, liberty, or property, without due process of law".[44] The Fourteenth Amendment, ratified in 1868, prohibits the states from violating the same guarantee.[45] In between, in 1845, the first Constitution for the State of Texas provided that "[n]o citizen of this State shall be deprived of life, liberty, [or] property ... except by

41. *Id.* §§ 83.102(i), 83.104(e).

42. *Id.* § 83.104(c).

43. *Id.* § 83.111.

44. U.S. CONST. amend. V.

45. U.S. CONST. amend. XIV, § 1.

due course of the law of the land."[46] The provision is now Article I, Section 19 of the Texas Constitution.

## A

This Court has recognized that Texas' due course of law guarantee protects both procedural and substantive rights.[47] But we have been mindful that applying substantive due process doctrine to economic regulation has never met with recognized success. The United States Supreme Court has vacillated in its view of the scope of federal due process protection. In *Lochner v. New York*, the Supreme Court famously took a broad view, holding that New York's regulation of bakers' working hours violated the Fourteenth Amendment.[48] Finding an implicit right of contract in the United States Constitution, the Supreme Court concluded that whether the state regulation deprived bakers of this right depends on whether it is:

> a fair, reasonable, and appropriate exercise of the police power of the state, or [rather] an unreasonable, unnecessary and arbitrary interference with the right of the individual to his personal liberty or to enter into those contracts in relation to labor which may seem to him appropriate or necessary for the support of himself and his family[.][49]

Justice Oliver Wendell Holmes dissented, warning:

> This case is decided upon an economic theory which a large part of the country does not entertain. If it were a question whether I agreed with that theory, I should desire to study it further and long before making up my mind. But I do not conceive that to be my duty, because I strongly believe that my agreement or disagreement has nothing to do with the right of a majority to embody their opinions in law[.] It is settled by various decisions of this court that state constitutions and state laws may regulate life in many ways which we as legislators might think as injudicious or if you like as tyrannical as this, and which equally with this interfere with the liberty to contract. Sunday laws and usury laws are ancient examples.... Some of these laws embody convictions or prejudices which judges are likely to share. Some may not. But a constitution is not intended to embody a particular economic theory, whether of paternalism and the organic relation of the citizen to the State or of *laissez faire*. It is made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar or novel and even shocking ought not to conclude our judgment upon the question whether statutes embodying them conflict with the Constitution of the United States.[50]

Subsequent cases proved true Holmes' warning that a mere reasonableness standard for substantive due process was unworkable and that judges cannot practically or legally constitutionalize economic theory.[51] *Lochner*'s substantive due process adventure soon ended.

---

46. TEX. CONST. OF 1845, art. I, § 16.

47. *Barshop v. Medina Cnty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 632 (Tex. 1996).

48. 198 U.S. 45, 58–59, 25 S.Ct. 539, 49 L.Ed. 937 (1905).

49. *Id.* at 56, 25 S.Ct. 539.

50. *Id.* at 75–76, 25 S.Ct. 539 (Holmes, J., dissenting).

51. *See, e.g., New State Ice Co. v. Liebmann*, 285 U.S. 262, 278, 52 S.Ct. 371, 76 L.Ed. 747 (1932) (striking down a state law prohibiting the sale of ice without a permit as unreasonable because the sale of ice was not a "public business" that could be so regulated); *Louis K. Liggett Co. v. Baldridge*, 278 U.S. 105, 113–

Thirty-three years later, the Supreme Court recanted *Lochner,* stating matter-of-factly, as if it should always have been obvious:

> regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless in the light of the facts made known or generally assumed, it is of such a character as to preclude the assumption that it rests upon some rational basis.... [52]

This requirement that economic regulation need only bear a rational relationship to a legitimate state interest is far more deferential to state legislatures than *Lochner*'s reasonableness test. Later reflecting on the passing of the *Lochner* era, Justice Douglas wrote for the Supreme Court:

> The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought.... For protection against abuses by legislatures the people must resort to the polls, not to the courts. [53]

## B

The United States Constitution does not, of course, prohibit the states from experimenting with substantive due process based in their own constitutions,[54] and Texas has done a bit of that. Twenty years ago we summarized the case law thusly:

> Texas courts have not been consistent in articulating a standard of review under the due course clause. Our courts have sometimes indicated that section 19 provides an identical guarantee to its federal due process counterpart. Under federal due process, a law that does not affect fundamental rights or interests—such as the economic legislation at issue here—is valid if it merely bears a rational relationship to a legitimate state in-

114, 49 S.Ct. 57, 73 L.Ed. 204 (1928) (prohibition on anyone not a licensed pharmacist owning a pharmacy or drug store struck down because the state had not shown a "reasonable relationship to the public health"); *Adams v. Tanner,* 244 U.S. 590, 596–597, 37 S.Ct. 662, 61 L.Ed. 1336 (1917) (finding a statute prohibiting employment agencies from demanding or receiving fees from workers "arbitrary and oppressive" and "unduly restrict[ive]"); *Bunting v. Oregon,* 243 U.S. 426, 433–434, 438, 37 S.Ct. 435, 61 L.Ed. 830 (1917) (law that prohibited employees in factories from working more than 10 hours a day, or 13 hours a day if paid overtime, upheld as a reasonable exercise of the police power). *Compare Adkins v. Children's Hosp.,* 261 U.S. 525, 559, 43 S.Ct. 394, 67 L.Ed. 785 (1923) (minimum wage requirement for women is an unconstitutional intrusion on freedom of contract, not proper exercise of the police power), *with W. Coast Hotel Co. v. Parrish,* 300 U.S. 379, 399–400, 57 S.Ct. 578, 81 L.Ed. 703 (1937) (minimum wage requirement for women and children is proper exercise of police power, as a means of protection for those "in an unequal position

with respect to bargaining power"); *compare Muller v. Oregon,* 208 U.S. 412, 416, 423, 28 S.Ct. 324, 52 L.Ed. 551 (1908) (limitation on hours worked in "any mechanical establishment, or factory, or laundry" by women upheld as a valid exercise of the police power aimed at the protection of women), *and Holden v. Hardy,* 169 U.S. 366, 395, 18 S.Ct. 383, 42 L.Ed. 780 (1898) (limitation on hours worked in underground mines a valid exercise of the police power for the protection of those employed in a dangerous profession), *with Lochner,* 198 U.S. at 58, 25 S.Ct. 539 (limitation on hours worked in a bakery is not a valid exercise of the police power).

**52.** *United States v. Carolene Prods. Co.,* 304 U.S. 144, 152, 58 S.Ct. 778, 82 L.Ed. 1234 (1938).

**53.** *Williamson v. Lee Optical of Okla., Inc.,* 348 U.S. 483, 488, 75 S.Ct. 461, 99 L.Ed. 563 (1955) (citations omitted) (quoting *Munn v. Illinois,* 94 U.S. 113, 134, 24 L.Ed. 77 (1876)).

**54.** *Slaughter–House Cases,* 83 U.S. (16 Wall.) 36, 74–78, 21 L.Ed. 394 (1872).

terest. On other occasions, however, our Court has attempted to articulate our own independent due course standard, which some courts have characterized as more rigorous than the federal standard.[55]

But, in the decades since the federal courts adopted the rational basis test, we have not wandered far from that standard. Even in *State v. Richards*—the case relied on principally by the Threaders to support heightened scrutiny of economic regulation—the Court's reasoning and result were deferential to the legislation at issue. We concluded that a provision authorizing forfeiture of a vehicle that had been used in furtherance of a crime without the owner's knowledge did not contravene the Texas Constitution.[56] We explained:

> A large discretion is necessarily vested in the Legislature to determine not only what the interests of the public require, but what measures are necessary for the protection of such interests. If there is room for a fair difference of opinion as to the necessity and reasonableness of a legislative enactment on a subject which lies within the domain of the police power, the courts will not hold it void.[57]

Though we did not refer to the federal rational basis test, our analysis was consistent with it.

For the past 20 years, we have consistently adhered to the rational basis test. In *Barshop v. Medina County Underground Water Conservation District*, we

upheld water regulations against a substantive due process challenge as "rationally related to legitimate state purposes in managing and regulating this vital resource."[58] In *City of San Antonio v. TPLP Office Park Properties*, we applied the rational basis test to city street regulations.[59] We explained that the proper inquiry "is whether the actions rationally could have been related to a proper exercise of its police power."[60] And in *Mayhew v. Town of Sunnyvale*, we upheld a zoning ordinance, explaining:

> A generally applicable zoning ordinance will survive a substantive due process challenge if it is designed to accomplish an objective within the government's police power and if a rational relationship exists between the ordinance and its purpose. This deferential inquiry does not focus on the ultimate effectiveness of the ordinance, but on whether the enacting body could have rationally believed at the time of enactment that the ordinance would promote its objective. If it is at least fairly debatable that the decision was rationally related to legitimate government interests, the decision must be upheld. The ordinance will violate substantive due process only if it is *clearly* arbitrary and unreasonable.[61]

Under our precedent, a clearly arbitrary and unreasonable regulation is one that has no rational relationship to its purpose in furthering a legitimate state interest.

**55.** *Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 525 (Tex.1995) (citations omitted) (internal quotation marks omitted); *see also Trinity River Auth. v. URS Consultants, Inc.*, 889 S.W.2d 259, 263 & n.5 (Tex. 1994).

**56.** *State v. Richards*, 157 Tex. 166, 301 S.W.2d 597, 599–600, 602–603 (1957) (on certified questions from court of civil appeals).

**57.** *Id.* at 602.

**58.** 925 S.W.2d 618, 631–633 (Tex.1996).

**59.** 218 S.W.3d 60, 65 (Tex.2007) (per curiam).

**60.** *Id.*

**61.** 964 S.W.2d 922, 938–939 (Tex.1998) (emphasis in original) (citations omitted).

The Court instead opts to concoct an entirely new standard from the differing terminology used in our precedents. To avoid violating substantive due process, a statute must not be "clearly arbitrary and unreasonable", must be sufficiently "rational and reasonable", must "strike [ ] a fair balance" between the legislative purpose and individual rights, must be "justified", and must not be "oppressive" or "in contravention of common right".[62] Put all these words in a blender and out pours the correct standard: a statute must not be "so unreasonably burdensome that it becomes oppressive". Reasonable burdensomeness is okay. And I think the Court really means *unduly* oppressive, as distinguished from the oppressiveness of the government in general. The analysis would be laughable if the consequences were not so serious.[63] One cannot distill a single test from common elements of the rational basis and "fair balance" standards; one must choose between them. Instead, the Court breeds a strict, deferential standard with a loose, non-deferential one, and the resulting misbegot is ... loose and non-deferential.

While substantive due process has been the subject of many cases and much study since *Lochner*, the Court cannot find a Texas case, a case from an American jurisdiction, or a scholarly treatise or article to cite in support of its "oppressive" test.[64] The obvious reason is that it is no standard at all. Oppression is very much in the eye of the beholder. In this case, the Court takes into account the amount, cost, and apparent usefulness of the required training, a threader's lost income-earning opportunity, and the danger to public health and safety. I suppose the Court would agree that it should also take into account the number and severity of incidents of harm due to poor training and the benefit to threaders and the public. This process is what is generally referred to as legislating. It should be done. It should not be done by judges.

The Court's answer is that a rational basis standard is no better because if, as in the present case, the State could rationally require some training, the State could require an unlimited amount of training.[65] The argument is nonsense. That some training is rational does not mean that more is. There are no bright lines for setting a permissible training requirement under either test. The difference is that the rational basis standard invokes objective reason as its measure, while the "oppressive" test is nothing more than an appeal to a judge's predilections.

---

**62.** *Ante* at 87.

**63.** As we recently observed in a different setting, "the test for determining whether something is oppressive will necessarily vary from one context to the next, and thus the term has multiple meanings, depending on the circumstances." *Ritchie v. Rupe*, 443 S.W.3d 856, 867 (Tex.2014).

**64.** Three *Lochner*-era cases reference the impropriety of "arbitrary or oppressive" legislation, but not one uses the phrase as a formal test for substantive due process. *Adams v. Tanner*, 244 U.S. 590, 595–596, 37 S.Ct. 662, 61 L.Ed. 1336 (1917); *McLean v. Arkansas*, 211 U.S. 539, 547, 29 S.Ct. 206, 53 L.Ed. 315

(1909); *accord Hous. & Tex. Cent. Ry. Co v. City of Dall.*, 84 S.W. 648, 653 (Tex.1905) (noting that without justification, an "invasion of [ ] rights under the guise of [the State's police] power" would be properly characterized as "unreasonable, arbitrary, [or] oppressive"). The Court instead focused its *Lochner*-ian sights on the existence of a "just relation to the protection of the public within the scope of legislative power," and finding none, concluded that the legislature had overstepped its constitutional bounds. *Adams*, 244 U.S. at 596, 37 S.Ct. 662; *McLean*, 211 U.S. at 547, 29 S.Ct. 206; *cf. Hous. & Tex. Cent. Ry. Co*, 84 S.W. at 653.

**65.** *Ante* at 88.

The subjectiveness of the Court's new test is clear from its response to the fact that Texas is not the only state that has concluded threading should be regulated as part of the practice of cosmetology or esthetics. Eight other states explicitly regulate threading in this way: Delaware, Hawaii, Illinois, Iowa, Louisiana, Mississippi, Oklahoma, and West Virginia.[66] Two others define cosmetology to encompass any type of superfluous hair removal.[67] These states each require aspiring cosmetologists and estheticians to complete hours of coursework in numbers similar to those required in Texas.[68] This is strong evidence that Texas' regulatory framework has a rational basis; it is common to many states. The Court's response is "so what". The reasoned judgment of multiple state legislatures is irrelevant to the Court because whether the training requirements are excessive and oppressive depends on what Texas judges think. The Court's "oppressive" test is pure judicial policy.

As long as judicial policy is made in the name of substantive due process, the Court argues, it is judging, not legislating.

**66.** 24 DEL. ADMIN. CODE § 5100–14.7 (listing "threading" as an example of "hair removal" and providing that "[h]air removal shall be performed by a licensed cosmetologist or licensed aesthetician only"); HAW. REV. STAT. § 439–1 (" 'Esthetician' means any person who, with hands or nonmedically prescribed mechanical or electrical apparatus or devices . . . engages for compensation in . . . [r]emoving superfluous hair about the body of any person."); 225 ILL. COMP. STAT. 410 / 3–1 (cosmetology includes "removing superfluous hair from the body of any person by the use of depilatories, waxing, threading, or tweezers"); *id.* / 3A–1(a)(3) (esthetics includes "removing superfluous hair from the body of any person"); IOWA CODE § 157.1(5)(c) (" 'Cosmetology' means . . . [r]emoving superfluous hair from the face or body of a person with the use of depilatories, wax, sugars, threading, or tweezing"); *id.* § 157.1(12)(c) (esthetics includes "[r]emoving superfluous hair"); LA. REV. STAT. ANN. § 37:563(6) (esthetics includes "hair removal by cosmetic preparations, threading, waxing, or other similar means"); MISS. CODE ANN. § 73–7–2(b)(iv) (cosmetology includes "[a]rching eyebrows, to include tweezing, waxing, threading or any other methods of epilation"); *id.* § 73–7–2(d)(ii) (esthetics includes the same); OKLA. ADMIN. CODE § 175:10–9–55(a) ("Only licensed Facialist/Estheticians, Cosmetologists or Barbers may perform threading."); W. VA. CODE § 30–27–3(a)(4) (esthetics includes "[t]he waxing, tweezing and threading of hair on another person's body").

**67.** 63 PA. CONS. STAT. § 507 (cosmetology includes "the removal of superfluous hair"); S.D. CODIFIED LAWS § 36–15–2(4) (the practice of cosmetology includes "removal of superfluous hair by nonpermanent means").

**68.** Like Texas, Illinois and Louisiana require applicants for a cosmetology license to complete 1,500 hours of coursework. 225 ILL. COMP. STAT. 410 / 3–2(1)(c); LA. ADMIN. CODE tit. 46 § 301. And, like Texas, they require applicants for a more limited esthetician's license to complete 750 hours of coursework. 225 ILL. COMP. STAT. 410 / 3A–2(c); LA. ADMIN. CODE tit. 46 § 303. Delaware, Mississippi, and Oklahoma require applicants for a cosmetology license to complete 1,500 hours of coursework. DEL. CODE ANN. tit. 24 § 5107; MISS. CODE ANN. § 73–7–13; OKLA. ADMIN. CODE § 175:10–3–34. These states require applicants for an esthetics license to complete 600 hours of coursework. DEL. CODE ANN. tit. 24 § 5135; MISS. CODE ANN. § 73–7–18; OKLA. ADMIN. CODE § 175:10–3–39. Hawaii and West Virginia require 1,800 hours of coursework for cosmetology and 600 hours for esthetics. HAW. REV. STAT. § 439–12(b), (d); W. VA. CODE R. §§ 3–1–5.1, 3–1–9.1. Iowa and South Dakota require 2,100 hours of coursework for a cosmetology license and 600 hours for an esthetics license. IOWA CODE § 157.10(1); IOWA ADMIN. CODE r. 645.61.14, S.D. ADMIN. R. 20:42:06:09, 20:42:06:09.02. Pennsylvania requires 1,250 hours of coursework for a cosmetology license and 300 hours for an esthetics license. 63 PA. CONS. STAT. §§ 510(a)(3), 511(b)(1). Some states allow aspiring cosmetologists and estheticians to complete an apprenticeship in lieu of or in combination with classroom work. *See, e.g.,* DEL. CODE ANN. tit. 24 § 5107(a)(3)(b)–(c); HAW. REV. STAT. § 439–12(b), (d); 63 PA. CONS. STAT. §§ 510(a), 510.3, 516; S.D. ADMIN. R. 20:42:07:06–07.

But the Court cannot, simply by invoking a constitutional doctrine, mask the true policy-making character of its ruling. One could take the Court's analysis of the costs and benefits of regulating eyebrow threaders and offer it in evidence at a legislative hearing, only there would also be evidence relating to the needs of the public and the cosmetology industry generally, evidence that the Court does not have and cannot weigh. The substantive due process doctrine empowers the Judiciary to check regulation that is a clearly arbitrary deprivation of economic liberty in violation of due course of law. The rational basis test for making this determination is not a disclaimer of judicial responsibility but a legal and practical recognition that "[t]he wisdom or expediency of the law is the Legislature's prerogative, not ours."[69]

### III

That the Court has gone where no one has gone before is proudly declared by Justice Willett's concurring opinion. Gone are the constraints of the rational basis standard, a standard dismissed as a "rubber stamp" and a "judicial shrug". Justice Willett's rhetorical torrent against economic regulation carries along its ultimate demand: Texas judges must conduct an investigation "asking" what the "government [is] actually up to", weighing "what policymakers *really* had in mind at the time," "scrutin[izing]" "actual assertions with actual evidence."[70] All this *Sturm und Drang* announces a new day. And to be sure, all this "asking" and "scrutiniz[ing]" is not judicial activism. It is merely judicial un-passivism.

I agree with Justice Willett about one thing: "[t]his case concerns far more than whether Ashish Patel can pluck unwanted hair with a strand of thread."[71] It is about a dramatic arrogation of power by the Court. Economic regulation is invalid whenever a majority of this Court feels it is oppressive.

Hair stylists could make the same argument the Threaders do: why should they be required to have instruction and examination in facial treatment, manicuring, massage, and the removal of unwanted hair? Whether to create various licensing classification schemes, and which practices to include within each, have been questions central to cosmetology regulation since 1971. It is the kind of line-drawing that the Legislature and the Department, not courts, are equipped to do. More importantly, the Constitution gives this line-drawing power—this policymaking—to the Legislature and the Executive, not to the Judiciary.

The same issue applies to other occupational regulation. There is an ongoing debate regarding whether law school should have a third year, whether students should be allowed to sit for the bar exam earlier, and whether a lawyer should be allowed to obtain a special, limited-practice license with less instruction. Further, students intent on pursuing a particular area of practice—tax law, for example—question why they should be required to take other courses, including those, like civil procedure, thought to be part of a fundamental first-year curriculum. Medical education is similarly questioned. Why should students intent on confining their practice to particular areas or specialities be required to take unrelated courses? The answer is often that subjects unrelated to a particu-

---

69. *Tex. Workers' Comp. Comm'n v. Garcia,* 893 S.W.2d 504, 520 (Tex.1995) (quoting *Smith v. Davis,* 426 S.W.2d 827, 831 (Tex. 1968)).

70. *Ante* at 112 (emphasis in original).

71. *Ante* at 93.

lar field of practice are nevertheless part of the background information important to the discipline. But even when this rationale is lacking, substantive due process is not violated merely because medical education is not tailor-made for each student. Our inquiry is whether the cosmetology licensing scheme is unconstitutional, not whether we think the lines chosen by the Legislature are well-placed as a matter of policy.

And while *Lochner* justified judicial invalidation of economic regulation in the name of substantive due process to protect a liberty interest grounded in an implied constitutional right to contract, liberty is not solely, not even primarily, an economic concept. Other constitutional rights have been found by implication in our constitutions.[72] Scholars argue that the right to privacy implied by the United States Supreme Court in the federal Constitution provides the basis for protecting personal liberty from social regulation.[73] The Court's power grab will not be limited to the "regulation of economic interests",[74] but will be wielded in future cases against all manner of legislation, maybe not by members of this Court, but by others who

see today as precedent. The *Lochner* monster, rediscovered and unleashed by the Court, will stray far from the Judiciary's proper sphere of authority—and to places far afield of the economic realm to which the Court is sympathetic. Judicial usurpation of authority over the State's policies may provide protection for the economic liberties on which the concurrence waxes eloquent, but it also gives rise to such decisions as *Roe v. Wade*.[75] JUSTICE WILLETT applauds the Court for "narrow[ing] the difference" between fundamental rights—a varsity team (to use his metaphor) that includes not only rights protected by the First Amendment, but also privacy-based liberty interests discovered solely in the due process clause itself—and the economic interests asserted here. JUSTICE WILLETT's concurring opinion fills the Court's sails and sets a *Lochner*-ian course.

## IV

I would apply the test established by our precedent: regulation is unconstitutional only if it lacks a rational relationship to a legitimate government interest.[76] The

**72.** For a recent discussion of the development of substantive due process and the fundamental rights it has been held to protect, *see* Joshua D. Hawley, *The Intellectual Origins of (Modern) Substantive Due Process*, 93 TEX. L. REV. 275, 280, 328–334 (2014) (discussing the demise of the *Lochner*-era police powers jurisprudence and its replacement with modern fundamental-rights jurisprudence, and arguing that this shift occurred because the Supreme Court came to find "personal moral choice" and "self-development"—such as the "right of privacy" the Court protected in *Roe v. Wade*, 410 U.S. 113, 153, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)—to be more "compelling" types of liberty than the private property protections that were the aim of the *Lochner* era).

**73.** *See, e.g.,* David E. Bernstein, Lochner *Era Revisionism, Revised:* Lochner *and the Ori-*

*gins of Fundamental Rights Constitutionalism,* 92 GEO. L.J. 1, 60 (2003) (arguing that "*Lochnerian* fundamental rights analysis returned in mutated form" in modern fundamental-rights decisions striking down laws as violative of "unenumerated due process rights"); David N. Mayer, *Substantive Due Process Rediscovered: The Rise and Fall of Liberty of Contract,* 60 MERCER L. REV. 563, 640–642 (2008) (discussing the liberty of contract cases that were used as groundwork for the Supreme Court's later protections of a "right to privacy").

**74.** *Ante* at 86.

**75.** 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

**76.** *See City of San Antonio v. TPLP Office Park Props.,* 218 S.W.3d 60, 64–66 (Tex.2007) (per

parties' evidence, the State's purpose in its regulatory scheme, and the effects of that regulation are all to be considered.[77] But our precedent makes clear that judges are not to ·weigh the evidence to determine whether the State's purpose and approach are reasonable or whether they will be successful; the role of judges is instead to decide whether, in light of the evidence presented, the enacting body "could have rationally ... decided that the measure might achieve the objective."[78] Unlike the Court's "oppressive" test, this inquiry is objective, looking not to whether the governmental body subjectively believed the purpose would be accomplished, but to whether a reasonable governmental body could have so believed in light of the evidence. It is not for the Judiciary to correct a mere error in judgment by the policymaking branches.

The Threaders do not dispute that, in general, Texas' long-standing regulation of cosmetology is rationally related to the State's legitimate interest in protecting public health and safety.[79] The Threaders argue only that the regulation as applied to eyebrow threading—specifically, the training and testing required for licensure—is so excessive as to deprive them of their liberty in choosing an occupation. The State does not dispute that as many as 320 of the required 750 hours are not useful to eyebrow threaders,[80] but it argues that the requirements are not clearly arbitrary, as they must be to violate substantive due process under the correct test.

The health risks of commercial hair removal cannot be minimized. Dr. Patel, the expert offered by the Threaders in the trial court, testified that avulsive hair removal opens a portal through which bacteria can enter the body through the skin. For this reason, she explained, she trains threaders in her medical spa to use an antiseptic on the eyebrow area before beginning the threading process and to apply

curiam); *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 938–939 (Tex.1998); *Barshop v. Medina Cnty. Underground Water Conservation Dist.,* 925 S.W.2d 618, 631–633 (Tex.1996); *State v. Richards,* 157 Tex. 166, 301 S.W.2d 597, 602–603 (1957).

**77.** In *Barshop,* we considered the entire record in determining that (1) the State has a legitimate purpose in regulating the use of water in the Edwards Aquifer, which is a scarce resource; and (2) that the challenged provisions were rationally related to the State's "purposes in managing and regulating this vital resource." 925 S.W.2d at 625, 633. We explained that, because *Barshop* was a facial challenge, "we should presume" the existence of any facts under which the Act would be constitutional "without making a separate investigation ... or attempting to decide whether the Legislature has reached a correct conclusion with respect to the facts." *Id.* at 625. This presumption exists because a facial challenge requires the challenger to show that the challenged regulation is unconstitutional under "any possible state of facts."

*Id.* Although this burden is high, a plaintiff challenging a law on its face nevertheless has the opportunity to put on evidence that the challenged law is unconstitutional in all possible applications.

**78.** *TPLP Office Park Props.,* 218 S.W.3d at 64–65 (citing *Nollan v. Cal. Coastal Comm'n,* 483 U.S. 825, 834 n.3, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987)).

**79.** We note that Texas has regulated a related practice, barbering, since 1907. Act of Apr. 18, 1907, 30th Leg., R.S., ch. 141, 1907 Tex. Gen. Laws 273. We have twice held that regulation of barbering is important to public health and safety. *Tex. State Bd. of Barber Exam'rs v. Beaumont Barber Coll.,* 454 S.W.2d 729, 731 (Tex.1970); *Gerard v. Smith,* 52 S.W.2d 347, 350 (Tex.Civ.App.–El Paso 1932, writ ref'd).

**80.** At oral argument, the State agreed that "430 hours of the 750–hour curriculum are addressed to subject matter relevant to eyebrow threading" and explained that it "has

an astringent to the skin after the process is complete. The astringent helps to close up the hair follicle to make it difficult for bacteria to enter. Patel testified that she also trains threaders on methods of keeping their work area clean, keeping the thread sanitary, and on the importance of always using a new piece of thread (and any other single-use items) on each client. She testified that threaders may need to be able to identify skin infections or other conditions that would make threading unsafe for a particular client. Patel recognized that threading may lead to the spread of various contagious bacterial and viral infections and that a threader's failure to utilize appropriate sanitation can further expose threading clients to infection and disease.

Applicants for a general cosmetology license or an esthetician speciality license are instructed in general sanitation and safety practices, and each of the specific procedures they learn incorporates the hygiene and safety practices pertinent to that procedure. If they attend a school that teaches threading, they learn to apply these concepts specifically to that practice, and if instead they attend a school that does not instruct in threading, they nevertheless learn these safety implications and requirements as applied to other avulsive forms of hair removal. Moreover, although there is evidence that only a few cosmetology schools currently teach threading, the Legislature could reasonably have concluded that more schools will teach it as demand for the procedure grows. Although there is evidence that no more than an hour of sanitation training is necessary for threading, there is other evidence from which the Legislature could reasonably conclude that the required instruction and testing would further its goal of protecting public health and safety through the regulation of cosmetology.

\* \* \* \* \* \*

Texas' cosmetology regulation as applied to threading is, to quote Justice Holmes, "injudicious", though I would not go so far as to say "tyrannical", and certainly not clearly arbitrary. I would hold that the regulation is rationally related to the State's legitimate interest in protecting the health and safety of the public.

The Court pooh-poohs the *Lochnerian* "monster". A word of caution: those who cannot remember the past are condemned to repeat it.[81]

I would affirm the judgment of the court of appeals. Accordingly, I respectfully dissent.

Justice Guzman, dissenting.

This Court has long maintained that it does not legislate from the bench. Today, it does just that. Worse yet, it does so in the context of revivifying substantive due process, one of the most volatile doctrines in constitutional history.[1] Like the accompanying dissent, I maintain that while the regulation seems excessive as a matter of policy, it is nevertheless not unconstitutional as a matter of law. Further, I harbor doubts that the test propounded by the Court to evaluate issues of this nature will provide any guidance in future cases. Thus, I write separately to underscore my conception of the judicial role. Because I unequivocally believe that policymaking is

---

not argued that the remaining 320 hours of instruction are [ ] necessary."

81. I George Santayana, The Life of Reason: Reason in Common Sense 284 (Charles Scribner's Sons, 2d ed. 1929).

1. *See, e.g.,* Op. at 138 (Hecht, C.J., dissenting) ("Judicial usurpation of authority over the State's policies may provide protection for the economic liberties on which the concurrence waxes eloquent, but it also gives rise to such decisions as *Roe v. Wade*.").

a prerogative properly and constitutionally vested in the Legislature, I respectfully dissent.

The Court's opinion ably sets out the facts, and describes the somewhat byzantine web of regulations that apply to cosmetologists, a class that includes eyebrow threaders like the petitioners ("Threaders"). To legally practice cosmetology in Texas, a license is required. TEX. OCC. CODE §§ 1602.251(a), .257. A general operator license requires training a minimum of 1,500 hours, whereas an esthetician specialty license requires a minimum of 750 hours.[2] Id. §§ 1602.254, .257; see also 16 TEX. ADMIN. CODE § 83.20(a), (b). Individuals engaged in the business of eyebrow threading are required to obtain at least an esthetician specialty license. See TEX. OCC. CODE §§ 1602.002(a)(9), .257(a); see also 16 TEX. ADMIN. CODE § 83.10(11).

The record shows that of the 750 hours required for an esthetician license, 40 hours are devoted to sanitation. Sanitation and hygiene issues are also intermittently addressed elsewhere during training, albeit in the context of instruction on other subjects. The fact that health and safety instruction comprises at least part of the required instruction is no small matter, given that the Threaders' own expert observed that improper threading procedures can contribute to the spread of highly contagious bacterial and viral infections, including flat warts, skin-colored lesions known as mulluscum contagiosum, pink eye, ringworm, impetigo, staphylococcus aureus, and other similarly unpleasant maladies.

The central dispute concerns the training requirements, specifically the amount of time they necessarily require. The Threaders contend that as many as 710 of the 750 training hours for an esthetician

license are unnecessary, given that they concern procedures unrelated to threading. The State disputes that math, but even its estimate concedes that as many as 320 of the curriculum hours are unrelated to health and safety issues engendered by eyebrow threading. In the Threaders' view, the licensure courses require too much time and feature too much irrelevant material, and by mandating them for eyebrow threading, the State of Texas violates the guarantee of the Texas Constitution that "[n]o citizen of this State shall be deprived of ... liberty ... except by the due course of the law of the land." TEX. CONST. art. I, § 19.

The Court propounds a novel test in resolving this core dispute. The second prong of this test holds that an as-applied challenge to an economic regulation statute under section 19's substantive-due-course-of-law requirement will fail to overcome the presumption that the statute is constitutional, unless the challenging party demonstrates that the statute's "actual, real-world effect as applied to the challenging party could not arguably be rationally related to, or is so burdensome as to be oppressive in light of, the governmental interest." Op. at 87. Relying on this element of the test, the Court estimates that approximately 42 percent of the minimum required training hours are "arguably" not relevant to the actual work performed by eyebrow threaders. Id. at 89–90. While this is not "determinative" of the constitutional question, the Court says that "the percentage must also be considered along with other factors, such as the quantitative aspect of the hours represented by that percentage and the costs associated with them." Id.

---

**2.** For the operator license, up to 500 hours of public vocational school may be credited toward the 1,500 hours. TEX. OCC. CODE § 1602.254(b)(3)(B).

I have significant doubts that this standard is workable in practice.[3] As the Court itself concedes, "[t]he dividing line is not bright between the number of required but irrelevant hours that would yield a harsh, but constitutionally acceptable, requirement and the number that would not." *Id.* at 90. But this concession seems to prove the folly of the enterprise in the first place. Lacking a standard that can be implemented consistently, how can a court be expected to make determinations of this nature in future cases (which, I hasten to add, will surely follow in the wake of this opinion)? I recognize that in many areas of the law, bright-line tests are simply not appropriate nor attainable.[4] But here the Court, with only the information gleaned from the limited record before us, is *marching into a fraught area*—substantive due process—armed only with an imprecise standard.

The Court agrees with the Threaders' characterization of the regulation as arbitrary, but alas, that same adjective could be applied to the line-drawing necessarily involved here and in future cases. Is 750 hours too much to require for threading? From the Threaders' perspective, perhaps. But from the vantage of someone injured by these procedures, perhaps not. Some threading techniques reportedly rely on placing one end of the string in the threader's mouth, which would seem to invite a host of bacterial infections (superficial folliculitis, for instance). Different skin sensitivities could be placed at different risks by these procedures. The crucial point is that these considerations, and their relation to training programs, are quintessential legislative inquiries. Thus, I agree

with the Court when it admits: "Differentiating between types of cosmetology practices is the prerogative of the Legislature and regulatory agencies to which the Legislature properly delegates authority," and likewise with the statement that "it is not for courts to second-guess their decisions as to the necessity for and the extent of training that should be required for different types of commercial service providers." *Id.* at 89. In my view, the plain truth of these statements suggests a contrary approach.

This case involves first principles, and timeless precepts bear repeating. By design, our system of government rests on checks and balances and separation of powers. The genius of the Founders lay in their prescience. Frankly acknowledging human frailty, they designed a system of government that apportions power among the three branches, allowing a proper balance of interests and ambitions. In order for this equipoise to persist, however, denizens of government's separate branches must properly conceive of their relative roles. For the judiciary, as with the other branches, this means recognizing the limits on its own authority. This is no easy matter, given that human nature tilts to the arrogation of power; as Justice Antonin Scalia once waggishly noted, this enduring trait is why Lord Acton never uttered " '[p]ower tends to purify.' " *Planned Parenthood of Se. Pa. v. Casey,* 505 U.S. 833, 981, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (Scalia, J., concurring in part and dissenting in part).

Were I a member of the Legislature, there is little question that I would look to

---

**3.** Whether a test is "workable" is something this Court has considered before. *See, e.g., Trevino v. Ortega,* 969 S.W.2d 950, 956 (Tex. 1998) ("The *National Tank* test is workable in the spoliation context; yet, it must be modified somewhat.").

**4.** *See, e.g., Ohio v. Robinette,* 519 U.S. 33, 34, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (noting that "the Court has consistently eschewed bright-line rules" in the Fourth Amendment context, "instead emphasizing the fact-specific nature of the reasonableness inquiry").

reduce the burden placed on eyebrow threaders, as I agree with the accompanying dissent's sense that "on this record, threading regulation is obviously too much."[5] Op. at 131 (Hecht, C.J., dissenting). But I am not a legislator; I am a judge. Accordingly, I am duty-bound to apply the law regardless of my policy preferences. The difficult line-drawing problems involved in this case are best resolved by the Legislature, which by dint of its experience and competence is better equipped to decide these questions than this tribunal. The question is not whether these regulations are prudent, but whether they violate the Texas Constitution's due-course-of-law provision. That is a different matter entirely. Because I disagree with the Court on this fundamental query, I respectfully dissent.

5. Assuming, of course, that the record before this Court is complete. As the accompanying dissent wisely observes, "nothing of what prompted the regulation is before us. We have conducted no investigations and held no hearings. As in any case, we know what the parties have told us, and nothing more." Op. at 131 (Hecht, C.J., dissenting).